**ORAL ARGUMENT NOT YET SCHEDULED**

**NOS. 22-11617 AND 22-12535**

**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

HUNT REFINING COMPANY,
*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondent.*

*On Petition for Review of Final Agency Action
of the U.S. Environmental Protection Agency*

**PETITIONER'S OPENING BRIEF**

Jonathan G. Hardin
Alexandra M. Bromer
Michael R. Huston
Karl J. Worsham
PERKINS COIE LLP
700 13th Street, N.W., Suite 800
Washington, D.C. 20005
(202) 654-6200
JHardin@perkinscoie.com

*Attorneys for Hunt Refining
Company*

*Hunt Refining Company v. U.S. Environmental Protection Agency,*
**Appeal Nos. 22-11617 & 22-12535**

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (CIP)

Pursuant to Circuit Rules 26-1.1 and 26.1-2, the following is a list of the trial judges, attorneys, person, associations of person, firms, partnerships, or corporations known to the undersigned that have an interest in the outcome of this particular case:

1. **Bromer, Alexandra Magill**, Perkins Coie LLP, counsel for Petitioner

2. **Hardin, Jonathan G.**, Perkins Coie LLP, counsel for Petitioner.

3. **Harrison, Bryan J.**, Attorney, United States Department of Justice, counsel for Respondent United States Environmental Protection Agency.

4. **Hunt Consolidated, Inc.**, parent company of Hunt Refining Company (not publicly traded, and no publicly held company has a 10 percent or greater ownership interest in it).

5. **Hunt Refining Company**, Petitioner, incorporated under the laws of Delaware and an indirect wholly owned subsidiary of Hunt Consolidated, Inc.

6. **Huston, Michael R.**, Perkins Coie LLP, counsel for Petitioner.

***Hunt Refining Company v. U.S. Environmental Protection Agency,***
**Appeal Nos. 22-11617 & 22-12535**

7. **Jacobi, Patrick R.**, Attorney, United States Department of Justice, counsel for Respondent United States Environmental Protection Agency.

8. **Miller, Gregory F.**, Perkins Coie LLP, counsel for Petitioner.

9. **United States Environmental Protection** Agency, Respondent.

10. **Worsham, Karl J.**, Perkins Coie LLP, counsel for Petitioner.

Petitioner will file a revised certificate of interested persons should it become aware of a change in corporate ownership interests that would affect the disclosures required by Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-4.

Dated: February 9, 2023

> *s/ Jonathan G. Hardin*
> Jonathan G. Hardin
> PERKINS COIE LLP

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner requests oral argument. This case presents novel and complex issues regarding EPA's authority to evaluate small-refinery hardship petitions under the Clean Air Act ("CAA"). In particular, Petitioner contends that EPA's final agency action was contrary to law because EPA retroactively applied a new interpretation of the CAA's hardship standard to past compliance years; violated the textual requirements of the CAA; and relied on a new economic theory that is empirically false.

On December 6, 2022, this Court directed the Clerk's Office "to expedite the petition for merits disposition purposes and place this petition on the next available oral argument calendar once briefing is complete." No. 22-11617, Doc. 37-1.

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (CIP) ............................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................. i

TABLE OF CONTENTS ................................................................... ii

TABLE OF AUTHORITIES ............................................................. v

GLOSSARY ................................................................................... xii

STATEMENT OF JURISDICTION ................................................... 1

STATEMENT OF ISSUES ............................................................... 1

STATEMENT OF THE CASE ........................................................... 2

I.  Introduction .......................................................................... 2

II.  Background ............................................................................ 6

    A.  The RFS Program ........................................................... 6

        1.  Renewable Volume Obligation ..................................... 6

        2.  Renewable Identification Numbers ............................. 8

        3.  Small refinery hardship relief ................................... 9

    B.  EPA's mismanagement of the RFS program and its disastrous effects ................................................... 10

    C.  Hunt's Tuscaloosa refinery and its history of hardship relief .............................................................. 14

    D.  April and June Denials ................................................ 16

        1.  *HollyFrontier* .......................................................... 16

# TABLE OF CONTENTS
(continued)

**Page**

2. EPA reverses Hunt's 2018 hardship grant ................. 17

3. EPA belatedly denies Hunt's 2019–2021 hardship petitions ................................................................ 19

4. EPA's actions cause skyrocketing RIN costs .............. 20

E. November 2022 GAO findings on EPA's April and June hardship denials ........................................................ 21

F. EPA's December 2022 RIN price analysis ........................... 22

G. Hunt's petitions for review and this Court's stay pending review ........................................................................ 23

SUMMARY OF ARGUMENT ................................................................. 24

STANDARD OF REVIEW ..................................................................... 27

ARGUMENT ........................................................................................ 28

I. EPA violated Hunt's constitutional rights, the APA, and the Clean Air Act when it belatedly and retroactively applied an entirely new standard for adjudicating hardship petitions ................................................ 28

A. EPA did not provide the fair notice required by law ........................................................................................ 28

B. EPA did not comply with statutory deadlines and did not ameliorate the harm that it caused ....................... 33

II. EPA adopted multiple interpretations of the Clean Air Act that are contrary to law ......................................................... 35

## TABLE OF CONTENTS
(continued)

**Page**

A.    EPA effectively eliminated statutory hardship exemptions. ...................................................................... 36

B.    EPA unlawfully redefined "disproportionate economic hardship." ........................................................ 37

C.    EPA failed to meaningfully consult with the Department of Energy, as the statute requires................... 40

D.    EPA refused to consider each refinery petition individually, as the statute requires. ................................. 43

E.    EPA's interpretations of the Clean Air Act are not entitled to any deference..................................................... 45

III.    EPA's Denials are arbitrary and capricious, as GAO's review demonstrates................................................... 49

CONCLUSION.................................................................... 57

CERTIFICATE OF COMPLIANCE ..................................... 58

CERTIFICATE OF SERVICE ............................................. 59

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AARP v. EEOC,*
489 F.3d 558 (3d Cir. 2007)................................................................36

*Americans for Clean Energy v. EPA,*
864 F.3d 691 (D.C. Cir. 2017)................................................25, 33, 34

*Ariz. Grocery Co. v. Atchison, T. & S. F. Ry. Co.,*
284 U.S. 370 (1932) .................................................................30, 31

*Arkema, Inc. v. EPA,*
618 F.3d 1 (D.C. Cir. 2010)................................................................29

*Baldwin v. United States,*
140 S. Ct. 690 (2020) ................................................................46

*Buffington v. McDonough,*
143 S. Ct. 14 (2022) (Gorsuch, J., dissenting)...........................28, 46

*Cal. Wilderness Coal. v. U.S. Dep't of Energy,*
631 F.3d 1072 (9th Cir. 2011)...............................................26, 40, 42

*Calumet Shreveport Refin., LLC v. EPA,*
No. 22-60266 (5th Cir. Jan. 27, 2023) ............................................24

*Chevron, U.S.A., Inc. v. Nat. Res. Defense Council,*
467 U.S. 837 (1984) .................................................. 27, 28, 46, 47, 48

*Christopher v. SmithKline Beecham Corp.,*
567 U.S. 142 (2012) ................................................................29

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Citizens Against Pellissippi Parkway Extension, Inc. v. Mineta,*
375 F.3d 412 (6th Cir. 2004) ..........................................................32

*De Niz Robles v. Lynch,*
803 F.3d 1165 (10th Cir. 2015).......................................................30

*DHS v. Regents of the Univ. of Cal.,*
140 S. Ct. 1891 (2020) ....................................................................30

*Ergon-West Virginia, Inc. v. EPA,*
896 F.3d 600 (4th Cir. 2018) .....................................................50, 55

*\*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ...........................................................49, 50, 56

*\*FCC v. Fox Television Stations, Inc.,*
567 U.S. 239 (2012) .................................................................24, 28

*Gen. Elec. Co. v. EPA,*
53 F.3d 1324 (D.C. Cir. 1995), *as corrected* (June 19, 1995)..............29

*\*HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n,*
141 S. Ct. 2172 (2021) ............... 2, 4, 6, 9, 16, 17, 25, 26, 37, 39, 48, 49

*Kern Oil & Refin. Co. v. EPA,*
No. 21-71246, 2022 WL 3369528 (9th Cir. Aug. 16, 2022)...........13, 54

*Kisor v. Wilkie,*
139 S. Ct. 2400 (2019) ..............................................................47, 48

*\*Landgraf v. USI Film Prods.,*
511 U.S. 244 (1994)...................................................24, 25, 29, 30

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Martin v. Soc. Sec. Admin., Comm'r,*
903 F.3d 1154 (11th Cir. 2018).......................................................48

*Michigan v. EPA,*
576 U.S. 743 (2015) .......................................................................49

*Morton v. Ruiz,*
415 U.S. 199 (1974) .......................................................................36

*\*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.
Auto. Ins. Co.,*
463 U.S. 29 (1983) ...........................................................49, 50, 51

*Nat. Gas Pipeline Co. of Am. v. FERC,*
590 F.2d 664 (7th Cir. 1979) .........................................................30

*Nat'l Petrochemical & Refiners Ass'n v. EPA,*
630 F.3d 145 (D.C. Cir. 2010)....................................................24, 29

*Palm Beach County v. FAA,*
53 F.4th 1318 (11th Cir. 2022).......................................................49

*Prieto v. United States,*
655 F. Supp. 1187 (D.D.C. 1987).....................................................32

*Renewable Fuels Ass'n v. EPA,*
854 F. App'x 983 (10th Cir. July 29, 2021) .....................................39

*Rosebud Sioux Tribe v. Gover,*
104 F. Supp. 2d 1194 (D.S.D. 2000), *rev'd on other
grounds sub nom. Rosebud Sioux Tribe v. McDivitt,* 286
F.3d 1031 (8th Cir. 2002) ...............................................................32

*Satellite Broad. Co. v. FCC,*
824 F.2d 1 (D.C. Cir. 1987), *as amended* (July 7, 1987) ...................29

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

**\*Sinclair Wyoming Refin. Co. v. EPA,**
  887 F.3d 986 (10th Cir. 2017)................................ 9, 27, 28, 38, 39, 47

*Skidmore v. Swift & Co.,*
  323 U.S. 134 (1944) ...........................................................27, 28, 47

*Treasure State Res. Indus. Ass'n v. EPA,*
  805 F.3d 300 (D.C. Cir. 2015)..................................................25

*United States v. Mead Corp.,*
  533 U.S. 218 (2001) ..........................................................46, 47

*United States v. Shumway,*
  199 F.3d 1093 (9th Cir. 1999).................................................36

*Util. Air Regul. Grp. v. EPA,*
  573 U.S. 302 (2014) ..............................................................35

*Wages & White Lion Invs., L.L.C. v. FDA,*
  16 F.4th 1130 (5th Cir. 2021).................................................29

STATUTES

5 U.S.C. § 705..........................................................................23

5 U.S.C. § 706(2) ...................................................................2, 27

42 U.S.C. § 7545(o)....................................................................6

42 U.S.C. § 7545(o)(1)(K) ...........................................................9

42 U.S.C. § 7545(o)(2) .........................................................6, 7, 31

42 U.S.C. § 7545(o)(3) ............................................................6, 7

42 U.S.C. § 7545(o)(5) ........................................................8, 9, 12

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

42 U.S.C. § 7545(o)(9)(A)(i) ...................................................................43

42 U.S.C. § 7545(o)(9)(A)(ii) .................................................................42

42 U.S.C. § 7545(o)(9)(A)(ii)(I) ...........................................................3, 10

42 U.S.C. § 7545(o)(9)(A)(ii)(II) ...........................................................44

42 U.S.C. § 7545(o)(9)(A)-(B) ...........................................................26, 37

42 U.S.C. § 7545(o)(9)(B) ..............................................................26, 39, 44

42 U.S.C. § 7545(o)(9)(B)(i) .........................................................2, 10, 43

42 U.S.C. § 7545(o)(9)(B)(ii) ................................... 3, 10, 26, 40, 42, 43

42 U.S.C. § 7545(o)(9)(B)(iii) ................................... 3, 10, 19, 30, 33

42 U.S.C. § 7607(b)(1) ...............................................................................1

## REGULATIONS

40 C.F.R. § 80.1406 ............................................................................7, 8

40 C.F.R. § 80.1407 ...............................................................................7

40 C.F.R. § 80.1426 ...............................................................................8

40 C.F.R. § 80.1427 ...............................................................................8

40 C.F.R. § 80.1428 ...............................................................................8

40 C.F.R. § 80.1429 ...............................................................................8

72 Fed. Reg. 23,900 (May 1, 2007) .......................................................8

75 Fed. Reg. 14,670 (Mar. 26, 2010) .....................................................8

## TABLE OF AUTHORITIES
### (continued)

Page(s)

87 Fed. Reg. 5,696 (Feb. 2, 2022)....................................................11, 34

87 Fed. Reg. 24,300 (Apr. 25, 2022)........................................................1

87 Fed. Reg. 34,873 (June 8, 2022).........................................................1

87 Fed. Reg. 35,711 (June 13, 2022)......................................................13

87 Fed. Reg. 39,600 (July 1, 2022)....................................................11, 12

87 Fed. Reg. 54,158 (Sept. 2, 2022)..................................................35, 36

87 Fed. Reg. 80,582 (Dec. 30, 2022).....................................................11

OTHER AUTHORITIES

DOE, Small Refinery Exemption Study: An Investigation
into Disproportionate Economic Hardship,
www.epa.gov/sites/default/files/2016-12/documents/small-
refinery-exempt-study.pdf........................................... 4, 10, 30, 31, 40

EPA, An Analysis of the Price of Renewable Identification
Numbers (RINs) and Small Refineries (Dec. 2022),
https://www.epa.gov/system/files/documents/2022-
12/420r22038.pdf..................................................................13

EPA, Biofuels and the Environment: Third Triennial Report
to Congress (External Review Draft) (Dec. 2022),
https://bit.ly/3JLrgQn..............................................................7

GAO, Renewable Fuel Standard: Actions Needed to Improve
Decision-Making in the Small Refinery Exemption
Program, GAO23104273 (Nov. 2022),
https://www.gao.gov/products/gao-23-104273
..................................9, 11, 12, 13, 17, 21, 22, 23, 27, 33, 40, 46, 51, 52

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Nat'l Wildlife Fed'n, Letter to EPA Administrator Andrew
Wheeler (May 29, 2020), https://bit.ly/3Y87DXb ...............................7

Questions for the Record for Joseph Goffman (May 25, 2022),
https://bit.ly/3x0mcQs .......................................................................46

\*   Authorities upon which we chiefly rely are marked with asterisks

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| April Denials | April 2022 Denial of Petitions for RFS Small Refinery Exemptions |
| CAA | Clean Air Act |
| December 2022 RIN Price Analysis | EPA, An Analysis of the Price of Renewable Identification Numbers (RINs) and Small Refineries (Dec. 2022), https://www.epa.gov/system/files/documents/2022-12/420r22038.pdf |
| DOE | U.S. Department of Energy |
| EPA | U.S. Environmental Protection Agency |
| GAO | U.S. Government Accountability Office |
| GAO Report | U.S. Government Accountability Office, Renewable Fuel Standard: Actions Needed to Improve Decision-Making in the Small Refinery Exemption Program, GAO23104273 (Nov. 2022), https://www.gao.gov/products/gao-23-104273 |
| Hunt | Hunt Refining Company |
| June Denials | June 2022 Denial of Petitions for RFS Small Refinery Exemptions |
| Pet.App. | Petitioner's Appendix |
| RFS | Renewable Fuel Standard |
| RINs | Renewable Identification Numbers |
| 2011 DOE Study | DOE, Small Refinery Exemption Study: An Investigation into Disproportionate Economic Hardship, www.epa.gov/sites/default/files/2016-12/documents/small-refinery-exempt-study.pdf |

## STATEMENT OF JURISDICTION

Respondent U.S. Environmental Protection Agency ("EPA") published notice of the April 2022 Denial of Petitions for RFS Small Refinery Exemptions ("April Denials") on April 25, 2022, 87 Fed. Reg. 24,300. Pet.App. EPA-HQ-OAR-2021-0566-0085. EPA published notice of the June 2022 Denial of Petitions for RFS Small Refinery Exemptions ("June Denials") on June 8, 2022, 87 Fed. Reg. 34,873.[1] Pet.App. EPA-HQ-OAR-2021-0566-0113. Petitioner Hunt Refining Company ("Hunt") timely filed its petitions for review of the April and June Denials on May 12, 2022 (Pet.App. No. 22-11617, Doc. 1), and August 3, 2022 (Pet.App. No. 22-12535, Doc. 1), respectively. 42 U.S.C. § 7607(b)(1).[2] This Court has jurisdiction under § 7607(b)(1), and venue is proper in this circuit where Hunt's Tuscaloosa, Alabama refinery is located. *See* No. 22-11617, Doc. 17; No. 22-12535, Doc. 11.

## STATEMENT OF ISSUES

Were EPA's April and June 2022 decisions, which denied Hunt's petitions for small-refinery hardship exemptions for compliance years

---

[1] The full text of the April Denials is included in Petitioner's Appendix (Pet.App.) at EPA-HQ-OAR-2021-0566-0106 and EPA-HQ-OAR-2021-0566-0108, and the June Denials' text is included at Pet.App. EPA-HQ-OAR-2021-0566-0117 and EPA-HQ-OAR-2021-0566-0118. The Denials are virtually identical.

[2] Unless otherwise noted, all statutory citations are to Title 42, U.S. Code.

2018 through 2021, arbitrary, capricious, or otherwise contrary to law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)?

## STATEMENT OF THE CASE

### I. Introduction

The Renewable Fuel Standard ("RFS") program in the CAA requires that certain amounts of biofuels be blended every year into the gasoline and diesel that powers Americans' motor vehicles. Rather than put that obligation on fuel blenders, EPA chose to obligate refineries—which convert crude oil into transportation fuel—by requiring them to either blend increasing amounts of ethanol and other biofuels themselves or else purchase credits (called "RINs") from others that can blend more than the required amounts. Congress also recgonized, however, that the RFS program "could work special burdens on small refineries," many of which are limited in their ability to blend renewable fuels or unable to blend at all. *HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2175 (2021).

Congress accordingly provided a safety valve that allows any small refinery to petition EPA for an exemption from the annual RFS compliance obligations based on "disproportionate economic hardship." § 7545(o)(9)(B)(i). Congress required EPA to decide small-refinery hardship petitions in "consultation" with the U.S. Department of Energy ("DOE"), and by "consider[ing] the findings" of a 2011 DOE study on

small refineries' economic hardship. § 7545(o)(9)(A)(ii)(I) and (B)(ii). Congress also required EPA to decide every hardship petition within "90 days." § 7545(o)(9)(B)(iii). But EPA has routinely missed that deadline, leading to significant uncertainty for petitioning refineries (and others).

Congress's small-refinery hardship exemption was a lifeline for Hunt, which operates a small refinery in Tuscaloosa, Alabama that provides good jobs for its community. Hunt lacks the blending facilities of larger competitors, and it is further constrained from blending by its shipment of product through the Colonial Pipeline, which does not carry blended fuel. Hunt applied for hardship relief for every year since the petition process opened. And until the decisions at issue here, every one of those applications was granted.

Hunt had good reason to expect that it would continue to receive hardship relief for the compliance years at issue here, 2018–2021, because its burdens from RFS compliance only grew more disproportionate in those years. DOE's 2011 study had predicted that small refineries' hardship would become more acute as annual blending requirements increased and larger companies developed blending facilities to capture RINs that small refineries like Hunt could not. And that is just what has happened: Hunt has no choice but to buy RINs at the price that larger companies are willing to sell them.

After the change in Presidential administrations, however, EPA came to see Congress's small-refinery hardship exemption as an obstacle

to be eliminated. EPA first flipped its legal position in *HollyFrontier* and asked the Supreme Court phase out the exemptions, but the Court rejected EPA's new legal argument. When that strategy did not work, EPA shifted course in 2022 to the decisions at issue here, which attempt to dramatically *and retroactively* change the standard for hardship petitions. Even though the compliance years 2018 to 2021 were already over, and even though EPA was years late in adjudicating Hunt's hardship petitions, EPA suddenly altered its intepretation of multiple CAA provisions, asking new questions that Hunt could not have foreseen in petitions it had submitted years before. EPA also denied *all* pending small-refinery hardship petitions—and announced its plan to never again grant hardship in the future—based on a new economic theory that small refineries supposedly recover the cost of purchasing RINs by passing on their costs to consumers. EPA ignored the 2011 DOE study and stopped meaningfully consulting with DOE, instead directing DOE merely to assume the validity of EPA's new "passthrough" theory.

EPA's decision is unlawful several times over. To start, the agency had no authority to decide Hunt's petitions by retroactively applying an entirely new standard, without any notice to Hunt, after the years were over and Hunt's petitions had been submitted. EPA also failed to comply with its obligation to minimize the harm that it caused by repeatedly missing statutory deadlines.

Second, EPA's new interpretation of the CAA is contrary to the plain text. The statute asks whether a small refinery like Hunt would experience disproportionate economic hardship from RFS compliance. But EPA has replaced that with a different, narrower inquiry altogether: whether a refinery experiences disproportionate compliance costs. EPA has also minimized its statutory obligation to consult with DOE. And instead of considering each petition individually, as the statute requires, EPA decided scores of them at once.

Third, EPA's new process for considering Hunt's petitions was arbitrary and capricious. The U.S. Government Accountability Office ("GAO") recently studied that process and identified a laundry list of Administrative Procedure Act ("APA") violations. GAO's bottomline conclusion was striking: EPA's April and June Denials rely on a "flawed assumption and an incomplete assessment," such that EPA "ma[d]e decisions on small refinery exemptions without quality information and, therefore, risk[ed] inappropriately denying valid exemption petitions" like Hunt's.

In sum, the April and June Denials are not the work of an agency that sought to faithfully implement the statutory text that governs the RFS program. They instead reveal an agency that started with its preferred result—to eliminate the small-refinery hardship exemption that Congress provided—and then used one backflip after another to get there. This was not reasoned agency action; it was a floor exercise in

statutory and evidentiary gymnastics. This Court should vacate the April and June Denials and remand with instructions to remedy the harm that EPA has imposed by so severely missing the statutory deadline to lawfully adjudicate Hunt's hardship petitions.

## II.   Background

### A.   The RFS Program

Congress amended the CAA to establish the RFS in 2005 and 2007. § 7545(o); *see HollyFrontier*, 141 S. Ct. at 2175. The CAA requires that, for each calendar year, a volume of four categories of biofuel must be blended into transportation fuels (gasoline and diesel) sold in the United States. § 7545(o)(2)(B)(i)(I)–(IV). Congress told EPA to promulgate regulations "to ensure that transportation fuel sold or introduced into commerce in the United States ... on an annual average basis, contains at least the applicable volume of renewable fuel" set by the statute. § 7545(o)(2)(A)(i).

#### 1.   Renewable Volume Obligation

To accomplish Congress's annual mandates, EPA sets a "renewable fuel obligation" for each of the four biofuel categories that is a "volume percentage of [the] transportation fuel" that DOE projects will be "sold or introduced into commerce in the United States" in the following year. § 7545(o)(3)(A) and (B)(ii). For example, if the projected amount of transportation fuel for next year were 100 billion gallons, and if the CAA called for 10 billion gallons of renewable fuel, then EPA would set a

volume percentage standard of 10 percent for that year.[3] Congress gave EPA a deadline to set annual volumes, although EPA has failed more than once to meet it. *See infra* Part II.B.

"Obligated parties" are responsible for ensuring that the renewable volume targets are met each year, by multiplying EPA's annual volume percentage by the volume of transportation fuel that the company produces or imports. § 7545(o)(3)(B)(ii)(I); 40 C.F.R. §§ 80.1406, 80.1407. Congress defined "obligated parties" as "refineries, blenders, distributors, and importers." § 7545(o)(2)(A)(iii)(I) and (3)(B)(ii)(I). "Refiners" produce petroleum-based fuels and other products from crude oil, whereas "blenders" mix renewable fuels into petroleum-based fuels to create the gasoline and diesel products sold to consumers at the pump. Despite the statutory definition of obligated parties, EPA chose to impose compliance obligations only on refiners and importers—even if those

---

[3] The environmental benefits of the RFS program are the subject of considerable debate. Most experts interviewed by the GAO "generally agreed that, to date, the RFS has likely had a limited effect, if any, on greenhouse gas emissions." GAO, RFS: Information on Likely Program Effects on Gasoline Prices and Greenhouse Gas Emissions at 1, 19, GAO-19-47 (May 2019). The RFS has increased only ethanol production, which has significant environmental impacts including "soil erosion, pesticide and fertilizer applications, and losses of seminatural habitat." EPA, Biofuels and the Environment: Third Triennial Report to Congress (External Review Draft) at ES-3 (Dec. 2022), https://bit.ly/3JLrgQn. Environmental conservation groups are outspoken critics of the RFS. *See, e.g.*, Nat'l Wildlife Fed'n, Letter to EPA Administrator Andrew Wheeler at 3 (May 29, 2020), https://bit.ly/3Y87DXb.

parties have no or limited means to blend renewable fuel into gasoline or diesel. *See* 40 C.F.R. § 80.1406(a)(1).

## 2.     Renewable Identification Numbers

Obligated parties demonstrate annual RFS compliance by securing blending credits called renewable identification numbers ("RINs"). 40 C.F.R. § 80.1427. A RIN is created when a biofuel—ethanol, for example—is manufactured. *Id.* § 80.1426. The RIN remains attached to the physical volume of biofuel until it is blended into petroleum-based transportation fuel, *id.* § 80.1428, at which point the RIN is "separated," *id.* § 80.1429. Obligated parties use separated RINs to demonstrate RFS compliance. *Id.* § 80.1427. An obligated party may either generate its own RINs through blending or else purchase RINs from other parties. § 7545(o)(5)(B).

Because the agency chose to obligate refiners but not renewable fuel blenders, EPA's implementation of the RFS program has created haves and have-nots. Refiners that cannot self-generate enough RINs through their own blending are forced to buy RINs from others on an unregulated secondary market. RINs are traded on a spot market or bought and sold through private contracts. 75 Fed. Reg. 14,670, 14,722 (Mar. 26, 2010). The RIN market is necessary because "[m]any obligated parties"— particularly small refineries like Hunt—"do not have access to renewable fuels or the ability to blend them, and so must use credits to comply." 72

Fed. Reg. 23,900, 23,904 (May 1, 2007).[4] RINs have a limited shelf-life; they can be used for compliance for the year in which they are generated or the next. § 7545(o)(5)(C).

"RIN markets are highly volatile," even "relative to related markets such as ethanol and other petroleum products." GAO, Renewable Fuel Standard: Actions Needed to Improve Decision-Making in the Small Refinery Exemption Program, GAO23104273, at 48 (Nov. 2022) ("GAO Report") (Pet.App. No. 22-12535, Doc. 27-2, Ex. A). As explained below, due to EPA's delays and other unlawful actions, RIN prices have skyrocketed to near all-time highs.

### 3. Small refinery hardship relief

"Congress was concerned" that RFS obligations "could work special burdens on small refineries that lack the 'inherent scale advantages of large refineries' and sometimes supply a major source of jobs in rural communities." *HollyFrontier*, 141 S. Ct. at 2175 (quoting *Sinclair Wyoming Refin. Co. v. EPA*, 887 F.3d 986, 989 (10th Cir. 2017)). Congress initially gave small refineries a blanket exception, and then provided that, starting in 2011, small refineries can petition "at any time" for annual hardship relief "for the reason of disproportionate economic

---

[4] "Small refineries" are those "for which the average aggregate daily crude oil throughput for a calendar year … does not exceed 75,000 barrels." § 7545(o)(1)(K).

hardship." § 7545(o)(9)(B)(i). EPA must decide each petition "not later than 90 days after" receipt. § 7545(o)(9)(B)(iii).

To evaluate hardship petitions, EPA must, in "consultation" with DOE, "consider the findings" of a congressionally mandated DOE study on "whether compliance … would impose a disproportionate economic hardship on small refineries." § 7545(o)(9)(A)(ii)(I) and (B)(ii). In that 2011 study, DOE: found that small refineries "have particular obstacles that would make compliance more costly than those of large integrated companies"; developed a scoring matrix "to evaluate the full impact of [the] disproportionate economic hardship"; and concluded that many small refineries should be exempt. DOE, Small Refinery Exemption Study: An Investigation into Disproportionate Economic Hardship at 3, 32, 37 ("2011 DOE Study") (Pet.App. EPA-HQ-OAR-2021-0566-0002).

For more than a decade after the 2011 DOE Study—until the April and June Denials at issue here—EPA "relied on DOE's findings" of disproportionate economic hardship and evaluated petitions for hardship relief by applying DOE's "scoring matrix." Pet.App. EPA-HQ-OAR-2021-0566-0117, at 24. Before the decisions at issue here, EPA virtually always granted hardship relief when DOE's scoring matrix recommended it.

### B. EPA's mismanagement of the RFS program and its disastrous effects

The CAA has important deadlines that are necessary to make the RFS program work: obligated parties need to know from EPA whether

and how many RINs they are required to generate in a given year. But EPA has refused to take those deadlines seriously. Two types of deadlines are particularly relevant here: First, EPA has been late multiple times in setting annual volume obligations, and it is now years behind. *See, e.g.*, 87 Fed. Reg. 5696 (Feb. 2, 2022) (EPA extending compliance deadlines for 2020, 2021, and 2022 compliance years in light of missed deadlines); *see also* 87 Fed. Reg. 80,582, 80,590 (Dec. 30, 2022) (EPA conceding that it is late setting 2023 and 2024 volumes). For example, EPA did not finalize obligated parties' renewable-fuel volume obligations for the 2021 compliance year until July 1, 2022—after the year was over and, therefore, after all the blending in 2021 had already occurred. *See* 87 Fed. Reg. 39,600, 39,601 (July 1, 2022). Second, EPA has failed to comply with the statutory 90-day decision deadline for *almost 90%* of small refinery hardship petitions since 2013. GAO Report 20.

Those missed deadlines resulted in EPA choosing to split the 2019 compliance deadline. Obligated parties other than small refineries were required to retire their RINs on March 31, 2020—the original compliance deadline for 2019. That decision drastically reduced supply in the RIN market, while small refineries were left in limbo for more than two years until their hardship petitions were decided in June 2022.

The combination of these regulatory failures has been calamitous for many small refineries. In light of EPA's missed deadlines, there was no responsible way for small refineries like Hunt to plan for compliance,

as GAO has explained. GAO Report 20-27. Hunt did not know even the final volumes that would apply for compliance years 2021 and 2022 until July 1, 2022. *See* 87 Fed. Reg. at 39,601. And Hunt did not know whether it would have any obligation at all for the years 2019–2021 until EPA finally adjudicated its long-pending hardship petitions in June 2022—years after the statutory deadlines.

GAO has further explained that, because EPA's actions "substantially" affect the price of RINs, EPA's late actions subjected small refineries like Hunt to huge risks no matter whether they attempted to purchase RINs or wait for EPA to decide their hardship petitions. *See, e.g.*, GAO Report 24 (small refineries "lose out" whether they purchase RINs throughout the compliance year or not). RINs generally decrease in value as their expiration date approaches, and expired RINs are valueless. § 7545(o)(5)(C). One small refinery that purchased RINs throughout the year lost $16 million dollars when EPA belatedly granted its petition just ten business days before its acquired RINs were to expire. GAO Report 24. RIN prices also dropped substantially several years ago when EPA granted all exemptions simultaneously for a particular compliance year, punishing refineries that had purchased throughout the year. *Id.* And even EPA now admits that small refineries must sell their RINs for less

than large refiners can. *See* Pet.App. Dec. 2022 RIN Price Analysis at 10.[5] The Ninth Circuit recently held that, because of EPA's late action on a small refinery hardship petition, the agency was required to compensate the refinery for the large loss in RIN value "between the time when the EPA should have acted on [its] petition in October 2018 and when [EPA] ultimately granted the petition in March 2019." *Kern Oil & Refin. Co. v. EPA*, No. 21-71246, 2022 WL 3369528, at *3 (9th Cir. Aug. 16, 2022).

On the other hand, a small refinery that waits until EPA's hardship decision to purchase RINs might have to buy RINs at artifically high prices. GAO Report 24. As GAO concluded, the "timing of EPA actions is associated with volatility in the RIN market, which adds to market uncertainty experienced by refineries." *Id.*

Due to EPA's regulatory failures, the RIN market is now cornered. GAO Report 48. As EPA itself acknowledges, only a small number of entities hold a huge portion of the RINs. EPA's report on 2020–2021 RIN holdings indicated that just 11 obligated parties hold 75% "of all available 2020 and 2021 RINs." 87 Fed. Reg. 35711, 35714 n.23 (June 13, 2022). The result is predictable: RIN prices are wildly out of control. As EPA admits, the few parties holding RINs will "choose to sell their RINs only

---

[5] EPA, An Analysis of the Price of Renewable Identification Numbers (RINs) and Small Refineries (Dec. 2022), https://www.epa.gov/system/files/documents/2022-12/420r22038.pdf ("December 2022 RIN Price Analysis").

at very high costs or in the alternative choose to not sell their RINs" at all. Pet.App. EPA-HQ-OAR-2021-0566-0107, at 13-14.

### C. Hunt's Tuscaloosa refinery and its history of hardship relief

Hunt's small refinery in Tuscaloosa employs 470 people, pays high salaries and wages, and supports local charitable organizations. *See* Pet.App. SI-234 at 1-2; Declaration of Hunt Refining Company ("Hunt Decl.") ¶¶ 23, 26-27 (No. 22-12535, Doc. 16, under seal). Hunt also provides free fuel and training to first responders. *Id.*

Hunt has applied for an RFS hardship exemption in every year since the petition process began in 2011, because compliance with the RFS would impose disproportionate economic harm. For every one of the RFS compliance years from 2011 through 2018, DOE always recommended, and EPA always granted, hardship relief to Hunt. Pet.App. JD-491, at 1; SI-243, at 3; SI-244 to 247. ███████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████



Hunt petitioned for hardship relief for 2018 on August 10, 2018. Pet.App. AD-290, AD-291. EPA missed the 90-day deadline to decide

Hunt's 2018 petition (November 8, 2018). Then, in August 2019, EPA followed DOE's recommendations to grant hardship exemptions for over 30 small refineries for 2018, including Hunt. Pet.App. EPA-HQ-OAR-2021-0566-0077, Tab I. Biofuel industry groups challenged EPA's grants, *id.*, but that challenge was held in abeyance pending resolution of *HollyFrontier* in the Supreme Court.

Hunt's economic situation worsened after 2018, so Hunt petitioned for hardship relief for 2019 on October 23, 2019, for 2020 on May 19, 2020, and for 2021 on July 20, 2021. Pet.App. AD-445 to AD-493.

### D.    April and June Denials

After the change in administration in January 2021, EPA began seeking to eliminate hardship exemptions entirely.

#### 1.    *HollyFrontier*

To start, EPA flipped its legal position in *HollyFrontier*. Reversing its prior interpretation of the statute, EPA argued to the Supreme Court that if a small refinery ever does well enough in a given year such that it does not need a hardship exemption for that year, then that refinery is never again eligible for hardship relief. That change in position would not have immediately affected Hunt, which (as explained above) had received hardship relief in every year. But it was the first salvo in EPA's new crusade to phase out hardship exemptions. The Supreme Court rejected EPA's new argument, finding it contrary to the CAA's "natural[]" meaning. *HollyFrontier*, 141 S. Ct. at 2181.

### 2. EPA reverses Hunt's 2018 hardship grant

After the Supreme Court rejected EPA's attempt to "funnel"-out hardship exemptions in *HollyFrontier*, EPA requested a voluntary remand of its earlier decision to grant hardship petitions for 2018. *See* Pet.App. EPA-HQ-OAR-2021-0566-0106, at 16. EPA then flip-flopped again—this time even more dramatically. In the April Denials, EPA *retroactively denied* all of the hardship petitions that it had previously granted for 2018, including Hunt's. *Id.* at 1, 20.

EPA's April Denials relied on multiple sea-changes in the agency's longstanding approach to hardship petitions. EPA (1) significantly changed its interpretation of multiple terms in the CAA to eliminate hardship relief forever; (2) abandoned the scoring matrix and DOE recommendations that EPA had relied on for more than a decade; and (3) replaced them with a new "economic theory" that is empirically and demonstrably false. Pet.App. *Id.* at 23-24, 30. Whereas in the past, EPA had complied with its statutory consultation obligation by relying on DOE's 2011 study, the scoring matrix, and DOE's recommendations on hardship petitions, EPA now stated that it had abandoned any reliance on all of those and had instead merely "discuss[ed] various aspects" of the hardship petition process—though *not* the validity of its new economic theory—with "staff" at DOE. Pet.App. EPA-HQ-OAR-2021-0566-0104, at 1-2 ("Bunker Memorandum"); *see also* GAO Report 17 (similar).

EPA's new "economic theory" is that "the RFS program cannot cause [disproportionate economic hardship]" because RIN costs are equal for all obligated parties regardless of their size or bargaining power, and because obligated parties supposedly fully pass through their RIN costs to customers in the price of their fuel. Pet.App. EPA-HQ-OAR-2021-0566-0117, at 11-12. The RIN cost passthrough hypothesis depends on the further assumption that obligated parties purchase RINs "ratably"—in real-time throughout the compliance year. *Id*. at 55.

EPA based this new "economic theory" on only one published study and one working paper by the same authors. Pet.App. EPA-HQ-OAR-2021-0566-0106, at 31; Pet.App. EPA-HQ-OAR-2021-0566-0117, at 32. That study and paper had obvious flaws that limited their usefulness: the authors looked at the refining industry *as a whole* (not by considering the particular markets where refineries operate); they analyzed data only from 2016 and 2017; and they did not specifically study small refineries. *Id*. EPA did not analyze data concerning Hunt or any other small refineries, nor did EPA even analyze the time period (2018 to 2021) that is relevant to Hunt's petitions for hardship relief. *See* Pet.App. SI-243, at 4-10. EPA admits that it "made no unique or individualized findings as to the ability of [Hunt] to recover the costs of RFS compliance, and EPA did not adjust its statutory interpretation and economic theory to the particulars of any specific small refinery." EPA's Mot. to Transfer at 16, No. 22-12535, Doc. 10.

EPA recognized that its delays and the dysfunctional RIN market made it impossible for small refineries to comply for 2018. *See* Pet.App. EPA-HQ-OAR-2021-0566-0107, at 13-14 (EPA conceding that the few obligated parties holding the vast majority of available RINs would sell at only very high prices or not at all). EPA thus provided small refineries an alternative way to demonstrate compliance for 2018 that did not require retiring RINs. *See id.* at 10. But EPA refused to take that same approach for 2019 through 2021.

### 3. EPA belatedly denies Hunt's 2019–2021 hardship petitions

Less than two months after announcing its new approach in the April Denials, EPA issued an identical decision denying Hunt's petitions for 2019, 2020, and 2021. Pet.App. EPA-HQ-OAR-2021-0566-0117, at 20. EPA's statutory deadlines to decide Hunt's petitions were January 21, 2020, August 17, 2020, and October 18, 2021, respectively. § 7545(o)(9)(B)(iii). But EPA ignored those statutory deadlines and waited to announce 69 pending hardship decisions on the same day, June 3, 2022. *Id.* EPA thus decided Hunt's 2019 petition *two and a half years late. Id.* As with Hunt's 2018 petition, EPA denied hardship relief despite DOE's finding that Hunt would suffer disproportionate economic hardship. Pet.App. AD-309, JD-498, SI-252, SI-253.

### 4. EPA's actions cause skyrocketing RIN costs

EPA's fits and starts caused RIN prices to skyrocket. Back on November 30, 2018—the day EPA set the 2019 volumes—the price of 2019 ethanol RINs was only $0.145.[6] On December 2, 2019—the first business day after EPA was required to set 2020 volumes—the price of 2020 ethanol RINs was just $0.205.[7] But on June 3, 2022—when EPA announced the June Denials—the prices of 2019 and 2020 ethanol RINs were both $1.60, increases of *1,003%* and *680%*, respectively.[8] 2021 and 2022 ethanol RINs were similarly expensive—$1.63 and $1.61, respectively.[9] In other words, the cost of RFS compliance increased by as much as ten-fold while EPA left Hunt and other small refineries in limbo.

Despite knowing that RIN prices had increased exponentially, EPA denied all 69 pending hardship petitions on the same day, which only served to intensely increase demand for a limited and fixed supply of RINs for years that are already over. Pet.App. EPA-HQ-OAR-2021-0566-0117, at 1. Hunt now faces the specter of RFS compliance for the first time ever, with four years' worth of volume obligations (2019–2022) ██████████████████████████████, under a compressed compliance schedule of just twelve months (beginning February 1, 2023), during

---

[6] OPIS End-of-Day Ethanol Assessment Report (Nov. 29, 2019).

[7] *Id.* (Dec. 2, 2019).

[8] *Id.* (June 3, 2022).

[9] *Id.*

arguably the worst RIN market in history. ██████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████ ██ █████████████

### E. November 2022 GAO findings on EPA's April and June hardship denials

In November 2022, following a multi-year investigation, GAO released a damning report finding that EPA has failed to responsibly manage the RFS program and that EPA cannot have any confidence in its decisions denying small refinery hardship exemptions like Hunt's. GAO Report 1, 2, 9.

For one thing, EPA's RIN passthrough theory relied on a "flawed assumption and an incomplete assessment." *Id.* at 9. Most notably, EPA's theory assumed that all parties pay and receive the same price for RINs, but when GAO analyzed EPA's RIN market transaction data, GAO determined that EPA's assumption is empirically false. *Id.* at 10. The data shows that small refineries pay more when they need to buy RINs and receive less when they sell them. *Id.* at 10, 67. GAO thus concluded that "EPA does not have assurance that its conclusion that all small refineries recover the cost of RINs in the price of the gasoline and diesel they sell is

based on quality information," and EPA "risks inappropriately denying valid exemption petitions." *Id*. at 9-13, 18, 26.

Moreover, EPA has not even established "policies and procedures for" consulting with DOE—as the stature requires—or for "making small refinery exemption decisions." *Id*. at 15. "EPA and DOE [thus] cannot ensure that exemption decisions are *consistent or correct*." *Id*. at 18 (emphasis added). GAO also confirmed that EPA's actions have created volatility in the RIN market, *id*. at 24-25, where prices have increased by ten-fold. *See id*.; *supra* p. 20.

### F. EPA's December 2022 RIN price analysis

A month after GAO's criticism, EPA posted a new RIN-price analysis on its website, relying on data that EPA has always possessed but inexplicably did not analyze before it issued the April and June Denials. December 2022 RIN Price Analysis 1, 10.

EPA's analysis confirmed GAO's conclusion that EPA's economic theory in the April and June Denials is empirically false. Small refineries paid more for RINs compared with the daily average price. *Id*. at 1. They also paid more than the large refineries for biomass-based diesel RINs. *Id*. EPA even found that a small refinery that purchases RINs ratably could actually pay disproportionately more for those RINs. *Id*. ("[T]he analysis finds that on average these 24 small refineries paid 1.3% more for RINs generated in the same year that the RINs were traded, 0.5% more for RINs generated in the prior year, and 0.9% less for RINs

generated two years before they were traded."). Moreover, in addition to paying more for RINs, small refineries must sell their RINs for less. *Id.* at 10. Those percentage differences mean many millions of dollars more in compliance costs for small refineries compared to their larger competitors, causing disproportionate economic hardship.

### G.    Hunt's petitions for review and this Court's stay pending review

Hunt challenged EPA's April and June Denials in this Court on May 12 and August 3, 2022. Pet.App. No. 22-11617, Doc. 1, and No. 22-12535, Doc. 1. EPA moved to dismiss or transfer the Denials case to the D.C. Circuit. No. 22-11617, Doc. 18; No. 22-12535, Doc.10. Hunt opposed and argued that jurisdiction and venue are proper in this Court. No. 22-11617, Doc. 19; No. 22-12535, Doc. 11. The Court ordered that EPA's motion "as well as the jurisdictional and venue issues" be carried with the case. No. 22-11617, Doc. 25-2; No. 22-12525, Doc. 29. Hunt rests on its prior briefing on those questions. No. 22-11617, Docs. 17, 19; No. 22-12535, Doc. 11.

In October 2022, Hunt moved for a stay of its RFS compliance obligations pending review, No. 22-12535, Doc. 15, which this Court granted, *id.*, Doc. 33 (citing 5 U.S.C. § 705). Hunt argued that it was likely to succeed on the merits of this appeal on numerous grounds and that, absent relief, ███████████████████████████████████████

███████████████████████████████████████████

After this Court granted Hunt's motion for stay, the Fifth Circuit similarly granted a stay in a nearly identical case involving two small refineries in Louisiana and Texas. *Calumet Shreveport Refin., LLC v. EPA*, No. 22-60266 (5th Cir. Jan. 27, 2023), Doc. 209-1 ("Fifth Circuit Stay Order"). The Fifth Circuit concluded that those refineries had made a "strong showing that they will succeed on the merits of their appeals," *id.* at 11, because the refineries are "likely to prevail on at least" their argument that EPA unlawfully applied its new "disproportionate economic hardship" standard retroactively, *id.* at 6, 7 (citations omitted). The court also recognized that EPA's "new interpretation" will likely "read the exemption framework promulgated by Congress out of the statute entirely." *Id.* at 8.

In January 2023, this Court consolidated Hunt's challenges to the April and June Denials. No. 22-11617, Doc. 42.

## SUMMARY OF ARGUMENT

I.      EPA violated Hunt's constitutional rights, the APA, and the CAA when it belatedly and retroactively applied an entirely new standard for adjudicating hardship petitions.

A.      Due process and the APA require that regulated parties have "fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-58 (2012). An agency thus cannot impose new consequences on past conduct. *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 158 (D.C. Cir. 2010); *Landgraf v. USI*

*Film Prods.*, 511 U.S. 244, 280 (1994). Here, EPA failed to fulfill its obligation to adjudicate Hunt's hardship petitions in view of "fair notice, reasonable reliance, and settled expectations." *Treasure State Res. Indus. Ass'n v. EPA*, 805 F.3d 300, 305 (D.C. Cir. 2015) (quoting *Landgraf*, 511 U.S. at 270). Hunt relied on EPA's prior approach, under which it always received hardship relief, to prepare its hardship petitions and determine its compliance strategy. After Hunt's 2018–2021 petitions were submitted (one of which was initially granted), and those compliance years were already over, EPA suddenly and dramatically changed its approach in April 2022, without giving Hunt notice or any opportunity to conform its past conduct to EPA's new legal regime.

B.     Even if EPA were entitled to retroactively apply this new framework, EPA did not comply with the statutory deadline to decide Hunt's petitions within 90 days. And EPA did not ameliorate the harm that its delays caused for compliance years 2019 to 2021, in violation of *Americans for Clean Energy v. EPA*, 864 F.3d 691, 718 (D.C. Cir. 2017) ("*ACE*").

II.     EPA adopted multiple interpretations of the CAA that are contrary to law.

A.     EPA effectively eliminated the statutory hardship exemption that Congress created, by making clear that EPA will never again grant small refinery hardship relief. That decision exceeds EPA's authority and contravenes the Supreme Court's decision in *HollyFrontier*, which held

that Congress intended to preserve small refinery hardship relief. 141 S. Ct. at 2180.

B. EPA unlawfully redefined the statutory term "disproportionate economic hardship." § 7545(o)(9)(A)-(B). Instead of asking whether a refinery experiences "disproportionate economic hardship," EPA asked an entirely different question by requiring small refineries to prove "disproportionate RFS compliance costs." Pet.App. EPA-HQ-OAR-2021-0566-0106, at 17; Pet.App. EPA-HQ-OAR-2021-0566-0117, at 17. EPA also attempted to impose an extra-textual severity requirement, insisting that small refineries' disproportionate RFS compliance costs must be "of sufficient magnitude." *Id.*

C. EPA failed to meaningfully consult with DOE about Hunt's disproportionate economic hardship and other economic factors, as required by § 7545(o)(9)(B)(ii). EPA disregarded DOE's 2011 Study, the scoring matrix, and its hardship recommendations. EPA and GAO have revealed that EPA's few meetings or calls with DOE leading up to the Denials fell far short of "meaningful consideration" of DOE's position. *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1088 (9th Cir. 2011).

D. EPA unlawfully refused to assess each refinery individually. The plain language and the structure of the CAA show that Congress required EPA to evaluate each hardship petition on an individual basis. § 7545(o)(9)(B).

E.      EPA's interpretations of the CAA are not entitled to any deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837 (1984), because EPA did not engage in meaningful notice and comment. If *Chevron* does apply here, then it should be overruled. A check on the Executive is especially crucial given EPA's flagrant defiance of Congress's directives. Courts have previously evaluated EPA's denials of small refinery hardship relief by applying *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *See, e.g.*, *Sinclair Wyoming*, 887 F.3d at 991-92. But EPA's decision here fails any standard.

III.     EPA's Denials are arbitrary and capricious, as GAO's review demonstrates and EPA's own RIN Price Analysis confirms. The Denials are based on an economic theory that (1) is contradicted by the evidence; (2) relies on an assumption that Congress did not intend and that ignores an important aspect of the problem; and (3) ignores refinery-specific evidence. Because of EPA's "flawed assumption[s]" and "incomplete assessment," EPA "risk[ed] inappropriately denying valid exemption petitions" like Hunt's. GAO Report 9, 13.

## STANDARD OF REVIEW

Congress authorized this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion," or "otherwise not in accordance with law." 5 U.S.C. § 706(2). EPA's hardship determinations are not entitled to

agency deference. *See Sinclair Wyoming*, 887 F.3d at 989. Instead, courts review hardship decisions under the *Skidmore* standard. *Id.* at 991.[10]

## ARGUMENT

**I.     EPA violated Hunt's constitutional rights, the APA, and the Clean Air Act when it belatedly and retroactively applied an entirely new standard for adjudicating hardship petitions.**

As discussed *infra* at Parts II & III, EPA's new approach to hardship petitions is contrary to law and arbitrary and capricious. But even if EPA's new approach were lawful, EPA cannot apply it to Hunt's 2018, 2019, 2020, and 2021 hardship petitions for two reasons. First, EPA acted contrary to law when it applied a fundamentally new approach *after* the compliance years were over and *after* Hunt had prepared and submitted petitions in reliance on the old framework. Second, EPA violated statutory deadlines without adequately mitigating the harm from its late action, contrary to the CAA and principles of due process.

**A.     EPA did not provide the fair notice required by law.**

1.     A "fundamental principle in our legal system," enshrined in the Due Process Clause, "is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Fox Television*, 567 U.S. at 253-58. Notice is fair if it allows regulated parties "to

---

[10] Any attempt by the government to invoke *Chevron* deference in this case would be inconsistent with the Constitution and the APA. *See, e.g.*, *Buffington v. McDonough*, 143 S. Ct. 14 (2022) (Gorsuch, J., dissenting).

identify, with *ascertainable certainty*, the standards with which the agency expects [them] to conform." *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995), *as corrected* (June 19, 1995) (emphasis added) (cleaned up).

If an agency "wishes to use [its new] interpretation to cut off a party's right, it must give full notice of its interpretation." *Satellite Broad. Co. v. FCC*, 824 F.2d 1, 3-4 (D.C. Cir. 1987), *as amended* (July 7, 1987). Regulated parties cannot be expected "to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158-59 (2012).

For those reasons, agency actions that impose new consequences on past conduct are impermissibly retroactive. *Nat'l Petrochemical & Refiners*, 630 F.3d at 158; *Landgraf*, 511 U.S. at 280 (condemning government actions that "increase a party's liability for past conduct"). Said differently, "[i]f a new rule is 'substantively inconsistent' with a prior agency practice and attaches new legal consequences to events completed before its enactment, it operates retroactively." *Arkema, Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010) (citation omitted). When an agency changes course, "it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1139 (5th Cir. 2021)

(granting stay pending appeal) (quoting *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020)).

An agency also cannot "act[] in its quasi judicial capacity" to "retroactively repeal" its own prior legal standard. *Nat. Gas Pipeline Co. of Am. v. FERC*, 590 F.2d 664, 668 (7th Cir. 1979) (quoting *Ariz. Grocery Co. v. Atchison, T. & S. F. Ry. Co.*, 284 U.S. 370, 389 (1932)). And "the more an agency acts like a legislator—announcing new rules of general applicability—the closer it comes to the norm of legislation and the stronger the case becomes for limiting application of the agency's decision to future conduct." *De Niz Robles v. Lynch*, 803 F.3d 1165, 1172 (10th Cir. 2015) (Gorsuch, J.).

2.     EPA's April and June Denials decisions did not provide the fair notice required by law. As explained above, EPA's new approach to hardship petitions imposes severe consequences on Hunt's past conduct. *See Landgraf*, 511 U.S. at 280. Hunt relied on EPA's prior approach when (1) preparing its petitions and (2) determining its compliance strategy for compliance years 2018 through 2021. Hunt submitted all of the relevant petitions long before EPA announced its new approach to hardship relief in April 2022. In fact, EPA was statutorily required to have *decided* all of Hunt's hardship petitions for 2018 through 2021 by November 8, 2018, January 21, 2020, August 17, 2020, and October 18, 2021. § 7545(o)(9)(B)(iii).

Hunt's petitions all relied on the 2011 DOE Study and DOE's scoring matrix. If EPA had adjudicated Hunt's petitions by the statutory deadlines, then Hunt would have received exemptions—just as it did for every year when the 2011 DOE Study and scoring matrix were applied. Hunt Decl. ¶ 10; Pet.App. SI-244 to SI-247. EPA does not attempt to refute that Hunt would have received exemptions if EPA had applied the criteria that it used on all prior petition decisions.

By the time that EPA announced its new adjudication framework, Hunt obviously could not change anything about its conduct during compliance years 2018 through 2021 because those years were already over. § 7545(o)(2)(B) (compliance year ends December 31). Hunt reasonably believed that it would receive hardship relief from EPA under the prior approach, especially given that its conditions for compliance had only grown worse since the prior years when it had received relief. Hunt Decl. ¶¶ 2-4 & n.2; Pet.App. EPA-HQ-OAR-2021-0566-0117, at 14 n.60 ("When making decisions about small refinery exemptions under the RFS program, the Agency is directed to follow DOE's recommendations …"). That reasonable belief was then vindicated by EPA's decision *granting* Hunt's 2018 petition before later denying it, and by DOE's scores on Hunt's petition for the years 2019 and 2020.

In short, EPA did precisely what the Supreme Court prohibited: it acted "in its quasi judicial capacity" to "retroactively repeal" its prior legal standard. *Ariz. Grocery*, 284 U.S. at 389.

3. In view of Hunt's detrimental reliance on EPA's initial decision granting 2018 hardship relief, EPA should not be permitted to reconsider and reverse that decision now. *Citizens Against Pellissippi Parkway Extension, Inc. v. Mineta,* 375 F.3d 412, 418 (6th Cir. 2004) ("detrimental reliance on the previous [agency determination] would militate against allowing the agency to withdraw" it); *see also Rosebud Sioux Tribe v. Gover,* 104 F. Supp. 2d 1194, 1201 (D.S.D. 2000) (observing that regulated parties had "already spent more than $5,000,000 in reliance on [the Bureau's] action[s]"), *rev'd on other grounds sub nom. Rosebud Sioux Tribe v. McDivitt,* 286 F.3d 1031 (8th Cir. 2002); *Prieto v. United States,* 655 F. Supp. 1187, 1188 (D.D.C. 1987). Even EPA acknowledged that it would be prohibitively harmful to enforce compliance for 2018. *See* EPA-HQ-OAR-2021-0566-0107, at 13-14. But those same factors—RIN scarcity and the exponentially increased compliance cost caused by EPA's illegal conduct—exist for 2019–2021 as well. Indeed, EPA made similar observations about the dire RIN market in April 2022.

As the Fifth Circuit recently observed, small refineries "are entitled to know the ground rules by which EPA will grant or deny their hardship petitions, in advance of making their applications." Fifth Circuit Stay Order 10-11. EPA's belated attempt at "denying the refiners' pending hardship petitions—in many cases for compliance periods now long elapsed—

based on its 'new interpretation'… disregarded the refiners' reliance interests, failed to give fair notice, and acted retroactively." *Id*. at 6, 8.

## B. EPA did not comply with statutory deadlines and did not ameliorate the harm that it caused.

Even if EPA were entitled to retroactively apply a new framework, in the particular circumstances here, the agency was obligated to mitigate harm from missed deadlines, but it did not do so.

Congress required EPA to decide Hunt's hardship petitions 90 days after EPA received them. § 7545(o)(9)(B)(iii). EPA blew past that statutory deadline several times for Hunt's petitions—just as it has blown almost 90% of the deadlines since 2013, according to GAO. GAO Report 20. EPA initially *granted* Hunt's 2018 petition 9 months late, then later reversed that decision in April 2022, over 40 months late. EPA decided Hunt's 2019 petition 30 months late; decided the 2020 petition 22 months late; and decided the 2021 petition over 8 months late. *See supra* Part II.D; *see also* GAO Report 21 (EPA resolved all 2019 hardship petitions "on average, more than 700 days" after receiving them).

These retroactive denials violate the settled principle of administrative law, based in due process, that EPA must consider the harm caused by its failure to meet statutory deadlines. Courts have repeatedly recognized, including in the context of the RFS program specifically, that when an agency like EPA misses statutory deadlines, "basic principles of due process" require EPA in that circumstance to "reasonably consider[]"

and "minimize the hardship caused to obligated parties by virtue of EPA's delay." *ACE*, 864 F.3d at 718, 719, 721 (cleaned up).

EPA has fulfilled that obligation to minimize harm for only one of the compliance years where it was late: 2018. EPA acknowledged that it would be unfair to require 2018 compliance now in light of the problems in the RIN market created by EPA's late action, so EPA provided an alternative method of compliance for 2018 that did not require Hunt to acquire and turn in RINs. *See* Pet.App. EPA-HQ-OAR-2021-0566-0107, at 13-15; EPA-HQ-OAR-2021-0566-0119, at 15-17.

But EPA did not come close to satisfying the *ACE* standard for 2019–2021. EPA never even acknowledged that obligated parties like Hunt relied to their detriment on EPA's prior methodology for assessing hardship petitions for those compliance years. And by changing the methodology after-the-fact, without fair notice and without any way to satisfy EPA's new approach, EPA exacerbated the harm from its late decisions and did nothing to ameliorate that harm.

In fact, EPA made the harm worse by compressing many annual compliance deadlines into a very short timeframe while RIN prices are near all-time highs. In February 2022, EPA announced the misnamed "Extension Rule," which compressed the deadlines for *four years' worth* of annual RFS compliance obligations (2019–2022) into just a *nine-month*

*period.* 87 Fed. Reg. 5696.[11] That compression is especially problematic given that the prices for 2021 and subsequent RINs are just as high as the prices for the short supply of 2020 RINs, and those high prices are due to EPA's unlawful actions.[12]

Under these particular circumstances, the remedy that would actually mitigate the harm caused by EPA's delays is the same one that EPA itself adopted to address its late action on the 2018 petitions. This Court should accordingly remand the June Denials to EPA with instructions to mitigate the harm to Hunt by permitting Hunt to utilize the same alternative compliance method that EPA offered for 2018—a method that would not require retiring RINs for the years where EPA belatedly and unlawfully denied hardship relief.

## II.  EPA adopted multiple interpretations of the Clean Air Act that are contrary to law.

In issuing the April and June Denials, EPA relied on multiple incorrect interpretations of the CAA that cannot be reconciled with the Act's plain text. "[A]n agency may not rewrite clear statutory terms to

---

[11] In September 2022, EPA made a slight alteration: small refineries would have to retire RINs for five compliance years (2019–2023) within just 14 months. Alternative RIN Retirement Schedule for Small Refineries, 87 Fed. Reg. 54,158 (Sept. 2, 2022).

[12] Average prices for 2020–2023 ethanol RINs range from $1.52 to $1.53. OPIS End of Day Ethanol Assessment Report (Feb. 6, 2023).

suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

### A. EPA effectively eliminated statutory hardship exemptions.

EPA's interpretation unlawfully eliminates the statutory hardship exemption that Congress expressly provided. *See* Fifth Circuit Stay Order 8 (EPA "read[s] the exemption framework promulgated by Congress out of the statute entirely, such that no small refinery will ever qualify for one"). EPA is quite clear that it intends never to grant small refinery hardship relief again: the agency believes that "the RFS program does not advantage or disadvantage any ... parties over the others," and that "a small refinery's ability to recover its RIN costs in the price of the fuel it produces does not depend on factors such as geographic range or pricing power." *See* Pet.App. EPA-HQ-OAR-2021-0566-0117, at 63. EPA has thus stated that a small refinery "should have no reasonable expectation that its SRE petition will be granted in the future." 87 Fed. Reg. 54,158, 54,161 n.27 (Sept. 2, 2022).

EPA cannot effectively repeal a statutory provision for small refinery hardship relief. *See Morton v. Ruiz*, 415 U.S. 199, 231-32 (1974) (agencies have authority to formulate policy and rules to fill any gaps left, implicitly or explicitly, by Congress); *AARP v. EEOC*, 489 F.3d 558, 563 n.5 (3d Cir. 2007) ("no administrative agency is permitted to effectively repeal any portion of a statute by regulation"); *United States v.*

*Shumway*, 199 F.3d 1093, 1107 (9th Cir. 1999) ("Administrative agencies lack authority effectively to repeal the statute by regulations."). EPA argued to the Supreme Court in *HollyFrontier* that Congress intended hardship exemptions to phase out over time, but the Court refused to endorse that reading, observing that, "[i]f Congress really had wanted all exemptions to cease," it "surely [chose] an odd way to achieve it." *Id.* at 2180.

Given the CAA's plain language providing for hardship relief, and the Supreme Court's recognition that such relief is available on an ongoing basis, it defies logic and law for EPA to announce that it will never again extend the hardship relief that Congress enacted.

## B. EPA unlawfully redefined "disproportionate economic hardship."

EPA unlawfully redefined the key statutory term in a further attempt to justify its refusal to grant any further hardship exemptions.

1. Congress conditioned hardship relief on determining whether "a small refinery … would be subject to *disproportionate economic hardship*" after "consider[ing] the findings of the [DOE] study … and other economic factors." § 7545(o)(9)(A)-(B) (emphasis added). But in the April and June Denials, EPA conducted an altogether different inquiry: whether small refineries had "demonstrate[d] how [their] specific RFS compliance costs [we]re disproportionate compared to other refineries'

RFS compliance costs." Pet.App. EPA-HQ-OAR-2021-0566-0106, at 17; Pet.App. EPA-HQ-OAR-2021-0566-0117, at 17.

Whether a refinery experiences "disproportionate economic hardship," § 7545(o)(9)(A)-(B), is a broader question than whether a small refinery can prove "disproportionate RFS compliance costs." Pet.App. EPA-HQ-OAR-2021-0566-0106, at 18; Pet.App. EPA-HQ-OAR-2021-0566-0117, at 18. Even if small refineries had the same RFS compliance costs as other refineries (an incorrect assumption, *see supra* Part III), the CAA would still permit them to demonstrate that RFS compliance would cause disproportionate economic hardship due to "other economic factors," including local economic conditions or other refinery-specific circumstances. *See Sinclair Wyoming*, 887 F.3d at 996-99 (EPA cannot ignore "other economic factors"). A simple example shows why: If EPA's actions caused RFS compliance to cost every refinery $1 billion per year, then all refineries would face the same compliance costs, but those costs would obviously disproportionately harm small refineries like Hunt with lower margins. EPA cannot "take[] the holistic evaluation required by Congress and morph[] it into a single question"—much less the *wrong* question. *Id.* at 997. But that is exactly what EPA did in the April and June Denials.

2. To make matters worse, EPA tries to smuggle a severity requirement into the statute, insisting that small refineries' disproportionate compliance costs must be "of sufficient magnitude to

warrant the exemption." Pet.App. EPA-HQ-OAR-2021-0566-0106, at 17; Pet.App. EPA-HQ-OAR-2021-0566-0117, at 17. But the statute contains no such requirement. If a small refinery suffers economic hardship—whether due to RFS compliance costs, "other economic factors," or some combination—that is greater than larger refineries' hardships, then it has demonstrated "disproportionate economic hardship" and is entitled to an exemption under the Act. § 7545(o)(9)(B).

Many years and multiple administrations ago, EPA tried to impose a similar severity requirement on "disproportionate economic hardship," but the Tenth Circuit rejected it as contrary to "the meaning and purpose of the statute." *Sinclair Wyoming*, 887 F.3d at 996-99. The court held that a small refinery need not demonstrate a threat to its viability to receive an exemption. *Id.* EPA's renewed attempt to impose a severity requirement and otherwise rewrite the statute fares no better.

EPA purports to rely for its new statutory interpretation on the Tenth Circuit's decision in *RFA v. EPA*. Pet.App. EPA-HQ-OAR-2021-0566-0117, at 2. But that reasoning is plainly flawed because the Tenth Circuit vacated *RFA* after the Supreme Court's decision in *HollyFrontier*, so *RFA* now has no legal force. *See Renewable Fuels Ass'n v. EPA*, 854 F. App'x 983 (10th Cir. July 29, 2021) (per curiam). The Tenth Circuit then issued a new judgment *affirming* EPA's grants of the hardship petitions at issue. *Id.* at 984; *see also* No. 18-9533 (10th Cir. July 29, 2021), Doc. 010110555246; *see also id.,* Doc. 010110567206 (Aug. 26,

2021) (denying EPA's motion for clarification that "the alternative holdings in the Court's January 24, 2020 opinion not addressed by the Supreme Court remain in effect").

### C. EPA failed to meaningfully consult with the Department of Energy, as the statute requires.

EPA did not merely disobey the CAA's requirements as to the appropriate hardship inquiry; it also failed to follow the Act's mandated decision-making *process*. GAO's Report confirms as much.

The CAA requires that EPA evaluate small refinery hardship petitions "in consultation with the Secretary of Energy" and "consider the findings" of the 2011 DOE Study in deciding hardship petitions. § 7545(o)(9)(B)(ii). A consultation obligation requires an agency to give "meaningful consideration" to the consultee's position. *See Cal. Wilderness*, 631 F.3d at 1088.

Here, though, EPA has all-but admitted that it did not meaningfully consult with DOE and instead intentionally ignored DOE's advice. Specifically, EPA admitted that it abandoned its past practice of relying on the 2011 DOE Study, the scoring matrix, and DOE's recommendations when evaluating hardship petitions. EPA did not consult DOE scoring for the April and June Denials for 2019 and 2020, and it did not even permit DOE to score for 2021. *See* Pet.App. EPA-HQ-OAR-2021-0566-0104,_at 1-2 ("Starting with the process that led to … the April 2022 Denial …, EPA will no longer consult with DOE by requesting that it score

individual SRE petitions using the matrix); GAO Report 17 (similar). Had EPA actually consulted with DOE and followed its recommendations, then EPA would have granted Hunt's hardship petitions as it had done every year in the past. DOE recommended that EPA grant Hunt complete relief for both 2019 and 2020. Pet.App. SI-252, SI-253.

EPA's own purported documentation confirms that EPA did not consult with DOE. The telephone calls and Microsoft Teams meetings described in vague, circular and boilerplate language in Byron Bunker's April 7 memorandum fail to satisfy the statutory requirement.

First, the Bunker Memorandum reveals that EPA never consulted with DOE regarding the critical question that would determine the fate of every petition: whether EPA's new RIN passthrough theory was actually correct and applicable to the small refinery at issue. Instead, EPA instructed DOE to *assume* the RIN passthrough theory was correct and was an appropriate basis for denying the hardship petitions:

> DOE concurs that, *if* EPA's assertion that the cost of compliance is the same whether refineries buy RINs or blend renewable fuel to acquire RINs *is correct*, *and* EPA's assertion that RFS compliance costs are passed through in the price of refined products *is also correct*, [then] refineries would not face a "high[er] cost of compliance relative to the industry average."

Pet.App. EPA-HQ-OAR-2021-0566-0104, at 2 (emphases added). In other words, EPA decided that it would deny every hardship petition based on a novel, unsupported economic theory, and DOE "concurred" with that

decision only because it was instructed to "assume[]" EPA was correct. The die was already cast, and DOE was just a bystander. When Congress enacts a consultation requirement, genuine consultation is required— EPA may not ask for a thought experiment that simply assumes its core conclusions are correct. *See Cal. Wilderness*, 631 F.3d at 1088.

Second, EPA's description of these calls and meetings establishes only that EPA talked with DOE about *whether* to consult. EPA says that, in these calls and meetings, it discussed "how EPA would conduct its consultation with DOE in compliance with its statutory obligation, EPA's consideration of DOE's 2011 Study," and "whether it was necessary and appropriate for EPA to consider DOE's scoring of the individual SRE petitions." Pet.App. EPA-HQ-OAR-2021-0566-0104, at 2.

Third, the Bunker Memorandum confirms that EPA's purported consultation with DOE was partial at best. The CAA requires EPA to consult DOE regarding both (1) DOE's findings as to whether RFS "compliance ... would impose a disproportionate economic hardship on small refineries," and (2) "other economic factors." § 7545(o)(9)(B)(ii) (cross-referencing § 7545(o)(9)(A)(ii)). But DOE's alleged consultation addressed only small refineries' RFS compliance costs and nothing else. *See* Pet.App. EPA-HQ-OAR-2021-0566-0104, at 2 (concurring that small refineries would not face disproportionate hardship by *assuming* EPA's RIN-passthrough theory was correct and that small refineries do not face "high[er] cost of [RFS] compliance relative to the industry average").

**D.     EPA refused to consider each refinery petition individually, as the statute requires.**

The CAA requires EPA to decide hardship petitions on an individual, case-by-case basis, but EPA denied 105 petitions in the April and June Denials without making any individualized determinations.

1.     The plain language of the CAA provides that EPA must decide hardship petitions individually: "*A* small refinery may at any time petition" for hardship relief "for the reasons of disproportionate economic hardship." § 7545(o)(9)(B)(i) (emphasis added). Likewise, EPA's charge is to evaluate whether "*a* petition" demonstrates hardship. § 7545(o)(9)(B)(ii) (emphasis added). Even EPA has acknowledged that evaluation of a hardship petition must be based on "data, contracts, and other information" received "from small refineries" relevant to their individual petitions. Pet.App. EPA-HQ-OAR-2021-0566-0106, at 25-26; Pet.App. EPA-HQ-OAR-2021-0566-0117, at 25-26.

Congress also built the individualized nature of adjudicating hardship petitions into the statutory structure. When Congress initially created the RFS, it provided an automatic, blanket hardship relief to *all* small refineries through 2011. § 7545(o)(9)(A)(i). Congress then directed EPA to extend that blanket exemption for at least two years to any small refinery that DOE determined would suffer "disproportionate economic

hardship." § 7545(o)(9)(A)(ii)(II).[13] When that two-year extension window ended, Congress put the onus on small refineries themselves to petition for relief. § 7545(o)(9)(B). They must show "disproportionate economic hardship" on an individual, refinery-specific basis. *Id.* To evaluate those petitions consistent with the statute, EPA's decisions must be individual and refinery specific. (And EPA tacitly recognized this when it sent each small refinery separate "confidential, refinery-specific appendices." Pet.App. EPA-HQ-OAR-2021-0566-0106, at 29; Pet.App. EPA-HQ-OAR-2021-0566-0117, at 30.)

Despite the Act's straightforward command that EPA must individually decide each hardship petition, EPA has already conceded that it "made no unique or individualized findings as to the ability of any of the ... petitioning small refineries" and did not consider "the particulars of any specific small refinery." EPA Mot. to Transfer at 16, No. 22-12535, Doc. 10. EPA's one-size-fits-all decision violated the CAA and Hunt's right to an individualized assessment.

2.      EPA's failure to evaluate each hardship petition on its individual merits is not remedied by EPA's "confidential, refinery-specific appendices" or EPA's assertion that it "reviewed all the information the small refineries and other interested parties submitted." Pet.App. EPA-HQ-OAR-2021-0566-0117, at 18. By its own admission, EPA's new RIN

---

[13] DOE determined that 13 small refineries should receive the exemption for 2011 and 2012.

passthrough theory "render[ed] irrelevant most *or all* local factors." EPA Reply at 8-9, No. 22-12535, Doc. 14 (emphasis added). Based on that theory, EPA found it "*unlikely* any one refinery would face disproportionate cost of compliance." Pet.App. EPA-HQ-OAR-2021-0566-0106, at 18-19, Pet.App. EPA-HQ-OAR-2021-0566-0117, at 18-19 (emphasis added). But even if that were the right test (which it is not, *see* Part II.B), a conclusion that it is "unlikely" any one refinery would face disproportionate compliance costs is not the same as faithfully determining whether a small refinery *actually* did.

In short, EPA was required to determine whether Hunt's petitions demonstrated that *Hunt*, individually, would experience disproportionate economic hardship. EPA's failure to do so is another reason why this Court should set aside the April and June Denials.

### E. EPA's interpretations of the Clean Air Act are not entitled to any deference.

The April and June Denials cannot be reconciled with the unambiguous language of the CAA. In pursuit of its goal to write hardship relief out of the statute altogether, EPA impermissibly changed and narrowed the statutory test for when hardship relief is available; failed to consult with DOE; and failed to conduct the individual hardship determinations that the Act requires.

In light of these multiple statutory violations, EPA's actions are not entitled to any deference. EPA's hardship determinations are not entitled

to deference under *Chevron* because the agency did not engage in meaningful notice and comment. *See United States v. Mead Corp.*, 533 U.S. 218, 230-31 (2001) ("notice-and-comment" is "significant" "in pointing to *Chevron* authority"). EPA's "notice and comment" process here was a sham: it deployed notice and comment here merely to add a veneer of legitimacy and attempt to manipulate judicial review of its decision based on inaccurate and incomplete information. *See* GAO Report 9-14. Indeed, EPA had never before used notice and comment when deciding hardship petitions, and then-nominee Joseph Goffman, now Principal Deputy Assistant Administrator of EPA's Office of Air and Radiation, testified under oath to Congress that the April and June Denials were individual adjudications.[14]

If *Chevron* does apply here, then it should be overruled. "*Chevron* withdraws a crucial check on the Executive from the separation of powers," and "requires judges to surrender their independent judgment to the will of the Executive." *Baldwin v. United States*, 140 S. Ct. 690, 695 (2020) (Thomas, J., dissenting from denial of certiorari) (recognizing *Chevron*'s "constitutional deficiencies"); *see also Buffington v. McDonough*, 143 S. Ct. 14, 22 (2022) (Gorsuch, J., dissenting). This case presents a textbook example of this problem. Any decision deferring to the agency would bless EPA's subversion of the CAA, which relied on

---

[14] Questions for the Record for Joseph Goffman at 11 (May 25, 2022), https://bit.ly/3x0mcQs.

Executive fiat to render congressionally mandated hardship-relief applications a dead letter that no small refinery can ever invoke.

Instead of *Chevron*, courts use the *Skidmore* standard to review hardship denials because "Congress did not intend the EPA's interpretation of 'disproportionate economic hardship' to have the 'force of law.'" *Sinclair Wyoming*, 887 F.3d at 991-93 (citing *Skidmore*, 323 U.S. 134; *Mead*, 533 U.S. 218). Under *Skidmore*, whether EPA's action can be sustained "will depend upon the thoroughness evident in [EPA's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140. Courts use that approach to hold the agency to account and require the agency to show its work; *Skidmore* does not amount to "deference." *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2424 (2019) (Roberts, C.J., concurring in part) ("there is a difference between holding that a court ought to be persuaded by an agency's interpretation and holding that it should defer to that interpretation under certain conditions").

But EPA's decision fails any standard. The April and June Denials cannot survive *Skidmore* scrutiny. For reasons outlined in Parts I and III, the Denials and EPA's statutory interpretation are "contrary to the meaning and purpose" of the CAA, are based on invalid reasoning, and are inconsistent with both earlier and later pronouncements. *See Sinclair Wyoming*, 887 F.3d at 999 (vacating hardship denials under *Skidmore*).

Even if *Chevron* applied, EPA's denials do not pass muster. "[T]he principles underlying *Chevron* are only applicable where Congress explicitly or implicitly expects the agency to be able to speak with the force of law when it *addresses ambiguity in the statute or fills a space in the enacted law*, and the agency actually acts in line with that expectation." *Martin v. Soc. Sec. Admin., Comm'r*, 903 F.3d 1154, 1159 (11th Cir. 2018) (per curiam) (cleaned up) (emphasis added); *see Kisor*, 139 S. Ct. at 2415 (*Chevron* applies only where a statute is "genuinely ambiguous"). A reviewing court will use all the "traditional tools of statutory construction" to determine the statute's meaning before it affords deference to the agency's interpretation. *Chevron*, 467 U.S. at 843 n.9. And even where ambiguity exists in the statute and Congress has delegated resolution of that ambiguity to the agency, *Chevron* permits the agency to adopt only a *reasonable* interpretation.

Here, for all the reasons discussed above, the CAA is clear that the focus of the "disproportionate" inquiry is "economic hardship," which encompasses more than just "compliance costs." The statute requires EPA to "consult[]" with the DOE. It requires EPA to evaluate hardship petitions on an individual basis. And of course, the statute requires that relief actually be available to small refineries experiencing disproportionate hardship. EPA's interpretation, which would automatically result in the denial of every hardship petition, is not a reasonable interpretation, especially in view of the Supreme Court's holding in *HollyFrontier* that

Congress made small-refinery hardship relief continuously available under the Act. 141 S. Ct. at 2180.

## III. EPA's Denials are arbitrary and capricious, as GAO's review demonstrates.

EPA's Denials are arbitrary and capricious for several reasons. They are grounded on a new economic theory that (1) runs counter to the evidence before the agency, as GAO found and as EPA itself recently confirmed; (2) relies on an assumption that Congress did not intend and that ignores an important aspect of the problem; and (3) ignores refinery-specific evidence.

An agency must engage in reasoned decision-making, *Michigan v. EPA*, 576 U.S. 743, 750 (2015), which means it must "examine the relevant data and articulate a satisfactory explanation for its action," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Agency action is arbitrary and capricious under the APA "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 34, 43; *see also Palm Beach County v. FAA*, 53 F.4th 1318 (11th Cir. 2022) (failed to follow its own regulations and procedures). For

example, EPA's failure to address refinery-specific evidence when evaluating a hardship petition ignores an important aspect of the problem and is thus arbitrary and capricious. *Ergon-West Virginia, Inc. v. EPA*, 896 F.3d 600, 613 (4th Cir. 2018).

As relevant here, when an agency changes position, it must provide "a more detailed justification" if, "for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *Fox Television*, 556 U.S. at 515. The Supreme Court held in *State Farm* that recission of a prior regulation required "a reasoned analysis for the change beyond" that required for a new regulation. 463 U.S. at 42. "It would be arbitrary or capricious to ignore such matters." *Fox Television*, 556 U.S. at 515.

As discussed above, EPA reversed position and denied hardship relief based on a new "economic theory" that supposedly makes it "unlikely" that any small refinery can suffer disproportionate economic hardship. *See* Pet.App. EPA-HQ-OAR-2021-0566-0117, at 18-19. Specifically, EPA assumes that all obligated parties' RFS compliance costs are the same, regardless of their size or bargaining power, and that the price of their fuel fully incorporates the cost of acquiring RINs. According to EPA, those facts enable obligated parties to fully pass through their RFS compliance costs to customers. *Id.* at 11. The RIN cost passthrough theory depends on the further assumption that obligated parties purchase RINs

"ratably"—that is, in real-time throughout the compliance year. *Id.* at 55. Thus, EPA concluded, "the RFS program cannot cause [disproportionate economic hardship]" because RIN costs are equal for all obligated parties and fully passed through to customers. *Id.* at 11-12.

EPA's reliance on this new economic theory is arbitrary and capricious for at least three reasons.

**First**, EPA's "RIN passthrough" hypothesis was counter to the evidence before the agency. *See State Farm*, 463 U.S. at 43. GAO's examination of the April and June Denials revealed that EPA's "RIN passthrough" theory relies on an incorrect assumption: that all parties pay and receive the same price for RINs. GAO's model, which used EPA's RIN market data, showed that "smaller buyers pay more, and smaller sellers receive less, when buying or selling RINs compared to larger buyers and sellers." GAO Report 67. GAO thus concluded that EPA's denials rely on a "flawed assumption and an incomplete assessment," such that EPA "ma[d]e decisions on small refinery exemptions without quality information and, therefore, risk[ed] inappropriately denying valid exemption petitions." *Id.* at 9, 13.

Following GAO's criticism, EPA itself *confirmed* that its evidence shows that the passthrough theory is incorrect. EPA's own belated December 2022 analysis shows that small refineries pay more and receive less when buying or selling RINs compared to their larger competitors. December 2022 RIN Price Analysis 1, 10. And the averages in the RIN

Price Analysis mask an even greater heterogeneity: some smaller refineries pay *even more* and receive *even less* than others. Congress created hardship relief for exactly this reason, and EPA is relying on a demonstrably false theory about the RIN market to ignore Congress's intent.

EPA should have figured this out earlier. Before EPA issued the Denials, Hunt provided EPA with multiple economic analyses refuting EPA's conclusion that all obligated parties pass through their compliance costs to customers. Hunt and other small refineries engaged Dr. Timothy Fitzgerald and the Louisiana State University Center for Energy Studies to analyze EPA's economic theory, and both concluded that EPA's new economic theory was "implausible, unsupported, and ignore[d] evidence that contradict[ed] EPA's position." Pet.App. EPA-HQ-OAR-2021-0566-0077 at 20 and Tabs M, O and P. Dr. Fitzgerald concluded that EPA's "RIN cost passthrough" position "is not consistent with the empirical results relevant to this issue in the academic literature." *Id.* at 21.

LSU also concluded that EPA's hypothesis that all obligated parties fully recover their compliance costs is incorrect. Among the empirical studies performed to date, "the amount of RIN pass-through has been found to vary across regions" and across fuel types. *Id.* at 27. It is therefore "unlikely that market participants in all situations are able to recover their firm-specific compliance costs through the market price they receive when they sell fuel." *Id.*; *see also* GAO Report 29 (criticizing EPA for "look[ing] at only a few large markets").

███████████████████████

**Second**, EPA's "RIN passthrough" theory relies on an assumption that Congress did not intend and that fails to consider an important aspect of the problem. EPA concedes that its passthrough hypothesis is applicable *only if* refineries "purchase the RINs they need for compliance on a ratable basis." Pet.App. EPA-HQ-OAR-2021-0566-0117, at 55. But EPA further concedes that purchasing RINs ratably is not required by statute or regulation, nor has it ever been a condition of small refinery hardship relief. Indeed, EPA has explicitly recognized that refineries can and do forego ratable RIN purchases. Hunt Decl. ¶ 28, Ex. C at 1 ("Obligated parties need not acquire RINs at the same time that they produce or import fuel but may, if they choose, simply purchase the required number of RINs by the end of the compliance period, once their annual production is known.").



████████████████████████████████████. Hunt therefore faces disproportionate economic hardship *even under* EPA's new "economic theory."

Even if ██████████████████████████████████████████████, it had good reasons not to do so. First, Hunt had received hardship relief in *every year* since the inception of the RFS program, and it reasonably relied on EPA's prior methodology when deciding whether to acquire RINs for the additional years for which it submitted hardship petitions. Hunt could not have foreseen that EPA would entirely upend the hardship evaluation process years later. In addition, EPA has previously refused to make whole refineries that had ratably purchased and retired RINs for compliance but then were belatedly granted hardship relief after EPA missed the statutory deadlines. *See, e.g.*, *Kern Oil*, 2022 WL 3369528, at *2. Those refineries were left with worthless or substantially devalued RINs, costing them tens of millions of dollars in losses. *See id.* at *3.

It is arbitrary and capricious—and incredibly callous—for EPA to now blame small refineries for unknowingly walking into a trap while EPA was brazenly violating its statutory deadlines and leaving small refineries in limbo for years. Instead of taking accountability for the ways EPA's failures to properly manage the RFS program have negatively affected small refineries, EPA questioned Hunt's financials and business decisions. EPA argues that Hunt should have purchased RINs ratably

despite its unbroken history of exemptions, and it alleges with no support whatsoever that Hunt has "cumulative savings" from prior exemptions to comply with the RFS program. Declaration of Bryon Bunker ¶¶ 43, 44 (No. 22-12535, Doc. 21 (under seal)). The RFS *imposes additional costs* on small refineries, so hardship relief does not confer a benefit but rather relieves a burden. For Hunt, hardship relief is not a windfall; it is a lifeline.

**Third**, EPA ignored Hunt's refinery-specific evidence proving that it actually faced disproportionate compliance costs. *See Ergon-West Virginia*, 896 F.3d at 613. Instead, EPA denied its hardship petitions based on the *assumption* that it is "unlikely" a small refinery "would face a disproportionate cost of compliance," *see* Pet.App. EPA-HQ-OAR-2021-0566-0117, at 18-19.

All of the facts that EPA previously relied on in finding that Hunt experienced disproportionate economic hardship are still true for the years at issue here. █████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████ █████

Hunt provided two independent economic analyses showing that EPA's new theory was empirically false as applied to Hunt. ███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████ EPA's passthrough theory, as applied to Hunt, is empirically false.

In sum, EPA's explanation for its Denials runs counter to the evidence before the agency, including EPA's own data; relies on factors Congress did not intend it to consider and that ignore an important aspect of the problem; and disregards refinery-specific evidence. EPA's rationale for its massive flip-flop falls far short of the "more detailed justification" that is required in view of Hunt's serious and reasonable reliance interests on EPA's prior methodology. *See Fox Television*, 556 U.S. at 515.

## CONCLUSION

For the foregoing reasons, the April and June Denials must be set aside. This Court should remand Hunt's petitions to EPA with instructions to remedy the harm caused by EPA's belated and unlawful Denial decisions.

Dated: February 9, 2023

Respectfully submitted,

*s/ Jonathan G. Hardin*

Jonathan G. Hardin
Alexandra M. Bromer
Michael R. Huston
Karl J. Worsham
PERKINS COIE LLP
700 Thirteenth Street, N.W.,
Suite 800
Washington, D.C. 20005-3960
Telephone: 202.654.6297
Facsimile: 202.654.6211
JHardin@perkinscoie.com
ABromer@perkinscoie.com
MHuston@perkinscoie.com
KWorsham@perkinscoie.com

*Attorneys for Hunt Refining Company*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. As measured by the word-processing system used to prepare this brief, the brief contains 12,949 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and complies with the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a 14 point proportionally spaced roman-style typeface (Century Schoolbook).

Date: February 9, 2023          */s/ Jonathan G. Hardin*
                                Jonathan G. Hardin

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2023, I electronically filed the redacted version of the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system. I further certify that the sealed version of Petitioner's Brief was submitted to the Court in paper format in a sealed envelope and will be received by the clerk within ten days of filing in accordance with Eleventh Circuit Rule 25-3(h), and an electronic copy of the sealed Brief will provided to Respondent's counsel via electronic means.

Date: February 9, 2023          */s/ Jonathan G. Hardin*
                                 Jonathan G. Hardin