No. 22-11617 (consolidated with No. 22-12535)

---

UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

---

HUNT REFINING COMPANY,
*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondent*.

---

On Petitions for Review of Final Agency Actions of the United States
Environmental Protection Agency

---

**EPA'S RESPONSE BRIEF**

---

TODD KIM
*Assistant Attorney General*

PATRICK R. JACOBI
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
Denver Place Building
999 18th Street
Suite 370—South Terrace
Of Counsel:                        Denver, CO 80202
                                   Tel: (303) 844-1348
SUSAN STAHLE
U.S. Environmental Protection Agency    BRYAN J. HARRISON
Office of General Counsel           U.S. Department of Justice
Washington, DC                      Environment and Natural Resources Division
                                    Environmental Defense Section
                                    P.O. Box 7611
                                    Washington, DC 20044-7611
                                    Tel: (202) 307-0930

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Circuit Rules 26.1-1 and 26.1-2, the following is a list of the trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations known to the undersigned counsel that have an interest in the outcome of this particular case:

1.  American Coalition for Ethanol — Movant-Intervenor, is a nonprofit trade association, whose members include ethanol and biofuel facilities, agricultural producers, ethanol industry investors, and supporters of the ethanol industry.  American Coalition for Ethanol promotes the general commercial, legislative, and other common interests of its members.  American Coalition for Ethanol does not have a parent company and issues no stock.

2.  Bromer, Alexandra — Perkins Coie, LLP — counsel for Petitioner.

3.  Dyl, Shelby L. — Pillsbury Winthrop Shaw Pittman LLP — counsel for Movant-Intervenors Renewable Fuels Association, Growth Energy, American Coalition for Ethanol, National Farmers Union, and National Corn Growers Association.

4.  Growth Energy — Movant-Intervenor, is a nonprofit trade association.  Its members are ethanol producers and supporters of the ethanol industry.  It operates to promote the general commercial, legislative, and other

common interests of its members.  Growth Energy does not have a parent company and issues no stock.

5.    Hardin, Jonathan G. — Perkins Coie, LLP — counsel for Petitioner.

6.    Harrison Bryan J. — Attorney, United States Department of Justice — counsel for Respondent United States Environmental Protection Agency.

7.    Hunt Consolidated, Inc. — parent company of Petitioner Hunt Refining Company, is not publicly traded, and no publicly held company has a ten percent or greater ownership interest in it.

8.    Hunt Refining Company — Petitioner, is incorporated under the laws of Delaware and an indirect, wholly owned subsidiary of Hunt Consolidated, Inc.

9.    Huston, Michael — Perkins Coie, LLP — counsel for Petitioner.

10.    Jacobi, Patrick R. — Attorney, United States Department of Justice — counsel for Respondent United States Environmental Protection Agency.

11.    Lehn, David M. — Wilmer Cutler Pickering Hale and Dorr LLP — counsel for Movant-Intervenor Growth Energy.[*]

12.    Miller, Gregory F. — Perkins Coie, LLP – counsel for Petitioner.

13.    Morin, Michael — Wilmer Cutler Pickering Hale and Dorr LLP — counsel for Movant-Intervenor Growth Energy.[*]

---

[*] As of this filing, counsel has not entered an appearance.

[*] As of this filing, counsel has not entered an appearance.

14.    Morrison, Matthew M. — Pillsbury Winthrop Shaw Pittman LLP — counsel for Movant-Intervenors Renewable Fuels Association, Growth Energy, American Coalition for Ethanol, National Farmers Union, and National Corn Growers Association.*

15.    National Corn Growers Association — Movant-Intervenor, is a nonprofit trade association.  Its members are corn farmers and supporters of the agriculture and ethanol industries.  The National Corn Growers Association promotes the general commercial, legislative, and other common interests of its members.  The National Corn Growers Association does not have a parent company and issues no stock.

16.    National Farmers Union — Movant-Intervenor, is a nonprofit trade association.  Its members include farmers who produce biofuel feedstocks and consume large quantities of fuel.  The National Farmers Union promotes the general commercial, legislative, and other common interests of its members.  It does not have a parent company and issues no stock.

17.    Renewable Fuels Association — Movant-Intervenor, is a nonprofit trade association.  Its members are ethanol producers and supporters of the ethanol industry.  It operates for the purpose of promoting the general commercial,

---

* As of this filing, counsel has not entered an appearance.

legislative, and other common interests of its members.  The Renewable Fuels Association does not have a parent company and issues no stock.

18.    United States Environmental Protection Agency — Respondent.

19.    Waxman, Seth P. — Wilmer Cutler Pickering Hale and Dorr LLP — counsel for Movant-Intervenor Growth Energy.[*]

20.    Worsham, Karl — Perkins Coie, LLP — counsel for Petitioner.


Dated:  April 20, 2023                          s/ *Patrick R. Jacobi*
                                                PATRICK R. JACOBI

---

[*] As of this filing, counsel has not entered an appearance.

## STATEMENT REGARDING ORAL ARGUMENT

Respondent United States Environmental Protection Agency ("EPA") requests oral argument. EPA believes that the Court would benefit from argument addressing the application of 42 U.S.C. § 7607(b)(1)'s venue provision to the agency actions challenged here.

If the Court reaches the merits, the petitions raise complex legal and record issues and involve evaluation of a complicated economic analysis. Petitioner's Appendix includes eight volumes totaling 1,585 pages, and Respondent's Supplemental Appendix includes hundreds more. Adjudicating the merits of the petitions for review will therefore require the Court to consider many complex issues and a substantial amount of information. The Court would therefore benefit from oral argument.

s/ *Patrick R. Jacobi*
PATRICK R. JACOBI

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................i

STATEMENT REGARDING ORAL ARGUMENT ................................................v

TABLE OF CONTENTS............................................................................................vi

TABLE OF CITATIONS ..........................................................................................ix

GLOSSARY.............................................................................................................xvi

INTRODUCTION ......................................................................................................1

STATEMENT OF JURISDICTION..........................................................................3

STATEMENT OF THE ISSUES...............................................................................3

STATEMENT OF THE CASE...................................................................................4

I.      STATUTORY AND REGULATORY BACKGROUND ..............................4

        A.      The Renewable Fuel Standard Program..................................................4

        B.      Renewable Identification Numbers ("RINs") .........................................5

        C.      The Temporary Exemption for Small Refineries.....................................6

        D.      Historical Approaches to "Disproportionate Economic
                Hardship"..................................................................................................7

        E.      EPA's Assessments of RIN Market Dynamics.......................................9

II.     FACTUAL AND PROCEDURAL BACKGROUND....................................10

        A.      Events Prompting Remand of EPA's Initial 2018
                Decision and Proposed Denial ...............................................................10

        B.      Remand of EPA's Initial 2018 Decision...............................................13

        C.      Proposed Denial and Hunt's Comments ...............................................13

D.    April Denial .......................................................................14

E.    June Denial ........................................................................15

F.    Related EPA Compliance Actions .....................................16

G.    Hunt's Petitions in This Court...........................................17

SUMMARY OF ARGUMENT ................................................................18

STANDARD OF REVIEW ......................................................................20

ARGUMENT ...........................................................................................21

I.    THE COURT SHOULD DISMISS OR TRANSFER HUNT'S
      PETITIONS TO THE D.C. CIRCUIT. ........................................21

II.   THE DENIAL ACTIONS DO NOT VIOLATE HUNT'S DUE
      PROCESS RIGHTS AND ARE NOT IMPERMISSIBLY
      RETROACTIVE...........................................................................22

      A.    Hunt Lacked Any Due Process Rights in Its Pending
            Exemption Petitions and Had Multiple Opportunities to
            Be Heard.............................................................................23

      B.    The Denial Actions Are Not Retroactive. ...........................25

      C.    Alternatively, Any Retroactive Effect of the Denial
            Actions Would Be Permissible. ..........................................27

            1.    Any Reliance by Hunt on EPA's Prior Approach Is
                  Unreasonable.............................................................28

            2.    The Timing of EPA's Denial Actions Does Not
                  Make Them Impermissibly Retroactive. ...................31

III.  EPA'S REVISED INTERPRETATION OF THE CAA'S
      SMALL REFINERY EXEMPTION PROVISIONS IS
      PERMISSIBLE..............................................................................33

IV.    EPA'S DENIAL ACTIONS WERE CONSISTENT WITH
       THE CAA AND REASONABLE....................................................41

       A.    EPA Did Not Eliminate the Small Refinery Exemption....................45

       B.    EPA's Consultation With DOE Satisfied the Statutory
             Requirement. ........................................................................46

       C.    EPA's Denial Actions Adjudicated Multiple Petitions
             and Considered Refinery-Specific Facts in Detail. ...........................49

       D.    Hunt's Remaining Arguments Do Not Show That EPA
             Acted Unreasonably or Failed to Reasonably Explain Its
             Findings. ...............................................................................51

             1.    The Post-Decisional GAO Report Should Not Be
                   Considered. .................................................................51

             2.    The Timing of Hunt's RIN Purchases Does Not
                   Invalidate RIN Cost Passthrough, and Hunt Did
                   Not Show That It Cannot Purchase RINs Ratably...................53

             3.    EPA Reasonably Rejected Hunt's Studies................................55

             4.    Hunt's Other Arguments Should Be Rejected...........................57

CONCLUSION ...................................................................................58

CERTIFICATES OF COMPLIANCE....................................................60

CERTIFICATE OF SERVICE ..............................................................61

# TABLE OF CITATIONS

Cases

*Aliceville Hydro Assocs. v. FERC*,
  800 F.2d 1147 (D.C. Cir. 1986) ........................................................27

*Alon Refin. Krotz Springs, Inc v. EPA*,
  936 F.3d 628 (D.C. Cir. 2019) *cert. denied sub nom.*,
  *Valero Energy Corp. v. EPA*, 140 S. Ct. 2792 (2020) .......................44

*Am. Hosp. Ass'n v. Becerra*,
  142 S. Ct. 1896 (2022) .....................................................................37

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
  526 U.S. 40 (1999) ...........................................................................24

*Ams. for Clean Energy v. EPA*,
  864 F.3d 691 (D.C. Cir. 2017) ................................................... 31, 32

*Bd. of Regents of State Colls. v. Roth*,
  408 U.S. 564 (1972) ................................................................. 23, 24

*Bellsouth Telecomms., Inc. v. Se. Tel., Inc.*,
  462 F.3d 650 (6th Cir. 2006) ............................................................26

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204, (1988) .........................................................................27

*Brock v. Pierce County*,
  476 U.S. 253 (1986) ..........................................................................31

*Cassell v. FCC*,
  154 F.3d 478 (D.C. Cir. 1998) ............................................... 28, 29, 33

*Chadmoore Commc'ns., Inc. v. FCC*,
  113 F.3d 235 (D.C. Cir. 1997) ..........................................................26

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
  467 U.S. 837 (1984) ..........................................................................21

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012) ........................................................................26

*City of Oxford v. FAA*,
  428 F.3d 1346 (11th Cir. 2005) ................................................. 21, 42

*Clark-Cowlitz Joint Operating Agency v. FERC*,
  826 F.2d 1074 (D.C. Cir. 1987) ......................................................27

*Craker v. DEA*,
  44 F.4th 48 (1st Cir. 2022) ..............................................................26

*Edelman v. Lynchburg Coll.*,
  535 U.S. 106 (2002) ........................................................................40

*Edwards v. U.S. Att'y Gen.*,
  56 F.4th 951 (11th Cir. 2022) .........................................................40

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ........................................................................37

*Fla. Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) .................................................................. 21, 51

*Hermes Consol., LLC v. EPA*,
  787 F.3d 568 (D.C. Cir. 2015) ............................................. 42, 47, 50

*HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*,
  141 S. Ct. 974 (2021) ......................................................................11

*HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*,
  141 S. Ct. 2172 (2021) .......................................................... 11, 36, 46

*In re Gateway Radiology Consultants, P.A.*,
  983 F.3d 1239 (11th Cir. 2020) ................................................. 21, 34

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994) ........................................................................25

*Lyashchynska v. U.S. Att'y Gen.*,
  676 F.3d 962 (11th Cir. 2012) ...............................................................48

*\*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989)............................................................. 21, 42, 45

*Martin v. Soc. Sec. Admin.*,
  903 F.3d 1154 (11th Cir. 2018) ...........................................................21

*Monroe Energy, LLC v. EPA*,
  750 F.3d 909 (D.C. Cir. 2014)............................................................25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)................................................................ 20, 30, 41

*NAACP v. FPC*,
  425 U.S. 662 (1976)...........................................................................49

*Nat'l Petrochemical & Refiners Ass'n v. EPA*,
  630 F.3d 145 (D.C. Cir. 2010) ...................................................... 25, 27

*Patterson v. Ga. Pac., LLC*,
  38 F.4th 1336 (11th Cir. 2022) ............................................................37

*Pine Tree Med. Assocs. v. Sec'y of Health & Hum. Servs.*,
  127 F.3d 118 (1st Cir. 1997)..............................................................26

*POM Wonderful, LLC v. FTC*,
  777 F.3d 478 (D.C. Cir. 2015)............................................................27

*Renewable Fuels Ass'n, et al. v. EPA*,
  948 F.3d 1206 (10th Cir. 2020) ..................................................... 10, 33

*RMS of Georgia, LLC v. EPA*,
  No. 21-14213, __ F.4th __, 2023 WL 2925109 (11th Cir. Apr. 13, 2023) .........22

*Sinclair Wyo. Refin. Co. v. EPA*,
  887 F.3d 986 (10th Cir. 2017) ........................................... 8, 20, 39, 40

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ................................................................20

*United States v. Adewani*,
  467 F.3d 1340 (D.C. Cir. 2006) ..............................................40

*United States v. Levy*,
  416 F.3d 1273 (11th Cir. 2005) ................................. 44, 54, 57

*United States v. Mead Corp.*,
  533 U.S. 218 (2001) ................................................................40

*United States v. Wiszowaty*,
  506 F.3d 537 (7th Cir. 2007) ..................................................52

*Verizon Tel. Cos. v. FCC*,
  269 F.3d 1098 (D.C. Cir. 2001) ..............................................28

*VHV Jewelers, LLC v. Wolf*,
  17 F.4th 109 (11th Cir. 2021) ................................... 20, 41, 45

**Statutes**

5 U.S.C. § 706 ..............................................................................51

5 U.S.C. § 706(2) .........................................................................33

5 U.S.C. § 706(2)(A) ....................................................................20

42 U.S.C. § 7545(*o*) ......................................................................4

42 U.S.C. § 7545(*o*)(1)(k) .............................................................6

42 U.S.C. § 7545(*o*)(2)(A) ...........................................................42

42 U.S.C. § 7545(*o*)(2)(A)(i) .........................................................4

42 U.S.C. § 7545(*o*)(2)(A)(iii) .......................................................4

42 U.S.C. § 7545(*o*)(2)(B) .............................................................4

42 U.S.C. § 7545(*o*)(2)(B)(ii) .......................................................... 4

42 U.S.C. § 7545(*o*)(2)(B)(i)(I)–(IV) ............................................ 4

42 U.S.C. § 7545(*o*)(3)(B)(i) ........................................................ 4

42 U.S.C. § 7545(*o*)(3)(B)(ii)(I) ............................................ 25, 37

42 U.S.C. § 7545(*o*)(5) ............................................................... 42

42 U.S.C. § 7545(*o*)(5)(D) ....................................................... 5, 38

42 U.S.C. § 7545(*o*)(7) ................................................................. 4

42 U.S.C. § 7545(*o*)(7)(A) ............................................................ 4

42 U.S.C. § 7545(*o*)(7)(D)–(F) ..................................................... 4

42 U.S.C. § 7545(*o*)(9) ................................................................. 6

42 U.S.C. § 7545(*o*)(9)(A) .......................................................... 36

42 U.S.C. § 7545(*o*)(9)(A)(i) .................................................... 6, 35

42 U.S.C. § 7545(*o*)(9)(A)(ii)(I) ............................................... 6, 42

42 U.S.C. § 7545(*o*)(9)(A)(ii)(II) .............................................. 6, 47

42 U.S.C. § 7545(*o*)(9)(A)(ii)(I)–(II) ........................................... 35

42 U.S.C. § 7545(*o*)(9)(B) ............... 3, 10, 11, 13, 14, 18, 19, 27, 33, 36, 41, 45, 50

42 U.S.C. § 7545(*o*)(9)(B)(i) ........................................ 6, 10, 35, 36, 46

42 U.S.C. § 7545(*o*)(9)(B)(ii) .............................. 7, 15, 24, 27, 35, 46, 47

42 U.S.C. § 7545(*o*)(9)(B)(iii) ............................................... 31, 35

42 U.S.C. § 7604(a)(2) ................................................................ 31

42 U.S.C. § 7607(b)(1)........................................................ v, 1, 3, 17, 18, 22

**Regulations**

40 C.F.R. § 80.1406 ........................................................................4, 25

40 C.F.R. § 80.1426(a) ........................................................................5

40 C.F.R. § 80.1426(e) ........................................................................5

40 C.F.R. § 80.1427(a)(1) ....................................................................5

40 C.F.R. § 80.1429(b) ........................................................................5

40 C.F.R. § 80.1427(a)(6) ....................................................................5

40 C.F.R. § 80.1428(c) ........................................................................5

40 C.F.R. § 80.1431(a) ........................................................................5

40 C.F.R. § 80.1451(f)(1)(i) .................................................................5

40 C.F.R. § 80.1451(f)(1)(i)(A)(1) ...................................................5, 29

40 C.F.R. §§ 80.1425–80.1429 .............................................................5

40 C.F.R. §§ 80.1425–80.1427 ...................................................... 42, 43

**Other Authorities**

Pub. L. No. 109-58 ..............................................................................4

Pub. L. No. 110-140 ............................................................................4

72 Fed. Reg. 23900 (May 1, 2007) .......................................................6

75 Fed. Reg. 14670 (Mar. 26, 2010)....................................................6

86 Fed. Reg. 17073 (Apr. 1, 2021) .....................................................16

87 Fed. Reg. 5696 (Feb. 2, 2022) ...............................................................16

87 Fed. Reg. 54158 (Sept. 2, 2022) ..........................................................17

# GLOSSARY

| | |
|---|---|
| 2011 Study | U.S. Department of Energy, Small Refinery Exemption Study, An Investigation into Disproportionate Economic Hardship |
| 2015 Burkholder Study | A Preliminary Assessment of RIN Market Dynamics, RIN Prices, and Their Effects |
| 2017 Point of Obligation Denial | November 2017 Denial of Petitions for Rulemaking to Change the RFS Point of Obligation |
| APA | Administrative Procedure Act |
| Alternative Compliance Action | April 2022 Alternative RFS Compliance Demonstration Approach for Certain Small Refineries |
| April Denial | April 2022 Denial of Petitions for RFS Small Refinery Exemptions |
| CAA | Clean Air Act |
| Consultation Memorandum | Memorandum from B. Bunker to Docket No. EPA-HQ-OAR-2021-0566 re Consultation with the Department of Energy under Clean Air Act § 211(*o*)(9)(B)(ii) Regarding the April 2022 Denial of Petitions for RFS Small Refinery Exemptions |
| Denial Actions | April 2022 Denial of Petitions for RFS Small Refinery Exemptions and June 2022 Denial of Petitions for RFS Small Refinery Exemptions (collectively) |
| DOE | U.S. Department of Energy |
| EPA or the Agency | Respondent U.S. Environmental Protection Agency |
| EPA's Venue Filings | EPA's Motions to Transfer the Petitions for Review to the D.C. Circuit or Dismiss Based on Improper Venue and Replies in Support |

| | |
|---|---|
| Flexibility Rule | Renewable Fuel Standard (RFS) Program:  Alternative RIN Retirement Schedule for Small Refineries |
| GAO | U.S. Government Accountability Office |
| GAO Report | U.S. Government Accountability Office, Renewable Fuel Standard:  Actions Needed to Improve Decision-Making in the Small Refinery Exemption Program |
| *HollyFrontier* | *HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172 (2021) |
| Hunt | Petitioner Hunt Refining Company |
| Initial 2018 Decision | Final Agency Action Entitled "Decision on 2018 Small Refinery Exemption Petitions," Anne Idsal, Acting Assistant Administrator, Office of Air and Radiation |
| June Denial | June 2022 Denial of Petitions for RFS Small Refinery Exemptions |
| PA | Petitioner's Appendix |
| Proposed Denial | Proposed RFS Small Refinery Exemption Decision |
| *RFA* | *Renewable Fuels Association, et al. v. EPA*, 948 F.3d 1206 (10th Cir. 2020) |
| RSA | Respondent's Supplemental Appendix |
| RFS | Renewable Fuel Standard |
| RINs | Renewable Identification Numbers |
| *Webster's* | *Webster's Third New Int'l Dictionary of the English Language Unabridged* (2002 ed.) |

## INTRODUCTION

The Environmental Protection Agency ("EPA") denied Petitioner Hunt Refining Company an exemption from Hunt's obligations for compliance years 2018 through 2021 under the Clean Air Act's ("CAA's") Renewable Fuel Standard ("RFS") program. EPA did so in two actions: An April 2022 Denial of Petitions for RFS Small Refinery Exemptions ("April Denial") and a June 2022 Denial of Petitions for RFS Small Refinery Exemptions ("June Denial") (collectively, "Denial Actions"). Hunt petitions this Court to review both Denial Actions.

Venue is improper in this Court. The Denial Actions are each "nationally applicable"—or if "locally or regionally applicable," both "based on a determination of nationwide scope or effect" made and published by EPA—and therefore reviewable only by the D.C. Circuit. 42 U.S.C. § 7607(b)(1). These petitions should be dismissed or transferred there, to be consolidated with the forty petitions to review the Denial Actions that Hunt and others have filed in that court.

If this Court reaches the merits, it should uphold the Denial Actions. Congress enacted the small refinery exemption as a safety valve to enable small refineries to seek relief in the narrow circumstances where they can show disproportionate economic hardship from RFS compliance. Following fluctuations in EPA's approach to determining hardship, an unprecedented increase in the number of exemption petitions, and judicial invalidation of EPA's grants of small

1

refinery exemptions, EPA comprehensively reviewed its approach to deciding them.  EPA considered refinery-specific materials submitted by many small refineries in support of their exemption petitions, reviewed years of experience and data collected in implementing the RFS program, and undertook an exhaustive analysis of the RFS credit ("RIN") and fuels markets.  Consistent with the statute and a decision from the Tenth Circuit, EPA concluded that Congress intended exemptions only for hardship caused by RFS compliance and where the hardship is "disproportionate."

EPA also determined that RFS compliance did not cause disproportionate economic hardship for Hunt and other petitioning small refineries for the RFS compliance years at issue.  In fact, the evidence demonstrates that Hunt and other small refineries passed on their RFS compliance costs in the sales price of their products through RIN discount and RIN cost passthrough principles.

Hunt's brief offers no basis to second-guess EPA's statutory interpretation and rational, record-based determinations.  Hunt's retroactivity and statutory arguments lack foundation and are not supported by the record.  Hunt's interpretation reads words out of the statute.  And Hunt fails to invalidate EPA's economic analysis.

For these reasons, the petitions for review should be denied.

## STATEMENT OF JURISDICTION

Hunt's petitions should be dismissed or transferred to the D.C. Circuit pursuant to 42 U.S.C. § 7607(b)(1). *See* Argument, Part I, *infra*. The challenged EPA actions otherwise constitute final agency action subject to judicial review pursuant to § 7607(b)(1), as Hunt timely filed its petitions for judicial review.

## STATEMENT OF THE ISSUES

1.     Whether venue is improper because the Denial Actions are either "nationally applicable" or else "based on a determination of nationwide scope or effect" made and published by EPA, 42 U.S.C. § 7607(b)(1).

2.     Whether EPA's revised interpretation of 42 U.S.C. § 7545($o$)(9)(B) and approach to determining disproportionate economic hardship violates Hunt's due process rights or is impermissibly retroactive, notwithstanding that Hunt had notice of the changes and took multiple opportunities to comment and supplement its pending exemption petitions accordingly.

3.     Whether EPA's revised interpretation of 42 U.S.C. § 7545($o$)(9)(B) as requiring that disproportionate economic hardship be caused by RFS compliance is permissible.

4.     Whether EPA's Denial Actions are consistent with 42 U.S.C. § 7545($o$)(9)(B), reasonable, and reasonably explained.

## STATEMENT OF THE CASE

## I.    STATUTORY AND REGULATORY BACKGROUND

### A.    The Renewable Fuel Standard Program

In 2005 and 2007, Congress amended the CAA to establish the RFS program, now codified at 42 U.S.C. § 7545(*o*), seeking, among other purposes, to "increase the production of clean renewable fuels." Pub. L. No. 110-140, 121 Stat. 1492; *see also* Pub. L. No. 109-58, 119 Stat. 594. The statute requires increasing annual "applicable volumes" of four categories of renewable fuel for the transportation sector. 42 U.S.C. § 7545(*o*)(2)(B)(i)(I)–(IV). Congress prescribed specified applicable volumes for certain renewable fuels through 2022; EPA sets annual volume requirements after that. *Id.* § 7545(*o*)(2)(B)(ii), (*o*)(7).

Congress also directed EPA to establish a compliance program and annual percentage standards to ensure that the applicable volumes are sold each year. *Id.* § 7545(*o*)(2)(A)(i), (iii), (2)(B), (3)(B)(i), (7)(A), (7)(D)–(F). EPA's implementing regulations identify refineries and importers of gasoline and diesel fuel as obligated parties. 40 C.F.R. § 80.1406. Obligated parties apply the percentage standards to their annual production or importation of gasoline and diesel to calculate their individual renewable volume obligation for each renewable fuel.

EPA regulations also set the RFS annual compliance date.  *See id.*
§ 80.1451(f)(1)(i).  The compliance date has always fallen after the calendar year
covered by the applicable annual rule.  *See id.* § 80.1451(f)(1)(i)(A)(1).

### B.    Renewable Identification Numbers ("RINs")

To implement Congress's requirement for a credit-trading program, EPA
established a system of Renewable Identification Numbers ("RINs").  Producers
and importers of renewable fuels generate RINs for each gallon of renewable fuel
they produce or import for use in the United States.  *Id.* § 80.1426(a).  The
producers and importers assign each RIN to a batch of renewable fuel.  *Id.*
§ 80.1426(e).  A RIN may be "separated" from its batch only by an obligated party
or an entity that blends the renewable fuel into conventional fuel.  *Id.* § 80.1429(b).
Once separated, RINs may be kept for compliance or sold.  *Id.* §§ 80.1425–
80.1429.

A RIN may be used for compliance only during the calendar year in which it
was generated or the following calendar year.  *Id.* §§ 80.1427(a)(6), 80.1428(c),
80.1431(a).  Obligated parties meet their renewable volume obligation by
"retiring" RINs in an annual compliance demonstration.  *Id.* § 80.1427(a)(1).
Parties who cannot comply may carry forward a compliance deficit to the next
year.  42 U.S.C. § 7545(*o*)(5)(D).  The RIN system gives obligated parties
flexibility in demonstrating compliance by allowing them to acquire RINs in

several different ways, including by purchasing and blending renewable fuels to generate RINs themselves or by purchasing RINs reflecting renewable fuel volumes blended by other entities. 72 Fed. Reg. 23900, 23942 (May 1, 2007); *see also* 75 Fed. Reg. 14670, 14722–23 (Mar. 26, 2010).

### C.    The Temporary Exemption for Small Refineries

Congress created a three-tiered, temporary exemption from the RFS program for certain obligated parties that qualify as "small refineries." 42 U.S.C. § 7545(*o*)(9); *see also id.* § 7545(*o*)(1)(k). First, Congress granted all small refineries a blanket exemption from the requirements of the RFS program until 2011. *Id.* § 7545(*o*)(9)(A)(i).

Second, Congress directed the U.S. Department of Energy ("DOE") to study "whether compliance with the requirements of [the RFS program] would impose a disproportionate economic hardship on small refineries." *Id.* § 7545(*o*)(9)(A)(ii)(I). For any small refinery that DOE determined "would be subject to disproportionate economic hardship if required to comply," Congress directed EPA to extend the exemption for two additional years. *Id.* § 7545(*o*)(9)(A)(ii)(II).

Third, Congress provided that a small refinery "may at any time petition [EPA] for an extension [beyond 2011] of the exemption under subparagraph (A) for the reason of disproportionate economic hardship." *Id.* § 7545(*o*)(9)(B)(i). In

evaluating such a petition, EPA, "in consultation with" DOE, "shall consider the findings of [DOE's study] and other economic factors." *Id.* § 7545(*o*)(9)(B)(ii).

### D. Historical Approaches to "Disproportionate Economic Hardship"

Due to changing approaches to disproportionate economic hardship and other factors, the number of discretionary exemptions granted for each compliance year increased from seven or eight during 2013 to 2015 to nineteen in 2016 and thirty-five in 2017. Petitioner's Appendix ("PA"), EPA-HQ-OAR-2021-0566-0117 at 67.

DOE issued its first small refinery study in 2009. Respondent's Supplemental Appendix ("RSA"), AD-1. DOE found that, in a liquid and competitive market, RFS compliance would not impose disproportionate economic hardship on any small refinery and recommended against extending exemptions beyond 2010. *Id.* at 2. DOE cautioned that "small refineries using the exemption might gain significant economic benefits" when "selling products that have lower production costs than their competitors if they are not required to participate in the RFS program." *Id.* at 4.

In 2011, DOE issued its "Small Refinery Exemption Study, An Investigation into Disproportionate Economic Hardship" ("2011 Study"). PA, EPA-HQ-OAR-2021-0566-0002. DOE's 2011 Study assumed that, "[i]f certain small refineries must purchase RINs that are far more expensive than those that may be generated

through blending, this will lead to disproportionate economic hardship for those effected [*sic*] entities" because they would experience a "high cost of compliance relative to the industry average." *Id*. at 2–3. Based on this assumption, DOE included a scoring matrix with two indices at the end of the 2011 Study to assess which small refineries would have less opportunity to blend and thus would have to buy RINs, which could result in disproportionate economic hardship ("DOE Matrix"). *Id.* at 31–36. After the 2011 Study, DOE scored its Matrix to recommend hardship for exemption petitions where the average on *both* indices exceeded "1."

In 2015 and 2016, members of Congress directed DOE and EPA to conclude that a fifty percent exemption—i.e., the small refinery need meet only half of its annual RFS program obligation—was warranted if DOE scored either Matrix index above "1." *See* PA, EPA-HQ-OAR-2021-0566-0117 at 14 & nn.59–60 (citations omitted). Considering these congressional statements, along with changing administration policies and vacatur of EPA's exemption petition denials in *Sinclair Wyoming Refinery Company v. EPA*, 887 F.3d 986, 997 (10th Cir. 2017) ("*Sinclair*"), EPA changed its approach to "disproportionate economic hardship" to allow for a grant of an exemption petition where a small refinery received a score above "1" on *either* index. PA, EPA-HQ-OAR-2021-0566-0117 at 14.

### E.    EPA's Assessments of RIN Market Dynamics

EPA first assessed obligated parties' ability to "pass through" RIN costs and the impact of RIN prices on the price of blended fuel in 2015 in "A Preliminary Assessment of RIN Market Dynamics, RIN Prices, and Their Effects" ("2015 Burkholder Study").  RSA, EPA-HQ-OAR-2021-0566-0006.  Based on market data, EPA concluded that "the RIN price, rather than acting as an additional cost, generally acts as a transfer payment between parties that blend renewable fuels and obligated parties who produce or import petroleum-based fuels and are required to obtain RINs for compliance purposes."  *Id.* at 2.  Further, "the discounting of renewable fuels enabled by the sale of the RINs and the higher petroleum prices that result from the cost of purchasing RINs, are expected to offset each other, resulting in the RIN price having no net impact across the entire fuel pool."  *Id.* at 2; *see also id.* at 21–31.  EPA reiterated the findings from the 2015 Burkholder Study in its November 2017 Denial of Petitions for Rulemaking to Change the RFS Point of Obligation ("2017 Point of Obligation Denial") based on more market data, studies by outside parties, and public comments.  RSA, EPA-HQ-OAR-2021-0566-0007 at 21–31.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Events Prompting Remand of EPA's Initial 2018 Decision and Proposed Denial

On August 9, 2019, EPA acted on thirty-six 2018 RFS exemption petitions, including Hunt's, in a two-page decision, granting thirty-one of the petitions and denying five ("Initial 2018 Decision").  *See* RSA, AD-2.  EPA announced that it would grant a full exemption where DOE had recommended a full or fifty percent exemption and deny where DOE recommended no exemption.  *Id.*  Multiple parties petitioned for review of EPA's Initial 2018 Decision.  *See* D.C. Circuit Nos. 19-1196, 19-1197, 19-1216, 19-1220, & 20-1099.

The Tenth Circuit issued *Renewable Fuels Association, et al. v. EPA*, 948 F.3d 1206 ("*RFA*") in January 2020, vacating and remanding three of EPA's 2016 and 2017 exemption grants.  The court held that:  (1) to be eligible for an "extension" of the exemption under 42 U.S.C. § 7545(*o*)(9)(B)(i), a small refinery needed to have maintained a continuous, uninterrupted exemption, which the small refineries at issue had not; (2) EPA's prior approach of finding "disproportionate economic hardship" for reasons other than RFS compliance was "outside the scope of the EPA's statutory authority" in § 7545(*o*)(9)(B); and (3) EPA "failed to consider an important aspect of the problem" when it "did not address the applicability of the [RIN cost] pass-through principle *at all*" when evaluating the exemption petitions.  *RFA*, 948 F.3d at 1244–57 (emphasis in original).

In January 2021, the Supreme Court granted a petition for a writ of certiorari limited to the Tenth Circuit's eligibility holding. *HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 974 (2021).

On February 2, 2021, EPA filed a consent motion to hold the petitions challenging EPA's Initial 2018 Decision in abeyance pending a decision from the Supreme Court, which was set to rule on overlapping eligibility issues. *Sinclair Wyo. Refin. Co. v. EPA*, No. 19-1196 (D.C. Cir.), Doc 1883334. The D.C. Circuit granted the motion. Doc. 1885774.

On June 25, 2021, the Supreme Court reversed the single Tenth Circuit holding on which certiorari was granted, concluding that the term "extension" as used in 42 U.S.C. § 7545(*o*)(9)(B) does not require a continuous exemption for future eligibility. *HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172 (2021) ("*HollyFrontier*"). As to the remaining issues decided in *RFA*, the Tenth Circuit's mandate noted that "jurisdiction is transferred back to the lower court/agency." *Renewable Fuels Ass'n v. EPA*, No. 18-9533 (10th Cir. July 29, 2021), Doc. 010110555262. EPA sought clarification, indicating that it would follow the alternative holdings in *RFA* on remand if the Tenth Circuit denied the motion or did not clarify otherwise. Doc. 010110564301 at 6–7. The Tenth Circuit declined to act. Doc. 010110567206.

In July and August 2021, EPA met with small refineries about the holdings of *HollyFrontier* and *RFA*, as well as EPA's findings on RIN discount and RIN cost passthrough, inviting them to submit any additional information for their pending petitions.  RSA, AD-4; *see also* RSA, AD-3.  EPA also emailed small refineries with pending exemption petitions "to be sure that you are aware that EPA is evaluating what this holding [in *RFA*] means and that you, too, have the opportunity to submit additional information to support your small refinery exemption petition(s)."  RSA, EPA-HQ-OAR-2021-0566-0101.

Hunt emailed a letter to EPA on June 15, 2021, ███████████████

███████████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

RSA, JD-475 at 1.  Hunt attended an August 25, 2021 meeting with EPA and submitted five supplements to its pending exemption petitions ██████████

███████████████████████████████████

███████████████████████████████████

███████████████  RSA, SI-230 at 1 (July 8, 2021); *see also* generally PA, SI-

234 (Sept. 10, 2021); RSA, SI-237 (Sept. 23, 2021); RSA, SI-240 (Nov. 2, 2021); RSA, SI-255 (Feb. 25, 2022).

### B.    Remand of EPA's Initial 2018 Decision

On August 25, 2021, EPA moved for voluntary remand without vacatur in the challenges to EPA's Initial 2018 Decision in the D.C. Circuit to allow EPA the opportunity to reconsider its action given the alternative holdings in *RFA*. *E.g.*, *Renewable Fuels Assoc., et al., v. EPA*, No. 19-1220, Doc. 1911608. Hunt was an intervenor-respondent in one of these cases. *Id.* at 3 n.4. The D.C. Circuit remanded the thirty-six 2018 exemption decisions to the Agency on December 8, 2021, with instructions to act within 120 days. Doc. 1925942.

### C.    Proposed Denial and Hunt's Comments

On December 7, 2021, EPA proposed to deny sixty-five pending exemption petitions for compliance years 2016 through 2021 ("Proposed Denial"). *See* PA, EPA-HQ-OAR-2021-0566-0023; RSA, EPA-HQ-OAR-2021-0566-0001 (publishing notice). Informed by the decisions in *RFA* and *HollyFrontier*, EPA took a fresh look at the exemption in 42 U.S.C. § 7545($o$)(9)(B) and proposed to interpret it to require a showing of disproportionate economic hardship caused by RFS compliance. PA, EPA-HQ-OAR-2021-0566-0023 at 23–26. In light of *RFA*, EPA also analyzed how principles of RIN discount and RIN cost passthrough apply in the context of the pending petitions. *Id.* at 26–62. EPA's analysis found

that the "market-based design of the RFS program and the RIN-based compliance system have equalized the cost of compliance among all market participants, such that no refinery would face disproportionate economic hardship from its RFS obligations" and that "the costs of RFS compliance (i.e., RINs) are passed through in the prices of refined products." *Id.* at 62. Therefore, EPA proposed to deny all the pending petitions.

On January 3, 2022, EPA notified stakeholders that it was considering inclusion of the remanded 2018 exemption petitions—including Hunt's—as part of the Proposed Denial and solicited comment on the issue. *See* RSA, EPA-HQ-OAR-2021-0566-0027.

Hunt submitted comments on the Proposed Denial with other small refineries, *see* PA, EPA-HQ-OAR-2021-0566-0077, Tabs I, M, O, & P; RSA, SI-257–SI-259, and specific to Hunt, *see* PA, SI-243–SI-253.

### D.    April Denial

On April 7, 2022, EPA denied all thirty-six exemption petitions for the 2018 RFS compliance year that had been remanded to the Agency, including Hunt's. PA, EPA-HQ-OAR-2021-0566-0106. EPA adopted its revised interpretation of 42 U.S.C. § 7545(*o*)(9)(B) and approach to determining disproportionate economic hardship, as proposed in December 2021. Based on the RIN discount and RIN cost

passthrough principles, EPA confirmed its finding that none of the petitioning

small refineries suffered disproportionate economic hardship.

As required by 42 U.S.C. § 7545(*o*)(9)(B)(ii), EPA engaged in a robust

consultation process with DOE for the Proposed Denial and Denial Actions,

described in a memorandum to the record ("Consultation Memorandum"), PA,

EPA-HQ-OAR-2021-0566-0104.  EPA also included detailed responses to non-

confidential small refinery arguments about EPA's economic analysis in the April

Denial, as well as separate appendices responding to non-confidential small

refinery comments (Appendix B, PA, EPA-HQ-OAR-2021-0566-0108) and

confidential, refinery-specific comments (appendices C through T, including

Hunt's comments in Appendix K, PA, AD-309).

### E.    June Denial

On June 3, 2022, EPA denied sixty-nine exemption petitions for the 2016

through 2021 RFS compliance years, including Hunt's 2019 through 2021

petitions.  PA, EPA-HQ-OAR-2021-0566-0117.  Save for the RFS compliance

years and specific petitioning small refineries, the June Denial is nearly identical to

the April Denial and includes its own Appendix B, PA, EPA-HQ-OAR-2021-

0566-0118, and confidential appendices C through U; Hunt's comments are

addressed in Appendix K, PA, JD-498.[1]  EPA concluded that none of the sixty-nine petitions, including Hunt's, demonstrated disproportionate economic hardship caused by RFS compliance.

### F.    Related EPA Compliance Actions

On the same day that it issued the April Denial, EPA undertook an action allowing "31 small refineries to resubmit their 2018 RFS annual compliance reports with zero deficit carryforward and no additional RIN retirements."  PA, EPA-HQ-OAR-2021-0566-0107 at 1 ("Alternative Compliance Action").  ███

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

EPA took additional steps to account for the timing of its reevaluated approach to small refinery exemption petitions.  As relevant to Hunt, EPA extended the compliance deadline for RFS compliance years 2019 and 2020 twice.  *See* 86 Fed. Reg. 17073 (Apr. 1, 2021) (extending the 2019 RFS compliance deadline from Mar. 31, 2020, to Nov. 30, 2021); 87 Fed. Reg. 5696 (Feb. 2, 2022) (extending the 2019 RFS compliance deadline to Sept. 1, 2022, as applied).

---

[1] Accordingly, EPA will largely cite the June Denial herein; cited content appears in the April Denial or Appendix B or K to the April Denial at the same or similar pages.

In September 2022, EPA finalized a rule that provides small refineries with an option to fully comply with their 2020 RFS obligations—including any RIN deficits from 2019 carried forward into the 2020 compliance year—by February 1, 2024. *See* 87 Fed. Reg. 54158 (Sept. 2, 2022) ("Flexibility Rule").

### G.    Hunt's Petitions in This Court

This Court requested that the parties address "whether the Petitioner was required to file its petition for review in the United States Court of Appeals for the District of Columbia" under 42 U.S.C. § 7607(b)(1) in case Nos. 22-11617 (May 25, 2022) and 22-12535 (Aug. 19, 2022). In response, EPA moved for dismissal or transfer to the D.C. Circuit in both cases. *See generally* EPA's Motions to Transfer the Petitions for Review to the D.C. Circuit or Dismiss Based on Improper Venue (June 22, 2022, in No. 22-11617 and Aug. 23, 2022, in No. 22-12535) and Replies in Support (July 12, 2022, in No. 22-11617 and Sept. 7, 2022, in No. 22-12535) (collectively, "EPA's Venue Filings"). In both cases, the Court carried EPA's Venue Filings with the case (Aug. 31, 2022, in No. 22-11617 and Dec. 1, 2022, in No. 22-12535). EPA maintains that the proper venue for Hunt's petitions is the D.C. Circuit, where forty other petitions for review of the Denial Actions are pending, including petitions filed by Hunt.

In October 2022, Hunt moved for a stay pending appeal of the June Denial Action in No. 22-12535.  Doc. 15.  A motions panel granted Hunt a stay without opinion.  Doc. 33.

## SUMMARY OF ARGUMENT

I.      Hunt's petitions for review challenging the Denial Actions should be dismissed or transferred to the D.C. Circuit for improper venue.  EPA's Denial Actions are "nationally applicable" or "based on a determination of nationwide scope or effect" made and published by EPA under 42 U.S.C. § 7607(b)(1).  This Court should dismiss Hunt's petitions or transfer them to the D.C. Circuit without reaching the merits.

II.     The Denial Actions do not violate Hunt's due process rights and are not impermissibly retroactive.  When EPA proposed its revised approach to determining disproportionate economic hardship under 42 U.S.C. § 7545($o$)(9)(B), Hunt's pending petitions were incomplete transactions to which no legal rights or reasonable reliance interests could have attached.

In any event, any retroactive effect would be permissible.  Hunt had ample notice of, and took multiple opportunities to be heard on, EPA's changed approach.  Against that backdrop, any expectation premised on Hunt's past exemptions was unreasonable.  The timing of EPA's Denial Actions also does not foreclose them, and EPA's related compliance actions mitigate any retroactive effect.

18

III.    EPA's revised interpretation of 42 U.S.C. § 7545(*o*)(9)(B) is the best reading of the statute and, at the very least, a permissible one.  EPA's prior interpretation allowed it to grant exemptions where a small refinery experienced disproportionate economic hardship for reasons other than RFS compliance.  But after the Tenth Circuit declared that interpretation unlawful, EPA prudently re-examined the statute and determined that an interpretation requiring that disproportionate economic hardship be caused by RFS compliance was the best reading of § 7545(*o*)(9)(A) & (B) in context.  EPA's interpretation merits *Chevron* deference but should be upheld regardless.

IV.    EPA's Denial Actions are otherwise reasonable and reasonably explained.  Based on the RIN discount and RIN cost passthrough principles, EPA reasonably concluded that Hunt and other petitioning small refineries did not suffer disproportionate economic hardship caused by RFS compliance.  EPA's robustly supported technical findings are entitled to great deference and should be upheld.  Contrary to Hunt's contention, EPA has not eliminated small refinery exemptions.  But, to obtain an exemption, petitioning small refineries must make a sufficient showing of disproportionate economic hardship that refutes or overcomes the evidence EPA has before it that small refineries like Hunt recover their compliance costs.  Hunt argues that EPA's consultation with DOE was not "meaningful," ignoring that EPA has discretion to shape the consultation and consulted DOE

19

extensively.  And Hunt's contention that EPA did not consider refinery-specific

information is belied by the record, which shows that EPA considered and

responded to the information received from Hunt and other small refineries in non-

confidential, aggregated responses, as well as confidential, refinery-specific

appendices.

## STANDARD OF REVIEW

Under the Administrative Procedure Act ("APA"), courts may "hold

unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "This

standard is exceedingly deferential, and limits [the Court's] role to ensuring that

the agency came to a rational conclusion."  *VHV Jewelers, LLC v. Wolf*, 17 F.4th

109, 114 (11th Cir. 2021) (citations and internal quotation marks omitted).  Where

EPA has considered the relevant factors and articulated a rational connection

between the facts found and the choices made, its decisions must be upheld.  *Motor*

*Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).[2]

Courts give substantial deference to EPA on disputed factual issues that

---

[2] Hunt incorrectly argues that "EPA's hardship determinations are not entitled to
agency deference" and that "courts review hardship decisions under the *Skidmore*
standard."  Br. at 27–28 (citing *Sinclair*, 887 F.3d at 989).  The Tenth Circuit
applied the deference from *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), only to
EPA's *interpretation* of the CAA and applied the APA standard of review to
EPA's small refinery exemption decision, *Sinclair*, 887 F.3d at 990, 993.

"implicate[] substantial agency expertise." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376–77 (1989); *City of Oxford v. FAA*, 428 F.3d 1346, 1352 (11th Cir. 2005) (similar) (citation omitted).  The Court's review is limited to the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985).

In reviewing EPA's statutory interpretation, the Court applies the two-step framework from *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–43 (1984).  First, using all the ordinary tools of construction, the Court "ascertain[s] whether Congress had a specific intent on the precise question." *In re Gateway Radiology Consultants, P.A*., 983 F.3d 1239, 1256 (11th Cir. 2020) (citation omitted).  If Congress's intent is clear, that is "the end of the matter," and the Court and agency must apply it. *Id.* (citation omitted).  If the statute is ambiguous, the Court defers to a reasonable agency interpretation. *Id.* (citation omitted).  If *Chevron* does not apply, the Court follows the analysis set forth in *Skidmore*. *Martin v. Soc. Sec. Admin.*, 903 F.3d 1154, 1159 (11th Cir. 2018).

## ARGUMENT

## I.    THE COURT SHOULD DISMISS OR TRANSFER HUNT'S PETITIONS TO THE D.C. CIRCUIT.

The Court should not review, much less grant, Hunt's petitions for review of the Denial Actions because venue is improper.  As explained in EPA's Venue Filings, which this Court carried with these cases, petitions to review the Denial

Actions must be filed in the D.C. Circuit. Both actions are nationally applicable, *see RMS of Georgia, LLC v. EPA*, No. 21-14213, __ F.4th __, 2023 WL 2925109, at *3–*5 (11th Cir. Apr. 13, 2023), and EPA made and published findings that each Denial Action is based on a determination of "nationwide scope or effect," 42 U.S.C. § 7607(b)(1). All merits challenges to EPA's Denial Actions must be heard by the D.C. Circuit, where forty consolidated petitions for review are likely to be briefed later this year—including Hunt's. *See Sinclair Wyo. Refin. Co. LLC, et al. v. EPA*, No. 22-1073 (Mar. 24, 2023), Doc. 1991732, at 2 n.2 & 3 (submitting joint briefing schedule that identifies Hunt as a petitioner).

Other courts of appeals have already dismissed or transferred petitions for review of the Denial Actions to the D.C. Circuit. *See Sinclair Wyo. Refin. Co. LLC, et al. v. EPA*, No. 22-1073 (D.C. Cir. Oct. 31, 2022), Doc. 1971464, at 7–12 (summarizing Ninth Circuit dismissals and Third, Seventh, and Tenth Circuit transfers). Hunt provides no basis in its venue filings or opening brief to deviate from these authorities or this Court's recent decision in *RMS of Georgia*. This Court accordingly should dismiss or transfer Hunt's petitions to the D.C. Circuit.

## II. THE DENIAL ACTIONS DO NOT VIOLATE HUNT'S DUE PROCESS RIGHTS AND ARE NOT IMPERMISSIBLY RETROACTIVE.

Hunt contends that the 2022 Denial Actions deprive Hunt of due process in violation of the Fifth Amendment and are impermissibly retroactive. Br. at 28–35.

As explained below and in EPA's Appendix B, PA, EPA-HQ-OAR-2021-0566-0118 at B-5–B-7, B-10–B-13, these arguments lack merit.

> **A.    Hunt Lacked Any Due Process Rights in Its Pending Exemption Petitions and Had Multiple Opportunities to Be Heard.**

Hunt's mere expectation that it would receive discretionary exemptions for RFS compliance years 2018 through 2021 because it received previous exemptions does not create a legal right to an exemption for which Hunt could, as a matter of law, be deprived of process required by the Constitution. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972) (concluding that due process for an alleged property right requires that a person "have a legitimate claim of entitlement," not merely "an abstract need or desire" or "a unilateral expectation").

Hunt incorrectly claims that it has a "right" to an exemption based on past exemptions and that it was not given fair notice of what conduct was "forbidden or required." Br. at 28–29 (citations and quotations omitted). ███████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ And EPA has been clear with small refineries that unless and until it grants a discretionary exemption for a given year, "[p]etitioning small refineries should *always presume* that they are subject to the requirements of the RFS program and include RFS

compliance in their overall planning." RSA, EPA-HQ-OAR-2021-0566-0003 at 3 (emphasis added). Hunt's purported expectation of renewal of the exemption in perpetuity fails because it ignores that the primary "required" behavior for RFS-obligated parties like Hunt is to comply with RFS annual requirements. *See Bd. of Regents*, 408 U.S. at 578 (no property interest in a contract with a specific termination date and no provision for automatic renewal).

Nor does the CAA provide Hunt with any vested legal right or expectation in its *pending* petition for a discretionary exemption. Under the statute, qualifying small refineries "may . . . petition" EPA for a temporary exemption "for the reason of disproportionate economic hardship," and EPA can grant an exemption *if* EPA determines in the exercise of its discretion that a small refinery has made the requisite showing. 42 U.S.C. § 7545(*o*)(9)(B)(ii); *see also* Br. at 44 (recognizing that "Congress put the onus on small refineries themselves to petition for relief," and "they must show 'disproportionate economic hardship'" (citations omitted)). Hunt thus had no vested or cognizable property right at the time of the Denial Actions. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 60 (1999) (until the governing authority determined that applicable conditions had been satisfied, no cognizable "property" interest arose in a claim for insurance reimbursement).

Even if Hunt had a cognizable property right to expect a discretionary exemption, Hunt was not deprived of any procedure required by the CAA or the

Fifth Amendment.  As described in Statement of the Case, Parts II.A & .C, *supra*, Hunt and other small refineries were provided—and took—many opportunities to be heard before the Denial Actions.  Hunt's due process argument fails.

### B.    The Denial Actions Are Not Retroactive.

The Denial Actions are not retroactive.  EPA applied its revised approach to determining disproportionate economic hardship to then-pending exemption petitions.  Unlike impermissibly retroactive regulations, the adjudications in the Denial Actions do not take away or impair "vested rights acquired under existing laws," or create a "new obligation, impose[] a new duty, or attach[] a new disability, in respect to transactions or considerations already past," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994) (citation omitted); nor do they "impose[] new sanctions on past conduct," *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 159 (D.C. Cir. 2010) (citations omitted).  The Denial Actions merely confirm the status quo that the petitioning small refineries comply with their *preexisting* RFS obligations.  *See, e.g.*, 42 U.S.C. § 7545(*o*)(3)(B)(ii)(I); 40 C.F.R. § 80.1406; *see also Monroe Energy, LLC v. EPA*, 750 F.3d 909, 920 (D.C. Cir. 2014) ("The statute set the renewable fuel obligation, and Monroe Energy had no legally settled expectation that EPA would exercise its waiver authority to reduce that obligation.").

Accordingly, no rights had vested in any of Hunt's uncompleted transactions:  Its 2018 exemption petition *pending* on remand from the D.C. Circuit and its *pending* (and never before decided) 2019 through 2021 petitions.  *See, e.g.*, *Bellsouth Telecomms., Inc. v. Se. Tel., Inc.*, 462 F.3d 650, 660–61 (6th Cir. 2006) (concluding that "filing an application with an agency does not generally confer upon the applicant an inviolable right to have the agency rule on the application pursuant to the regulations in effect at the time of filing" (citation omitted)); *Chadmoore Commc'ns., Inc. v. FCC*, 113 F.3d 235, 241 (D.C. Cir. 1997) (citing cases holding that no rights vest upon the filing of an administrative application).[3] As one court explained, "'the mere filing of'" an exemption petition "'is not the kind of completed transaction in which a party could fairly expect stability . . . as of the transaction date,'" and where, as here, "a change involves 'the substantive standards for granting the application on the merits,' it does not typically raise . . . 'fair notice and retroactivity concerns.'"  *Craker v. DEA*, 44 F.4th 48, 64 (1st Cir. 2022) (quoting *Pine Tree Med. Assocs. v. Sec'y of Health & Hum. Servs.*, 127 F.3d 118, 121 (1st Cir. 1997)).  The Court should reject Hunt's retroactivity argument on this basis alone.

---

[3]  Hunt relies on inapplicable authorities involving rulemakings, as well as cases involving completed transactions or other distinguishable facts.  *See, e.g.*, *Christopher v. SmithKline Beecham Corp.* 567 U.S. 142, 158–59 (2012) (agency interpretation announced "for the first time in an enforcement proceeding").

26

### C.    Alternatively, Any Retroactive Effect of the Denial Actions Would Be Permissible.

The Denial Actions are lawful even if this Court considers them to apply "retroactively." EPA is not "precluded from announcing new principles" in its informal adjudications. *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 497 (D.C. Cir. 2015) (citations omitted). In general, "when an agency proceeds by adjudication, it will apply its ruling to the case at hand." *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1082 (D.C. Cir. 1987). Congress delegated resolution of exemption petitions to EPA in 42 U.S.C. § 7545(*o*)(9)(B)(ii), thereby expressly authorizing any purported retroactive effect, *Nat'l Petrochemical*, 630 F.3d at 159. And, as explained in Argument, Parts III & IV, *infra*, EPA reasonably adjudicated Hunt's exemption petitions, making any purported retroactive effect permissible. *See Nat'l Petrochemical*, 630 F.3d at 159 (a secondarily retroactive action, which "merely 'upsets expectations,'" is deemed "invalid only if arbitrary and capricious" (citation omitted)).

EPA did not substitute "new law for old law that was reasonably clear." *Aliceville Hydro Assocs. v. FERC*, 800 F.2d 1147, 1152 (D.C. Cir. 1986). EPA never announced an interpretive rule for 42 U.S.C. § 7545(*o*)(9)(B) nor subjected any of its prior interpretations to notice and comment; rather, EPA applied differing interpretations in confidential, informal adjudications at different times. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 224, (1988) ("[W]here no

27

pre-existing interpretive rule construing those requirements is in effect, nothing

prevents the agency from acting retroactively through adjudication.").

Even before *RFA*, it was uncertain whether EPA would interpret and apply

"disproportionate economic hardship" or consider the 2011 Study in the same way

for the same refinery in consecutive years.  *See* Statement of the Case, Part I.D,

*supra*; *Cassell v. FCC*, 154 F.3d 478, 486 (D.C. Cir. 1998) (allowing retroactive

effect where "the *status quo ante* was not a benchmark at all, but rather a case-by-

case assessment" lacking certainty).  After the Tenth Circuit held in *RFA* that

EPA's prior statutory interpretation was unlawful and that EPA had to address its

RIN discount and RIN cost passthrough findings, EPA's need to reevaluate its

approach became acute.  *See Verizon Tel. Cos. v. FCC*, 269 F.3d 1098, 1111 (D.C.

Cir. 2001) (agencies may "rectify legal mistakes identified by a federal court" in

adjudications, even if seemingly retroactive).  EPA's Denial Actions are therefore

permissible.  *Id.* at 1109.

### 1.    Any Reliance by Hunt on EPA's Prior Approach Is Unreasonable.

Hunt could not reasonably have relied on EPA's prior approach of applying

DOE's scoring of its Matrix in Hunt's pending petitions.  Br. at 28, 31.  Hunt was

aware of EPA's proposed new approach, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮, its August 25, 2021 meeting with EPA, and five supplements that Hunt

made to its pending exemption petitions.  *See* Statement of the Case, Part II.A,

28

*supra*; *see also* Br. at 52 ("Hunt provided EPA with" analyses challenging the passthrough analysis "[*b*]*efore* EPA issued the Denials" (emphasis added)). And Hunt had ample notice of EPA's changed approach before (and certainly after) the Proposed Denial. *See Cassell*, 154 F.3d at 486 (retroactive effect of adjudications allowed where fair and equitable). Indeed, Hunt and other small refineries had clear notice of EPA's intent to change its approach to disproportionate economic hardship in response to *RFA* and *HollyFrontier* based on many EPA efforts—in which Hunt actively participated. *See* Statement of the Case, Parts II.A & .C, *supra*. Any reliance by Hunt on the DOE Matrix was "badly misplaced and hence inappropriate for consideration" by this Court. *Cassell*, 154 F.3d at 486.

None of Hunt's arguments demonstrates otherwise. Hunt presumes that it would have received an exemption if EPA had decided the petitions based on the DOE Matrix, Br. at 31, but Hunt ignores the well-documented adjustments in EPA's prior approaches in responses to judicial opinions, congressional statements, and other factors, *see* Statement of the Case, Parts I.D & II.A, *supra*. Hunt's argument that the issuance of the Denial Actions after the relevant RFS compliance years prevented Hunt from changing its behavior during the individual compliance years, Br. at 30–31, fails because RFS compliance has typically been due, and exemption petitions have typically been decided, *after* the compliance year at issue*, see* 40 C.F.R. § 80.1451(f)(1)(i)(A)(1). Hunt also fails to explain what it

29

would have done differently had it known of EPA's changed approach during each

compliance year and omits that ███████████████████████, RSA, JD-475,

which was months before the compliance deadlines for the 2019 through 2021 RFS

compliance years.  A reasonable small refinery in Hunt's position would have

planned for compliance, including by acquiring RINs as it incurred RFS

obligations or at least as early as ██████ December 2021—in what Hunt claims

was a more favorable market—or otherwise adjusting its operations.

Hunt's arguments about its 2018 petition are even weaker.  It claims

detrimental reliance on EPA's Initial 2018 Decision.  Br. at 32.  ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████ Hunt argues that

EPA "should not be permitted to reconsider and reverse" the Initial 2018 Decision,

Br. at 32, ignoring that the D.C. Circuit granted EPA's remand motion over Hunt's

objection without any substantive instructions or limitations.  Hunt's argument also

contradicts the core APA concept that agencies have inherent authority to

reconsider past decisions and to revise, replace, or repeal initial actions, *State

Farm*, 463 U.S. at 42, and inappropriately asks this Court to nullify the D.C.

Circuit's remand order even though Hunt did not seek review of that order.  Hunt's

reliance argument fails.

### 2.    The Timing of EPA's Denial Actions Does Not Make Them Impermissibly Retroactive.

Hunt argues that EPA failed to adequately consider and minimize hardship to small refineries from the lack of action on Hunt's petitions within the ninety-day statutory time frame under 42 U.S.C. § 7545(*o*)(9)(B)(iii).  Br. at 31, 33–35. Hunt's argument fails for three reasons.

First, the alleged failure to timely act does not void EPA's later actions or render the Denial Actions impermissibly retroactive.  *See Ams. for Clean Energy v. EPA*, 864 F.3d 691, 720 (D.C. Cir. 2017) ("*ACE*") (recognizing the Supreme Court's reluctance in *Brock v. Pierce County*, 476 U.S. 253, 260 (1986), to conclude that any agency failure to timely act voids subsequent agency action (further citations omitted)).  Hunt could have pursued an action to compel a response under 42 U.S.C. § 7604(a)(2) but did not.  And Hunt's claim that it was deprived of the opportunity to purchase RINs for compliance when prices were lower ignores that Hunt had the opportunity—indeed the obligation—to comply with its RFS obligations throughout the years that it accrued those obligations.

Second, EPA promptly acted following the *RFA* and *HollyFrontier* decisions, as Hunt implicitly recognized when consenting to an abeyance in the D.C. Circuit in February 2021.  *See generally Sinclair Wyo. Refin. Co. v. EPA*, No. 19-1196, Doc 1883334.  As EPA explained in its remand motion, "[i]t would have been premature for EPA to consider these issues prior to" *HollyFrontier* because

"[m]ost small refineries that have applied for an extension of the small refinery exemption have not received continuous extensions of the exemption." *Sinclair Wyo. Refin. Co. v. EPA*, No. 19-1196 (Aug. 25, 2021 D.C. Cir.), Doc. 1911606, at 11. Therefore, "had the Supreme Court upheld the Tenth Circuit's decision," most small refineries would have been ineligible for an exemption, regardless of the alternative holdings in *RFA*. *Id.* Likewise, after *RFA*, EPA would have risked an adverse ruling had it decided the pending petitions under its prior approach to disproportionate economic hardship, which did not account for *RFA*'s alternative holdings. Hunt's complaint rings hollow.

Third, while EPA has determined that RFS compliance does not cause any hardship to obligated parties, *see* Argument, Part IV, *infra*, EPA nevertheless took steps reducing the financial impacts claimed by small refineries after the Denial Actions, *ACE*, 864 F.3d at 716 n.5. ██████████████████████████████ ███████████████████████████████████████████████; multiple extensions of the compliance deadline for compliance years 2019 and 2020; and an option to fully comply with RFS obligations—including any RIN deficits from 2019 carried forward into the 2020 compliance year—by February 1, 2024, in the Flexibility Rule. *See* Statement of the Case, Part II.F, *supra*. ██████████████████████████ █████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████.[4]  And Hunt's claim that

the extensions and Flexibility Rule do not provide enough time for compliance

fails because compliance would otherwise have been due much earlier with no

flexibility.

At bottom, Hunt should have been complying all along rather than gamble

on a discretionary exemption that "was not a sure bet."  *Cassell*, 154 F.3d at 486

(D.C. Cir. 1998) (citations omitted).  Hunt's timing argument should be rejected.

## III.    EPA'S REVISED INTERPRETATION OF THE CAA'S SMALL REFINERY EXEMPTION PROVISIONS IS PERMISSIBLE.

In the Denial Actions, EPA interpreted 42 U.S.C. § 7545(*o*)(9)(B) to require

that petitioning small refineries show "disproportionate economic hardship" *from*

RFS obligations to obtain an exemption.  That is the best interpretation of that

provision, considering the CAA's text, structure, and purposes.

Under prior approaches, EPA granted an exemption petition where a small

refinery experienced disproportionate economic hardship for reasons *other than*

RFS compliance.  PA, EPA-HQ-OAR-2021-0566-0117 at 17–19.  In January

2020, the Tenth Circuit declared that approach unlawful.  *RFA*, 948 F.3d at 1253–

---

[4] Hunt's request omits that EPA's Alternative Compliance Action and Flexibility Rule are not before this Court, *see* 5 U.S.C. § 706(2) (providing that court may "set aside" the *challenged* agency action), and are under review in other courts.

54.  EPA then carefully reviewed and reconsidered the language, structure, and purposes of the small refinery exemption provisions and determined that disproportionate economic hardship must be caused by RFS compliance to allow EPA to grant an exemption petition.  PA, EPA-HQ-OAR-2021-0566-0117 at 27–29.

Applying the ordinary tools of statutory construction, EPA's revised interpretation is the best reading of the CAA.  *In re Gateway Radiology*, 983 F.3d at 1256.  To begin with, the usual purpose of a hardship exemption—in any context—is to avoid harm caused by the requirement at issue.  *See* Exempt, *Webster's Third New Int'l Dictionary of the English Language Unabridged* (2002 ed.) ("*Webster's*") ("to release or deliver from some liability or requirement to which others are subject"); Hardship, *Webster's* ("something that causes or entails suffering or privation").  In the RFS, Congress required obligated parties to increase their production of renewable fuel or to demonstrate the purchase of sufficient credits to increase the overall production of renewable fuel.  An exemption serves the purpose of avoiding hardship caused by these requirements; avoiding such harm is, after all, the reason not to apply them to certain entities.  If Congress had exempted parties that are suffering for unrelated reasons, that would turn the RFS program into a benefit for entities that suffer economic hardship for

34

unrelated reasons.  It would be quite odd for Congress to use the phrase "hardship exemption" in § 7545(*o*)(9)(B)(iii) if that were its intent.

Turning to the text, small refineries may petition under § 7545(*o*)(9)(B)(i), which authorizes EPA to grant an extension of the exemption from RFS compliance obligations "*under subparagraph (A)* for the reason of disproportionate economic hardship." (emphasis added).  In evaluating exemption petitions, EPA must "consider the findings of the study *under subparagraph (A)(ii)* and other economic factors."  42 U.S.C. § 7545(*o*)(9)(B)(ii) (emphasis added).  Thus, any reading of the text in subparagraph (B) must harmonize with subparagraph (A).

Subparagraph (A) has two exemption tiers.  First, in § 7545(*o*)(9)(A)(i), Congress granted a blanket exemption for all small refineries until 2011.  Second, Congress directed DOE to study "*whether compliance with the requirements* of [the RFS] *would impose* a disproportionate economic hardship on small refineries" and allowed an extension of the blanket exemption for two years if DOE determined in the study that a small refinery "*would be subject to* a disproportionate economic hardship *if required to comply*" with RFS requirements. *Id.* § 7545(*o*)(9)(A)(ii)(I)–(II) (emphasis added).

The language in subparagraph (A) shows that disproportionate economic hardship must be caused by RFS compliance to allow the second-tier exemption for two years.  Using ordinary meanings, DOE was studying whether RFS

35

compliance would "cause [small refineries] to be burdened" with disproportionate economic hardship.  Impose, *Webster's*.  Similarly, Congress allowed DOE to grant an exemption if RFS compliance would "cause [a small refinery] to undergo" disproportionate economic hardship.  Subject, *Webster's*.

After the two-year exemption, the third tier of the exemption provision in § 7545(*o*)(9)(B) applies.  It is entirely dependent on the parameters established in subparagraph A, which dictates what may be petitioned for—"an extension of the exemption" from RFS compliance obligations "for the reason of disproportionate economic hardship"—and sets forth what EPA must consider, including DOE's study.  42 U.S.C. § 7545(*o*)(9)(B)(i).

The interrelated small refinery exemption provisions therefore use language demonstrating that disproportionate economic hardship must be caused by RFS compliance obligations.  The cross-references in subparagraph (B) to subparagraph (A) require that allowing exemptions for "disproportionate economic hardship" must be for the same reasons in subparagraphs (A) and (B), including the causal element, i.e., compliance "would impose" and "subject to . . . if required to comply."  *See HollyFrontier*, 141 S. Ct. at 2177 (recognizing that § 7545(*o*)(9)(B) should be interpreted consistent with § 7545(*o*)(9)(A)).  And Congress again used causal language in subparagraph (B)—"for the reason of"—consistent with the structure of the exemption provision and statute overall.  Thus, after its

36

independent review, EPA rationally concluded that disproportionate economic hardship must be caused by RFS compliance, consistent with the Tenth Circuit's approach in *RFA*. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (an agency change need only be permissible under the statute, with an explanation of why the new approach is better).

EPA's interpretation also comports with the purpose of the statute. *Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896, 1904 (2022). Congress sought to "increase the production of clean renewable fuels," 121 Stat. 1492, by creating a market for renewable transportation fuel and allowing EPA to identify refineries as obligated parties, *see* 42 U.S.C. § 7545(*o*)(3)(B)(ii)(I). While Congress provided a safety valve from compliance for small refineries, it limited that exemption to a "temporary" time, after which compliance would resume, and to those that could establish disproportionate economic hardship from RFS compliance. It would be odd for Congress to have intended a "temporary" exemption from a program designed to increase renewable fuel use to create a general, permanent subsidy for small refineries to offset or better withstand *other factors* impacting profitability that are unrelated to RFS compliance. *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1348 (11th Cir. 2022) ("We assume that Congress does not generally hide elephants in mouseholes." (citations and internal quotations omitted)). Considering the language that Congress chose for small refinery exemptions and

its other choices allowing for flexibility to better ensure compliance by all obligated parties, such as carrying over a RIN deficit from one compliance year to the next, 42 U.S.C. § 7545(*o*)(5)(D), EPA's interpretation comports with the purpose of the statute.  EPA's interpretation should therefore be upheld.

Hunt argues that Congress intended for EPA to grant small refinery exemptions for hardship caused by reasons *other than* RFS compliance.  *See* Br. at 38.  But Hunt reads the causal language in § 7545(*o*)(9)(A) & (B) out of the statute.[5]  Hunt's argument that the proper question is whether small refineries "experience" disproportionate economic hardship for any reason fails because, among other reasons, the word "experience" does not appear in the relevant provisions.  And Hunt's isolated focus on the requirement that EPA consider "other economic factors" (beyond the 2011 Study) fails because such consideration does not eliminate the causal language from the statutory provisions and therefore does not allow EPA to consider economic factors unrelated to RFS compliance. *See* PA, EPA-HQ-OAR-2021-0566-0117 at 18–19.[6]

---

[5] *Compare* Br. at 37–40 (omitting the causal elements of § 7545(*o*)(9)(A) from its statutory interpretation), *with* Br. at 42 (citing the causal elements of the same provision to support a separate argument).

[6] Hunt's argument that the pre-*RFA* decision in *Sinclair* permits EPA to grant an exemption for reasons other than RFS compliance because EPA must consider "other economic factors," Br. at 38, ignores that the *Sinclair* court had no occasion to consider the causal language in the exemption provisions but nevertheless

Likewise, EPA's interpretation that small refineries must show an impact from RFS compliance that is greater than on other refineries to show disproportionate economic hardship, *id.* at 17, does not add an impermissible "severity" requirement as Hunt claims, Br. at 38–39. EPA simply interprets the word "disproportionate" in the statute consistent with its ordinary meaning of being "out of proportion" to any hardship imposed by RFS compliance on other obligated parties. Disproportionate, *Webster's*. The purported economic harm must therefore be of a "magnitude, quantity, or degree" greater than for other obligated parties, Proportion, *Webster's*, not merely "greater than" by any amount, as Hunt suggests, Br. at 39. Neither can Hunt rely on the Tenth Circuit's decision in *Sinclair*, 887 F.3d at 997, which held that EPA cannot use viability impairment as the sole criterion for determining hardship, because the Denial Actions do not impose a viability test.

Moreover, Hunt's contention that the alternate *RFA* holdings lack legal force is irrelevant and incorrect. Br. at 39–40. It is irrelevant because EPA's decision rests on its independent interpretation of the statute, which *RFA* also supports, undertaken within the discretion Congress provided. *See* PA, EPA-HQ-OAR-2021-0566-0117 at 17–18; PA, EPA-HQ-OAR-2021-0566-0118 at B-28–B-29. It is incorrect because the alternate *RFA* holdings remain good law. The Tenth

---

concluded that EPA must examine "*the effect of the RFS Program compliance costs* on a given refinery." 887 F.3d at 997 (emphasis added).

Circuit did not contradict EPA's statement that the actions were returned to EPA for further proceedings on the issues not addressed by *HollyFrontier*.  *See* PA, EPA-HQ-OAR-2021-0566-0117 at 15–16 (summarizing events).  Further, "[w]hen the Supreme Court vacates a judgment" of a circuit court "without addressing the merits of a particular holding in the panel opinion, that holding continue[s] to have precedential weight."  *United States v. Adewani*, 467 F.3d 1340, 1342 (D.C. Cir. 2006) (internal quotation marks omitted).

Hunt's deference arguments, *see* Br. at 45–49, are irrelevant if EPA's revised interpretation is the best reading of the statute.  *See Edelman v. Lynchburg Coll.*, 535 U.S. 106, 114 n.8 (2002) ("[T]here is no need to resolve deference issues when there is no need for deference.").  But even if it were otherwise, EPA's reading should be upheld as permissible under this Court's recent precedents applying *Chevron* for the reasons explained above.  *E.g.*, *Edwards v. U.S. Att'y Gen.*, 56 F.4th 951, 960, 962–64 (11th Cir. 2022).[7]  EPA's adjudications here— unlike the adjudications in *Sinclair*—qualify for *Chevron* deference because EPA undertook notice and comment before taking the Denial Actions, which have the force and effect of law.  *United States v. Mead Corp.*, 533 U.S. 218, 230–31 (2001); *Sinclair*, 887 F.3d at 991–92 (identifying notice and comment as the "safe

---

[7] EPA's interpretation should be upheld under *Skidmore* deference for the same reasons.

harbor of *Chevron* deference" (citations omitted)).[8]  Hunt's alternative request to overturn *Chevron* cannot be entertained by this Court.

Because EPA's interpretation of § 7545(*o*)(9)(B) is the best (and at a minimum, permissible) considering the text, structure, and purposes of the CAA, it should be upheld.

## IV.   EPA'S DENIAL ACTIONS WERE CONSISTENT WITH THE CAA AND REASONABLE.

EPA's Denial Actions should be upheld under the deferential APA standard. *VHV Jewelers*, 17 F.4th at 114.  EPA reasonably denied Hunt's and other exemption petitions in the Denial Actions based on the RIN discount and RIN cost passthrough principles, considering the relevant factors and articulating a rational connection between the facts found and the choices made.  *State Farm*, 463 U.S. at 43.  Congress authorized EPA to implement the RFS and to evaluate claimed disproportionate economic hardship; thus, EPA's analysis falls within its technical expertise and involves evaluation of a vast amount of technical data.  Accordingly,

---

[8] Hunt's claim that EPA's process—in which Hunt actively participated—was a "sham," citing only the extra-record report by the U.S. Government Accountability Office ("GAO Report"), Br. at 46, omits that the GAO Report does not discuss EPA's notice-and-comment process for the Denial Actions *at all* and that GAO's failure to consider the information that EPA shared and received in the notice-and-comment process for the Denial Actions was among EPA's chief criticisms of the Report, PA, No. 22-12535, Doc. 27-2, Ex. A at 55–57.

EPA's conclusions are entitled to substantial deference. *Marsh*, 490 U.S. at 376–77; *City of Oxford*, 428 F.3d at 1352.

Congress required that EPA create a market for renewable transportation fuel and a credit system to allow obligated parties to comply. *See, e.g.*, 42 U.S.C. § 7545(*o*)(5). But Congress did not define the phrase "disproportionate economic hardship" or fully grasp how the RFS program would operate in the marketplace, tasking DOE with studying this issue, *id.* § 7545(*o*)(9)(A)(ii)(I), and leaving RFS implementation choices to EPA, *see, e.g.*, 42 U.S.C. § 7545(*o*)(2)(A), including for exemption petitions, *Hermes Consol., LLC v. EPA*, 787 F.3d 568, 575 (D.C. Cir. 2015). Through many years of implementation, EPA honed its understanding of how the RFS program operates for obligated parties, beginning with the 2015 Burkholder Study and the 2017 Point of Obligation Denial.

EPA has now considered and tested its economic analysis against empirical market data, as well as data submitted by many market participants, including small refineries, and reasonably concluded that obligated parties pass through RFS compliance costs. *See* PA, EPA-HQ-OAR-2021-0566-0117 at 30–59 (explaining RIN discount and RIN cost passthrough, RIN market dynamics, underlying economic principles, impacts on different market participants, and evaluation of market data confirming the analysis). As a compliance mechanism, RINs correspond to particular quantities of renewable fuel. 40 C.F.R. §§ 80.1425–

80.1427.  Because the RIN and fuels markets are highly competitive, they do not allow for one market participant to be advantaged or disadvantaged by its role within the market; instead, all "types of obligated parties bear the same cost from compliance with the RFS program."  PA, EPA-HQ-OAR-2021-0566-0117 at 30.

In operation, the price Hunt receives when selling its transportation fuel includes the cost of acquiring the RIN needed to meet its RFS obligations associated with that fuel (RIN cost passthrough).  Related, entities that blend gasoline with renewable fuel do not incur lower compliance costs because they discount the sales price of their blended fuel to reflect the revenue that they will receive from selling the RINs generated from blending (RIN discount).  Hunt specifically demonstrates RIN cost passthrough when it operates as a merchant refiner because the market price of Hunt's gasoline blendstock includes the cost of the RINs, and the blender accepts the market price (which reflects the RIN cost) because the blender will be able to offer blended fuels at a competitive price after accounting for the separation and sale of RINs associated with the blended renewable fuel.  *Id.* at 36–39.  Hunt demonstrates RIN discount in its role as an integrated refiner when it sells a blended fuel like E10 (gasoline containing ten percent ethanol) to another party under contract, discounting the price of the E10 to reflect the value of the RINs generated from the blended ethanol.  *Id.* at 38–41; *see also* █████████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████.[9]

In 2019, the D.C. Circuit upheld the RIN discount and RIN cost passthrough analysis in consolidated petitions for review of the 2017 Point of Obligation Denial, to which Hunt was a party. *Alon Refin. Krotz Springs, Inc v. EPA*, 936 F.3d 628, 649–51 (D.C. Cir. 2019), *cert. denied sub nom.*, *Valero Energy Corp. v. EPA*, 140 S. Ct. 2792 (2020). Among other conclusions, the D.C. Circuit found that: (1) "EPA reasonably rejected" the argument that "refiners cannot recover their RIN costs"; (2) "EPA reasonably explained" that "refiners 'recover the cost of the RINs they purchase' by passing that cost along in the form of 'higher prices for the petroleum based fuels they produce'" and "grounded that conclusion in studies and data in the record"; (3) "EPA (accurately) reported that" various studies "'concluded that the RIN cost was generally included in the sale prices of obligated fuels'"; and (4) blenders and integrated refiners "must discount their blended fuel by roughly the value of the RINs that they detached and kept for themselves." *Id.* (citations omitted). Since then, EPA has considered more market data and further solidified its conclusions. *See* PA, EPA-HQ-OAR-2021-0566-0117 at 30–59.

_____

[9] ████████████████████████████████████████████
████████████ waives any argument on the issue. *United States v. Levy*, 416 F.3d 1273, 1275–76 (11th Cir. 2005) (per curiam).

Accordingly, this Court should follow the D.C. Circuit's persuasive conclusions and uphold EPA's economic analysis as applied in the Denial Actions based on EPA's experience and expertise in implementing the program and the evidence before the Agency. *Marsh*, 490 U.S. at 376–77; *VHV Jewelers*, 17 F.4th at 114. Hunt fails to prove otherwise. As explained below, EPA's Denial Actions were consistent with the opportunity that 42 U.S.C. § 7545(*o*)(9)(B) guarantees small refineries to petition for an exemption for the reason of disproportionate economic hardship; EPA consulted DOE and considered the 2011 Study and other economic factors in deciding exemption petitions; EPA considered and rejected refinery-specific information, including Hunt's; and Hunt's challenges to EPA's economic analysis fail.

## A.    EPA Did Not Eliminate the Small Refinery Exemption.

The record does not support Hunt's argument that EPA eliminated the small refinery exemption. Br. at 36–37, 48. EPA's economic analysis demonstrates that RFS compliance does not cause economic hardship to any refinery regardless of size. While small refineries are therefore unlikely to incur any economic hardship—disproportionate or not—from RFS compliance, EPA has made clear that an extension of the small refinery exemption remains available upon a sufficient showing. *See* PA, EPA-HQ-OAR-2021-0566-0118 at B-16–B-17 (explaining that, "if a small refinery had provided data and evidence of other

45

economic factors upon which EPA could determine[] . . . that the particular small refinery had demonstrated that it faced" disproportionate economic hardship, then "EPA would have issued an exemption to that small refinery"), B-26 (explaining that the Denial Actions "do[] not prejudge future [exemption] petitions or eliminate the possibility of new, different data becoming available in the future that could support a different conclusion"). That "no individual small refinery has made such a showing in the [exemption] petitions EPA reviewed in taking" the Denial Actions, *id.* at B-17, does not "repeal" the relevant statutory provision, as Hunt suggests, Br. at 36. And contrary to Hunt's Brief at 37, the Denial Actions are consistent with the holding in *HollyFrontier*, which addressed only eligibility for an exemption and not entitlement. *See* 141 S. Ct. at 2180–81 (small refineries may petition for, "(if not always receive)," an exemption "at any time" under 42 U.S.C. § 7545(*o*)(9)(B)(i)). Hunt's argument fails.

### B.    EPA's Consultation With DOE Satisfied the Statutory Requirement.

Hunt's argument that EPA did not "meaningfully" consult DOE lacks merit. *See* Br. at 40–42. In evaluating small refinery exemption petitions, Congress required only that, "in consultation with" DOE, EPA "consider the findings of the study under subparagraph (A)(ii) and other economic factors." 42 U.S.C. § 7545(*o*)(9)(B)(ii). The word "consultation" is not defined in the CAA; as the D.C. Circuit has held, "Congress placed no limits on how DOE should provide its

46

consultation to EPA." *Hermes*, 787 F.3d at 577.  EPA and DOE, not Hunt, have discretion to determine the shape of the procedural consultation requirement.

EPA extensively consulted DOE.  EPA met with DOE thirteen times during the development of the Proposed Denial and Denial Actions; considered how EPA would conduct its consultation with DOE in compliance with its statutory obligation; and considered the 2011 Study, various economic factors,[10] whether DOE should score the petitions under its Matrix, responses to public comments, and the final actions denying petitions.  *See generally* PA, EPA-HQ-OAR-2021-0566-0104.  EPA therefore consulted DOE and considered the 2011 Study and other economic factors in doing so.

Hunt cannot force EPA to use its previous method of consultation by fiat. *See* Br. at 41.  Unlike Congress's choice to allow DOE to determine disproportionate economic hardship in the 2011 Study without EPA involvement in § 7545(*o*)(9)(A)(ii)(II), § 7545(*o*)(9)(B)(ii) requires that EPA *consider* the 2011 Study, which it did here, and does not require EPA to rely on the DOE Matrix or any specific scoring or even accept DOE's scoring or recommendation.  Likewise,

_____

[10] While EPA disagrees with Hunt's interpretation that § 7545(*o*)(9)(B)(ii) requires EPA to consult DOE regarding "other economic factors," Br. at 42, the Consultation Memorandum shows that EPA did so.  Regardless, EPA retains "broad discretion to choose which 'economic factors' it will (and will not) consider," *Hermes*, 787 F.3d at 577, and beyond RIN cost passthrough, EPA considered many economic factors, EPA-HQ-OAR-2021-0566-0117 at 18.

Hunt's argument that the descriptions of the calls and meetings with DOE do not include sufficiently specific details, Br. at 41, fails because EPA is not statutorily required to disclose *any* specific details of consultation. Regardless, the descriptions and the rest of the Consultation Memorandum provide ample detail of the substance of the consultation, including the topics discussed, factors considered, and conclusions reached. *See generally* PA, EPA-HQ-OAR-2021-0566-0104.

Nor did EPA force DOE to presume that the RIN cost passthrough analysis was correct. *See* Br. at 41–42.[11] DOE's 2011 Study, including the DOE Matrix, assumes that, "[i]f certain small refineries must purchase RINs that are far more expensive than those that may be generated through blending, this will lead to disproportionate economic hardship for those effected [*sic*] entities" because they would experience that "high cost of compliance relative to the industry average." PA, EPA-HQ-OAR-2021-0566-0002 at 2. During consultation, DOE recognized the flaw of this assumption when it concluded "that, if . . . the cost of compliance is the same whether refineries buy RINs or blend renewable fuel to acquire RINs" and "RFS compliance costs are passed through in the price of refined products,"

---

[11] Aside from the impropriety of Hunt's suggestion that DOE, an independent federal agency not a party to this case, cannot stand up for itself, Hunt's argument does not overcome the presumption of legitimacy generally accorded to government records and official conduct. *See, e.g.*, *Lyashchynska v. U.S. Att'y Gen.*, 676 F.3d 962, 970 (11th Cir. 2012) (citations omitted).

then small refineries "would not face a higher cost of RFS compliance relative to the industry average," and thus no disproportionate economic hardship occurs. PA, EPA-HQ-OAR-2021-0566-0104 at 2. DOE also "*confirm*[*ed*] that its 2011 Study did not evaluate empirical evidence pertaining to RIN cost passthrough" and *confirmed* that it has not "conducted a more recent assessment that would enable [DOE] to reach any independent conclusions regarding RIN cost passthrough." *Id.* If DOE had reached some other conclusion, that would be reflected in the Consultation Memorandum. Based on DOE's and EPA's conclusions, there was no reason to continue using the DOE Matrix.

## C.   EPA's Denial Actions Adjudicated Multiple Petitions and Considered Refinery-Specific Facts in Detail.

Hunt argues that EPA improperly failed to consider exemption petitions individually. Br. at 43–45. EPA considered each petition on its merits and determined—based on factors and facts common to each petition—that every petition should be denied. EPA reasonably followed the principle, honored by both administrative agencies and courts, that like cases should have like results. Neither the uniform outcomes, nor EPA's choice to aggregate the petitions for decision, renders the Denial Actions unlawful. *See, e.g.*, *NAACP v. FPC*, 425 U.S. 662, 668 (1976) (agencies have discretion to shape their actions).

The record shows that EPA considered individual refinery information. The Denial Actions are based on EPA's revised statutory interpretation and economic

analysis applied to all petitioning small refineries.[12]  EPA accordingly adjudicated each of 105 exemption petitions in the Denial Actions, responded to cross-cutting small refinery comments and arguments in the aggregate, and responded to specific confidential facts and arguments raised by *each* petitioning small refinery in confidential appendices—including Hunt's in Appendix K for both Actions.  *See* PA, EPA-HQ-OAR-2021-0566-0118 at B-16–B-17 (discussing EPA's efforts to consider individual petitions and comments), B-30 (similar); *see also* PA, EPA-HQ-OAR-2021-0566-0117 at 26 (EPA "carefully reviewed data, contracts, and other information from small refineries to evaluate if[] . . . refineries that acquire RINs through blending get them at a lower cost than do refineries that purchase RINs on the open market").  The confidential appendices include detailed discussions of refinery-specific contracts, markets, and studies, including Hunt's. *See generally, e.g.*, PA, JD-498.  EPA explained that none of the refinery specific information invalidated EPA's economic analysis and therefore concluded that none of the petitioning small refineries established disproportionate economic hardship.[13]  Hunt's argument fails.

_____

[12] Nothing in § 7545(*o*)(9)(B) requires EPA to consider *only* local or regional factors or prevents EPA from deciding petitions based on a nationally applicable economic analysis, leaving these choices to EPA's discretion.  *Hermes*, 787 F.3d at 575.

[13] Hunt's argument that EPA determined that small refineries were merely "unlikely" to suffer disproportionate economic hardship caused by RFS

### D. Hunt's Remaining Arguments Do Not Show That EPA Acted Unreasonably or Failed to Reasonably Explain Its Findings.

#### 1. The Post-Decisional GAO Report Should Not Be Considered.

Hunt's argument relying on the November 2022 GAO Report is improper, incomplete, and incorrect. *See* Br. at 51–52. The GAO Report is not part of the administrative record for the Denial Actions. It therefore cannot be considered in review of Hunt's petitions in this Court. 5 U.S.C. § 706; *Fla. Power & Light*, 470 U.S. at 743–44.

Further, any consideration would have to account for EPA's criticisms included with the GAO Report as Appendix IV—but unmentioned in Hunt's Brief. EPA criticized GAO's unexplained "assumptions and simplifications" on RIN pricing, which predictably led to GAO's "unexpected" and incorrect results. PA, No. 22-12535, Doc. 27-2, Ex. A at 58. GAO's finding "does not account for the scope of review . . . to evaluate [exemption] petitions, the notice and comment process that EPA conducted prior to issuing its adjudications, or the information EPA reviewed and evaluated as a result of the comments it received." *Id.* at 55–56. EPA even "conducted additional analyses of the same RIN transaction data that GAO analyzed using an updated approach that addresses the various

---

compliance, Br. at 45, is belied by the remainder of the paragraph from the June Denial that Hunt cites and the Denial Actions in general.

methodological problems" with the GAO Report. *Id.* at 61. EPA's preliminary results showed "little significant difference in the price that small refineries pay to acquire RINs when compared to the rest of the RIN market," which would not "impact an evaluation of potential disproportionate economic hardship by a small refinery." *Id.* at 58, 61.

EPA confirmed these results with additional analyses in December 2022, concluding that small refineries only "paid 1.1% (1.2¢) more per RIN when buying separated RINs when compared to the average daily price and 0.5% (0.6¢) more per RIN than the largest 20 refiners." PA, December 2022 RIN Price Analysis at 1. Whether these small differences result from noise in the data or some other factor, they are not statistically significant, and they do not constitute disproportionate economic hardship. Contrary to Hunt's assertion, Br. at 51, EPA's December analysis *supports* EPA's overall conclusions.

Hunt's reliance on the GAO Report is therefore misplaced. *See, e.g.*, *United States v. Wiszowaty*, 506 F.3d 537, 541 (7th Cir. 2007) (affirming exclusion of a GAO report as "confusing and irrelevant"). If the Court does consider the GAO Report, any consideration should account for EPA's criticisms, as well as the specifics of EPA's December 2022 conclusions.[14]

---

[14] Any consideration should also account for the GAO Report's conclusion that the 2011 Study is "critically flawed." PA, No. 22-12535, Doc. 27-2, Ex. A at 13–14.

### 2. The Timing of Hunt's RIN Purchases Does Not Invalidate RIN Cost Passthrough, and Hunt Did Not Show That It Cannot Purchase RINs Ratably.

Hunt wrongly argues that EPA's economic analysis "assumes that obligated parties purchase RINs" ratably. Br. at 50–52, 53. Hunt conflates the operation of the RIN cost passthrough principle, which occurs no matter when RINs are purchased, with EPA's recommendation that small refineries purchase RINs needed to satisfy the obligation for all the fuel sold ratably, i.e., "on a systematic, regular basis," to ensure that obligated parties "recover the cost of the RINs they purchase in the sales price of the petroleum fuel they sell." PA, EPA-HQ-OAR-2021-0566-0117 at 55. Where an obligated party like Hunt chooses to purchase RINs well in advance or after the sale of its gasoline blendstock, it will still recover an amount of revenue sufficient to purchase RINs on the day that it sells its gasoline blendstock, but that obligated party ultimately may have to spend more (or less) to purchase RINs than it would have if it had purchased RINs ratably. *See id*. In other words, while obligated parties may try to time the market to their relative advantage or disadvantage, all obligated parties receive an increased price (and increased revenue) for the sale of transportation fuel products from the operation of the RFS in the market. The timing of RIN purchases therefore does not invalidate the concept of RIN cost passthrough (or RIN discount). Nor does a

small refinery's choices about when to purchase RINs support a finding of disproportionate economic hardship from RFS compliance.

Hunt also failed to demonstrate that it cannot purchase RINs ratably. After full explanation, EPA reasonably "reject[ed] small refinery arguments regarding the cost of capital" and "regarding the ability to afford" ratable RIN purchases and further concluded that "small refineries can enter into contracts with various RIN brokers to purchase RINs on a ratable basis." PA, EPA-HQ-OAR-2021-0566-0118 at B-63. Hunt fails to address EPA's responses,[15] ████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████.

Hunt's failure to show that it cannot buy RINs ratably further cements EPA's conclusion that Hunt passes through its RIN costs.

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[15] Hunt therefore waived any argument regarding EPA's responses. *Levy*, 416 F.3d at 1275–76.



### 3.    EPA Reasonably Rejected Hunt's Studies.

Hunt's reliance on various studies, *see* Br. at 52, 56, fails because EPA reasonably explained why those studies do not invalidate EPA's economic analysis.

The studies submitted by multiple small refineries "on balance . . . provide more evidence in support of the conclusion that RIN costs are passed through than evidence to suggest they do not."  PA, EPA-HQ-OAR-2021-0566-0118 at B-46. The Fitzgerald study's focus on the unavailability of RIN quote prices on weekends and holidays did not invalidate EPA's conclusion that small refineries pass through RIN costs or can purchase RINs ratably.  *Id.* at B-39.  The Louisiana State University ("LSU") study's assumption that "compliance costs are not the

---

16

same for all obligated parties" based on regional and other differences overlooks that RINs "are generated by renewable fuel producers" whose "cost structure varies very little across the country" and that blenders must "discount their fuel blends by the entire value of the RIN to remain competitive."  *Id.* at B-40.  EPA also generally rejected the notion that regional variation prevents complete passthrough because, among other reasons, "interrelation between linked fuel markets" shows "that many small refineries acting in local markets directly index the prices for the products they sell to the major coastal markets and posted prices from those markets," which "ensure[s] that the local market price indexes (rises and falls) with those major markets."  *Id.* at B-47, B-57–B-58 (similar); *see also* PA, EPA-HQ-OAR-2021-0566-0117 at 32–35, 50–56 (discussing competitive markets).

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

███████████

Moreover, Hunt failed in its Brief to address EPA's explanations from the Denial Actions.  Hunt should not be allowed to sandbag its arguments on this aspect of EPA's Denial Actions until reply.  *See Levy*, 416 F.3d at 1275–76.

### 4.    Hunt's Other Arguments Should Be Rejected.

Hunt's remaining arguments lack merit.  In the main, Hunt argues that █

████████████████████████████████████████

███████████████████████[17]███████████████████████

█████████████████████████.  Br. at 54–55.  As explained in Argument, Part II, *supra*, Hunt's mere expectation of an exemption in perpetuity was not reasonable and cannot provide relief here, especially considering that Hunt stated that ████

████████████████████████████████.  And as explained in the Consultation Memorandum, the 2011 Study relied on flawed assumptions that led to DOE and EPA's decision not to consider the DOE Matrix for the Denial Actions.  Hunt cannot force EPA to rely on this flawed methodology to the

---

[17] The RIN cost passthrough principle also operates for the sale of diesel blendstock.

exclusion of all other factors.  Finally, Hunt argues that EPA did not provide sufficient justification for its economic analysis, Br. at 50, 56, but omits that EPA explained its prior approach, the reasons for its change, the data supporting EPA's conclusion (including studies, market data, and information from small refineries), and its response to comments in the Denial Actions and the general and refinery-specific appendices.  Hunt's petitions should be denied.

## CONCLUSION

The Court should dismiss or transfer Hunt's petitions for review to the D.C. Circuit or else deny them on the merits.

Respectfully submitted,

TODD KIM
*Assistant Attorney General*

s/ *Patrick R. Jacobi*
PATRICK R. JACOBI
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
Denver Place Building
999 18th Street
Suite 370—South Terrace
Denver, CO 80202
Tel:  (303) 844-1348
patrick.r.jacobi@usdoj.gov

Of Counsel:

SUSAN STAHLE
U.S. Environmental Protection Agency
Office of General Counsel
Washington, DC

April 20, 2023

BRYAN J. HARRISON
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, DC  20044-7611
Tel:  (202) 307-0930
bryan.harrison@usdoj.gov

## CERTIFICATES OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,993 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using the 2016 version of Microsoft Word in 14-point Times New Roman.

Dated:  April 20, 2023                    s/ *Patrick R. Jacobi*
                                          PATRICK R. JACOBI
                                          U.S. Department of Justice
                                          Environment and Natural Resources
                                              Division
                                          Environmental Defense Section
                                          999 18th Street
                                          Suite 370—South Terrace
                                          Denver, CO  80202
                                          Tel:  (303) 844-1348
                                          patrick.r.jacobi@usdoj.gov

## CERTIFICATE OF SERVICE

Consistent with the Protective Order entered in this case, Doc. 65-2, I hereby certify that I electronically filed the redacted version of EPA's Response Brief with the Clerk of the Court using the CM/ECF system, which will send notification of said filing to the attorneys of record, who are required to have registered with the Court's CM/ECF system.

I further certify that the sealed version of EPA's Response Brief was submitted to the Court in paper format in a sealed envelope labeled "DOCUMENTS UNDER SEAL" and will be received by the clerk within ten days of filing in accordance with Eleventh Circuit Rule 25-3(h). By agreement, the undersigned counsel will also provide copies of the sealed filing to Petitioner's counsel via electronic means.

Dated:  April 20, 2023

s/ *Patrick R. Jacobi*
PATRICK R. JACOBI
U.S. Department of Justice
Environment and Natural Resources
    Division
Environmental Defense Section
999 18th Street
Suite 370—South Terrace
Denver, CO  80202
Tel:  (303) 844-1348
patrick.r.jacobi@usdoj.gov

No. 22-11617 (consolidated with No. 22-12535)

UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

HUNT REFINING COMPANY,
*Petitioner*,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondent*.

On Petitions for Review of Final Agency Actions of the United States
Environmental Protection Agency

**EPA'S ADDENDUM TO RESPONSE BRIEF**

TODD KIM
*Assistant Attorney General*

PATRICK R. JACOBI
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
Denver Place Building
999 18th Street
Suite 370—South Terrace
Of Counsel:                          Denver, CO  80202
                                     Tel:  (303) 844-1348
SUSAN STAHLE
U.S. Environmental Protection Agency    BRYAN J. HARRISON
Office of General Counsel               U.S. Department of Justice
Washington, DC                          Environment & Natural Resources Division
                                        Environmental Defense Section
                                        P.O. Box 7611
                                        Washington, DC  20044-7611
                                        Tel:  (202) 307-0930

# TABLE OF CONTENTS

Table of Contents ............................................................ Add. i

42 U.S.C. § 7545(*o*) ...................................................... Add. 001

86 Fed. Reg. 17073 ........................................................ Add. 010

87 Fed. Reg. 5696 ......................................................... Add. 016

87 Fed. Reg. 54158 ........................................................ Add. 023

shall take effect no later than November 1, 1992 (or at such other date during 1992 as the Administrator establishes under the preceding provisions of this paragraph). For other areas, the revision shall provide that such requirement shall take effect no later than November 1 of the third year after the last year of the applicable 2-year period referred to in paragraph (1) (or at such other date during such third year as the Administrator establishes under the preceding provisions of this paragraph) and shall include a program for implementation and enforcement of the requirement consistent with guidance to be issued by the Administrator.

**(3) Waivers**

(A) The Administrator shall waive, in whole or in part, the requirements of paragraph (2) upon a demonstration by the State to the satisfaction of the Administrator that the use of oxygenated gasoline would prevent or interfere with the attainment by the area of a national primary ambient air quality standard (or a State or local ambient air quality standard) for any air pollutant other than carbon monoxide.

(B) The Administrator shall, upon demonstration by the State satisfactory to the Administrator, waive the requirement of paragraph (2) where the Administrator determines that mobile sources of carbon monoxide do not contribute significantly to carbon monoxide levels in an area.

(C)(i) Any person may petition the Administrator to make a finding that there is, or is likely to be, for any area, an inadequate domestic supply of, or distribution capacity for, oxygenated gasoline meeting the requirements of paragraph (2) or fuel additives (oxygenates) necessary to meet such requirements. The Administrator shall act on such petition within 6 months after receipt of the petition.

(ii) If the Administrator determines, in response to a petition under clause (i), that there is an inadequate supply or capacity described in clause (i), the Administrator shall delay the effective date of paragraph (2) for 1 year. Upon petition, the Administrator may extend such effective date for one additional year. No partial delay or lesser waiver may be granted under this clause.

(iii) In granting waivers under this subparagraph the Administrator shall consider distribution capacity separately from the adequacy of domestic supply and shall grant such waivers in such manner as will assure that, if supplies of oxygenated gasoline are limited, areas having the highest design value for carbon monoxide will have a priority in obtaining oxygenated gasoline which meets the requirements of paragraph (2).

(iv) As used in this subparagraph, the term distribution capacity includes capacity for transportation, storage, and blending.

**(4) Fuel dispensing systems**

Any person selling oxygenated gasoline at retail pursuant to this subsection shall be required under regulations promulgated by the Administrator to label the fuel dispensing system with a notice that the gasoline is oxygenated and will reduce the carbon monoxide emissions from the motor vehicle.

**(5) Guidelines for credit**

The Administrator shall promulgate guidelines, within 9 months after November 15, 1990, allowing the use of marketable oxygen credits from gasolines during that portion of the year specified in paragraph (2) with higher oxygen content than required to offset the sale or use of gasoline with a lower oxygen content than required. No credits may be transferred between nonattainment areas.

**(6) Attainment areas**

Nothing in this subsection shall be interpreted as requiring an oxygenated gasoline program in an area which is in attainment for carbon monoxide, except that in a carbon monoxide nonattainment area which is redesignated as attainment for carbon monoxide, the requirements of this subsection shall remain in effect to the extent such program is necessary to maintain such standard thereafter in the area.

**(7) Failure to attain CO standard**

If the Administrator determines under section 7512(b)(2) of this title that the national primary ambient air quality standard for carbon monoxide has not been attained in a Serious Area by the applicable attainment date, the State shall submit a plan revision for the area within 9 months after the date of such determination. The plan revision shall provide that the minimum oxygen content of gasoline referred to in paragraph (2) shall be 3.1 percent by weight unless such requirement is waived in accordance with the provisions of this subsection.

**(n) Prohibition on leaded gasoline for highway use**

After December 31, 1995, it shall be unlawful for any person to sell, offer for sale, supply, offer for supply, dispense, transport, or introduce into commerce, for use as fuel in any motor vehicle (as defined in section 7554(2)[8] of this title) any gasoline which contains lead or lead additives.

**(o) Renewable fuel program**

**(1) Definitions**

In this section:

**(A) Additional renewable fuel**

The term ''additional renewable fuel'' means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in home heating oil or jet fuel.

**(B) Advanced biofuel**

**(i) In general**

The term ''advanced biofuel'' means renewable fuel, other than ethanol derived from corn starch, that has lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, that are at least 50 percent less than baseline lifecycle greenhouse gas emissions.

---

[8] So in original. Probably should be section ''7550(2)''.

**(ii) Inclusions**

The types of fuels eligible for consideration as "advanced biofuel" may include any of the following:

(I) Ethanol derived from cellulose, hemicellulose, or lignin.

(II) Ethanol derived from sugar or starch (other than corn starch).

(III) Ethanol derived from waste material, including crop residue, other vegetative waste material, animal waste, and food waste and yard waste.

(IV) Biomass-based diesel.

(V) Biogas (including landfill gas and sewage waste treatment gas) produced through the conversion of organic matter from renewable biomass.

(VI) Butanol or other alcohols produced through the conversion of organic matter from renewable biomass.

(VII) Other fuel derived from cellulosic biomass.

**(C) Baseline lifecycle greenhouse gas emissions**

The term "baseline lifecycle greenhouse gas emissions" means the average lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, for gasoline or diesel (whichever is being replaced by the renewable fuel) sold or distributed as transportation fuel in 2005.

**(D) Biomass-based diesel**

The term "biomass-based diesel" means renewable fuel that is biodiesel as defined in section 13220(f) of this title and that has lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, that are at least 50 percent less than the baseline lifecycle greenhouse gas emissions. Notwithstanding the preceding sentence, renewable fuel derived from co-processing biomass with a petroleum feedstock shall be advanced biofuel if it meets the requirements of subparagraph (B), but is not biomass-based diesel.

**(E) Cellulosic biofuel**

The term "cellulosic biofuel" means renewable fuel derived from any cellulose, hemicellulose, or lignin that is derived from renewable biomass and that has lifecycle greenhouse gas emissions, as determined by the Administrator, that are at least 60 percent less than the baseline lifecycle greenhouse gas emissions.

**(F) Conventional biofuel**

The term "conventional biofuel" means renewable fuel that is ethanol derived from corn starch.

**(G) Greenhouse gas**

The term "greenhouse gas" means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons,[9] sulfur hexafluoride. The Administrator may include any other anthropogenically-emitted gas that is determined by the Administrator, after notice and comment, to contribute to global warming.

**(H) Lifecycle greenhouse gas emissions**

The term "lifecycle greenhouse gas emissions" means the aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions such as significant emissions from land use changes), as determined by the Administrator, related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer, where the mass values for all greenhouse gases are adjusted to account for their relative global warming potential.

**(I) Renewable biomass**

The term "renewable biomass" means each of the following:

(i) Planted crops and crop residue harvested from agricultural land cleared or cultivated at any time prior to December 19, 2007, that is either actively managed or fallow, and nonforested.

(ii) Planted trees and tree residue from actively managed tree plantations on non-federal[10] land cleared at any time prior to December 19, 2007, including land belonging to an Indian tribe or an Indian individual, that is held in trust by the United States or subject to a restriction against alienation imposed by the United States.

(iii) Animal waste material and animal byproducts.

(iv) Slash and pre-commercial thinnings that are from non-federal[10] forestlands, including forestlands belonging to an Indian tribe or an Indian individual, that are held in trust by the United States or subject to a restriction against alienation imposed by the United States, but not forests or forestlands that are ecological communities with a global or State ranking of critically imperiled, imperiled, or rare pursuant to a State Natural Heritage Program, old growth forest, or late successional forest.

(v) Biomass obtained from the immediate vicinity of buildings and other areas regularly occupied by people, or of public infrastructure, at risk from wildfire.

(vi) Algae.

(vii) Separated yard waste or food waste, including recycled cooking and trap grease.

**(J) Renewable fuel**

The term "renewable fuel" means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in a transportation fuel.

**(K) Small refinery**

The term "small refinery" means a refinery for which the average aggregate daily

---

[9] So in original. The word "and" probably should appear.

[10] So in original. Probably should be "non-Federal".

crude oil throughput for a calendar year (as determined by dividing the aggregate throughput for the calendar year by the number of days in the calendar year) does not exceed 75,000 barrels.

**(L) Transportation fuel**

The term ''transportation fuel'' means fuel for use in motor vehicles, motor vehicle engines, nonroad vehicles, or nonroad engines (except for ocean-going vessels).

**(2) Renewable fuel program**

**(A) Regulations**

**(i) In general**

Not later than 1 year after August 8, 2005, the Administrator shall promulgate regulations to ensure that gasoline sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains the applicable volume of renewable fuel determined in accordance with subparagraph (B). Not later than 1 year after December 19, 2007, the Administrator shall revise the regulations under this paragraph to ensure that transportation fuel sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains at least the applicable volume of renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel, determined in accordance with subparagraph (B) and, in the case of any such renewable fuel produced from new facilities that commence construction after December 19, 2007, achieves at least a 20 percent reduction in lifecycle greenhouse gas emissions compared to baseline lifecycle greenhouse gas emissions.

**(ii) Noncontiguous State opt-in**

**(I) In general**

On the petition of a noncontiguous State or territory, the Administrator may allow the renewable fuel program established under this subsection to apply in the noncontiguous State or territory at the same time or any time after the Administrator promulgates regulations under this subparagraph.

**(II) Other actions**

In carrying out this clause, the Administrator may—

(aa) issue or revise regulations under this paragraph;

(bb) establish applicable percentages under paragraph (3);

(cc) provide for the generation of credits under paragraph (5); and

(dd) take such other actions as are necessary to allow for the application of the renewable fuels program in a noncontiguous State or territory.

**(iii) Provisions of regulations**

Regardless of the date of promulgation, the regulations promulgated under clause (i)—

(I) shall contain compliance provisions applicable to refineries, blenders, dis-

tributors, and importers, as appropriate, to ensure that the requirements of this paragraph are met; but

(II) shall not—

(aa) restrict geographic areas in which renewable fuel may be used; or

(bb) impose any per-gallon obligation for the use of renewable fuel.

**(iv) Requirement in case of failure to promulgate regulations**

If the Administrator does not promulgate regulations under clause (i), the percentage of renewable fuel in gasoline sold or dispensed to consumers in the United States, on a volume basis, shall be 2.78 percent for calendar year 2006.

**(B) Applicable volumes**

**(i) Calendar years after 2005**

**(I) Renewable fuel**

For the purpose of subparagraph (A), the applicable volume of renewable fuel for the calendar years 2006 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of renewable fuel (in billions of gallons): |
| --- | --- |
| 2006 | 4.0 |
| 2007 | 4.7 |
| 2008 | 9.0 |
| 2009 | 11.1 |
| 2010 | 12.95 |
| 2011 | 13.95 |
| 2012 | 15.2 |
| 2013 | 16.55 |
| 2014 | 18.15 |
| 2015 | 20.5 |
| 2016 | 22.25 |
| 2017 | 24.0 |
| 2018 | 26.0 |
| 2019 | 28.0 |
| 2020 | 30.0 |
| 2021 | 33.0 |
| 2022 | 36.0 |

**(II) Advanced biofuel**

For the purpose of subparagraph (A), of the volume of renewable fuel required under subclause (I), the applicable volume of advanced biofuel for the calendar years 2009 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of advanced biofuel (in billions of gallons): |
| --- | --- |
| 2009 | 0.6 |
| 2010 | 0.95 |
| 2011 | 1.35 |
| 2012 | 2.0 |
| 2013 | 2.75 |
| 2014 | 3.75 |
| 2015 | 5.5 |
| 2016 | 7.25 |
| 2017 | 9.0 |

| Calendar year: | Applicable volume of advanced biofuel (in billions of gallons): |
|---|---|
| 2018 | 11.0 |
| 2019 | 13.0 |
| 2020 | 15.0 |
| 2021 | 18.0 |
| 2022 | 21.0 |

**(III) Cellulosic biofuel**

For the purpose of subparagraph (A), of the volume of advanced biofuel required under subclause (II), the applicable volume of cellulosic biofuel for the calendar years 2010 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of cellulosic biofuel (in billions of gallons): |
|---|---|
| 2010 | 0.1 |
| 2011 | 0.25 |
| 2012 | 0.5 |
| 2013 | 1.0 |
| 2014 | 1.75 |
| 2015 | 3.0 |
| 2016 | 4.25 |
| 2017 | 5.5 |
| 2018 | 7.0 |
| 2019 | 8.5 |
| 2020 | 10.5 |
| 2021 | 13.5 |
| 2022 | 16.0 |

**(IV) Biomass-based diesel**

For the purpose of subparagraph (A), of the volume of advanced biofuel required under subclause (II), the applicable volume of biomass-based diesel for the calendar years 2009 through 2012 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of biomass-based diesel (in billions of gallons): |
|---|---|
| 2009 | 0.5 |
| 2010 | 0.65 |
| 2011 | 0.80 |
| 2012 | 1.0 |

**(ii) Other calendar years**

For the purposes of subparagraph (A), the applicable volumes of each fuel specified in the tables in clause (i) for calendar years after the calendar years specified in the tables shall be determined by the Administrator, in coordination with the Secretary of Energy and the Secretary of Agriculture, based on a review of the implementation of the program during calendar years specified in the tables, and an analysis of—

(I) the impact of the production and use of renewable fuels on the environ-ment, including on air quality, climate change, conversion of wetlands, eco-systems, wildlife habitat, water quality, and water supply;

(II) the impact of renewable fuels on the energy security of the United States;

(III) the expected annual rate of future commercial production of renewable fuels, including advanced biofuels in each category (cellulosic biofuel and bio-mass-based diesel);

(IV) the impact of renewable fuels on the infrastructure of the United States, including deliverability of materials, goods, and products other than renew-able fuel, and the sufficiency of infra-structure to deliver and use renewable fuel;

(V) the impact of the use of renewable fuels on the cost to consumers of trans-portation fuel and on the cost to trans-port goods; and

(VI) the impact of the use of renewable fuels on other factors, including job cre-ation, the price and supply of agricul-tural commodities, rural economic de-velopment, and food prices.

The Administrator shall promulgate rules establishing the applicable volumes under this clause no later than 14 months before the first year for which such applicable volume will apply.

**(iii) Applicable volume of advanced biofuel**

For the purpose of making the deter-minations in clause (ii), for each calendar year, the applicable volume of advanced biofuel shall be at least the same percent-age of the applicable volume of renewable fuel as in calendar year 2022.

**(iv) Applicable volume of cellulosic biofuel**

For the purpose of making the deter-minations in clause (ii), for each calendar year, the applicable volume of cellulosic biofuel established by the Administrator shall be based on the assumption that the Administrator will not need to issue a waiver for such years under paragraph (7)(D).

**(v) Minimum applicable volume of biomass-based diesel**

For the purpose of making the deter-minations in clause (ii), the applicable vol-ume of biomass-based diesel shall not be less than the applicable volume listed in clause (i)(IV) for calendar year 2012.

**(3) Applicable percentages**

**(A) Provision of estimate of volumes of gaso-line sales**

Not later than October 31 of each of cal-endar years 2005 through 2021, the Adminis-trator of the Energy Information Administra-tion shall provide to the Administrator of the Environmental Protection Agency an es-timate, with respect to the following cal-endar year, of the volumes of transportation fuel, biomass-based diesel, and cellulosic biofuel projected to be sold or introduced into commerce in the United States.

**(B) Determination of applicable percentages**
**(i) In general**

Not later than November 30 of each of calendar years 2005 through 2021, based on the estimate provided under subparagraph (A), the Administrator of the Environmental Protection Agency shall determine and publish in the Federal Register, with respect to the following calendar year, the renewable fuel obligation that ensures that the requirements of paragraph (2) are met.

**(ii) Required elements**

The renewable fuel obligation determined for a calendar year under clause (i) shall—

(I) be applicable to refineries, blenders, and importers, as appropriate;

(II) be expressed in terms of a volume percentage of transportation fuel sold or introduced into commerce in the United States; and

(III) subject to subparagraph (C)(i), consist of a single applicable percentage that applies to all categories of persons specified in subclause (I).

**(C) Adjustments**

In determining the applicable percentage for a calendar year, the Administrator shall make adjustments—

(i) to prevent the imposition of redundant obligations on any person specified in subparagraph (B)(ii)(I); and

(ii) to account for the use of renewable fuel during the previous calendar year by small refineries that are exempt under paragraph (9).

**(4) Modification of greenhouse gas reduction percentages**
**(A) In general**

The Administrator may, in the regulations under the last sentence of paragraph (2)(A)(i), adjust the 20 percent, 50 percent, and 60 percent reductions in lifecycle greenhouse gas emissions specified in paragraphs (2)(A)(i) (relating to renewable fuel), (1)(D) (relating to biomass-based diesel), (1)(B)(i) (relating to advanced biofuel), and (1)(E) (relating to cellulosic biofuel) to a lower percentage. For the 50 and 60 percent reductions, the Administrator may make such an adjustment only if he determines that generally such reduction is not commercially feasible for fuels made using a variety of feedstocks, technologies, and processes to meet the applicable reduction.

**(B) Amount of adjustment**

In promulgating regulations under this paragraph, the specified 50 percent reduction in greenhouse gas emissions from advanced biofuel and in biomass-based diesel may not be reduced below 40 percent. The specified 20 percent reduction in greenhouse gas emissions from renewable fuel may not be reduced below 10 percent, and the specified 60 percent reduction in greenhouse gas emissions from cellulosic biofuel may not be reduced below 50 percent.

**(C) Adjusted reduction levels**

An adjustment under this paragraph to a percent less than the specified 20 percent greenhouse gas reduction for renewable fuel shall be the minimum possible adjustment, and the adjusted greenhouse gas reduction shall be established by the Administrator at the maximum achievable level, taking cost in consideration, for natural gas fired corn-based ethanol plants, allowing for the use of a variety of technologies and processes. An adjustment in the 50 or 60 percent greenhouse gas levels shall be the minimum possible adjustment for the fuel or fuels concerned, and the adjusted greenhouse gas reduction shall be established at the maximum achievable level, taking cost in consideration, allowing for the use of a variety of feedstocks, technologies, and processes.

**(D) 5-year review**

Whenever the Administrator makes any adjustment under this paragraph, not later than 5 years thereafter he shall review and revise (based upon the same criteria and standards as required for the initial adjustment) the regulations establishing the adjusted level.

**(E) Subsequent adjustments**

After the Administrator has promulgated a final rule under the last sentence of paragraph (2)(A)(i) with respect to the method of determining lifecycle greenhouse gas emissions, except as provided in subparagraph (D), the Administrator may not adjust the percent greenhouse gas reduction levels unless he determines that there has been a significant change in the analytical methodology used for determining the lifecycle greenhouse gas emissions. If he makes such determination, he may adjust the 20, 50, or 60 percent reduction levels through rulemaking using the criteria and standards set forth in this paragraph.

**(F) Limit on upward adjustments**

If, under subparagraph (D) or (E), the Administrator revises a percent level adjusted as provided in subparagraphs (A), (B), and (C) to a higher percent, such higher percent may not exceed the applicable percent specified in paragraph (2)(A)(i), (1)(D), (1)(B)(i), or (1)(E).

**(G) Applicability of adjustments**

If the Administrator adjusts, or revises, a percent level referred to in this paragraph or makes a change in the analytical methodology used for determining the lifecycle greenhouse gas emissions, such adjustment, revision, or change (or any combination thereof) shall only apply to renewable fuel from new facilities that commence construction after the effective date of such adjustment, revision, or change.

**(5) Credit program**
**(A) In general**

The regulations promulgated under paragraph (2)(A) shall provide—

(i) for the generation of an appropriate amount of credits by any person that re-

fines, blends, or imports gasoline that contains a quantity of renewable fuel that is greater than the quantity required under paragraph (2);

(ii) for the generation of an appropriate amount of credits for biodiesel; and

(iii) for the generation of credits by small refineries in accordance with paragraph (9)(C).

**(B) Use of credits**

A person that generates credits under subparagraph (A) may use the credits, or transfer all or a portion of the credits to another person, for the purpose of complying with paragraph (2).

**(C) Duration of credits**

A credit generated under this paragraph shall be valid to show compliance for the 12 months as of the date of generation.

**(D) Inability to generate or purchase sufficient credits**

The regulations promulgated under paragraph (2)(A) shall include provisions allowing any person that is unable to generate or purchase sufficient credits to meet the requirements of paragraph (2) to carry forward a renewable fuel deficit on condition that the person, in the calendar year following the year in which the renewable fuel deficit is created—

(i) achieves compliance with the renewable fuel requirement under paragraph (2); and

(ii) generates or purchases additional renewable fuel credits to offset the renewable fuel deficit of the previous year.

**(E) Credits for additional renewable fuel**

The Administrator may issue regulations providing: (i) for the generation of an appropriate amount of credits by any person that refines, blends, or imports additional renewable fuels specified by the Administrator; and (ii) for the use of such credits by the generator, or the transfer of all or a portion of the credits to another person, for the purpose of complying with paragraph (2).

**(6) Seasonal variations in renewable fuel use**

**(A) Study**

For each of calendar years 2006 through 2012, the Administrator of the Energy Information Administration shall conduct a study of renewable fuel blending to determine whether there are excessive seasonal variations in the use of renewable fuel.

**(B) Regulation of excessive seasonal variations**

If, for any calendar year, the Administrator of the Energy Information Administration, based on the study under subparagraph (A), makes the determinations specified in subparagraph (C), the Administrator of the Environmental Protection Agency shall promulgate regulations to ensure that 25 percent or more of the quantity of renewable fuel necessary to meet the requirements of paragraph (2) is used during each of the 2 periods specified in subparagraph (D) of each subsequent calendar year.

**(C) Determinations**

The determinations referred to in subparagraph (B) are that—

(i) less than 25 percent of the quantity of renewable fuel necessary to meet the requirements of paragraph (2) has been used during 1 of the 2 periods specified in subparagraph (D) of the calendar year;

(ii) a pattern of excessive seasonal variation described in clause (i) will continue in subsequent calendar years; and

(iii) promulgating regulations or other requirements to impose a 25 percent or more seasonal use of renewable fuels will not prevent or interfere with the attainment of national ambient air quality standards or significantly increase the price of motor fuels to the consumer.

**(D) Periods**

The 2 periods referred to in this paragraph are—

(i) April through September; and

(ii) January through March and October through December.

**(E) Exclusion**

Renewable fuel blended or consumed in calendar year 2006 in a State that has received a waiver under section 7543(b) of this title shall not be included in the study under subparagraph (A).

**(F) State exemption from seasonality requirements**

Notwithstanding any other provision of law, the seasonality requirement relating to renewable fuel use established by this paragraph shall not apply to any State that has received a waiver under section 7543(b) of this title or any State dependent on refineries in such State for gasoline supplies.

**(7) Waivers**

**(A) In general**

The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, may waive the requirements of paragraph (2) in whole or in part on petition by one or more States, by any person subject to the requirements of this subsection, or by the Administrator on his own motion by reducing the national quantity of renewable fuel required under paragraph (2)—

(i) based on a determination by the Administrator, after public notice and opportunity for comment, that implementation of the requirement would severely harm the economy or environment of a State, a region, or the United States; or

(ii) based on a determination by the Administrator, after public notice and opportunity for comment, that there is an inadequate domestic supply.

**(B) Petitions for waivers**

The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, shall approve or disapprove a petition for a waiver of the requirements of paragraph (2) within 90 days

after the date on which the petition is received by the Administrator.

**(C) Termination of waivers**

A waiver granted under subparagraph (A) shall terminate after 1 year, but may be renewed by the Administrator after consultation with the Secretary of Agriculture and the Secretary of Energy.

**(D) Cellulosic biofuel**

(i) For any calendar year for which the projected volume of cellulosic biofuel production is less than the minimum applicable volume established under paragraph (2)(B), as determined by the Administrator based on the estimate provided under paragraph (3)(A), not later than November 30 of the preceding calendar year, the Administrator shall reduce the applicable volume of cellulosic biofuel required under paragraph (2)(B) to the projected volume available during that calendar year. For any calendar year in which the Administrator makes such a reduction, the Administrator may also reduce the applicable volume of renewable fuel and advanced biofuels requirement established under paragraph (2)(B) by the same or a lesser volume.

(ii) Whenever the Administrator reduces the minimum cellulosic biofuel volume under this subparagraph, the Administrator shall make available for sale cellulosic biofuel credits at the higher of $0.25 per gallon or the amount by which $3.00 per gallon exceeds the average wholesale price of a gallon of gasoline in the United States. Such amounts shall be adjusted for inflation by the Administrator for years after 2008.

(iii) Eighteen months after December 19, 2007, the Administrator shall promulgate regulations to govern the issuance of credits under this subparagraph. The regulations shall set forth the method for determining the exact price of credits in the event of a waiver. The price of such credits shall not be changed more frequently than once each quarter. These regulations shall include such provisions, including limiting the credits' uses and useful life, as the Administrator deems appropriate to assist market liquidity and transparency, to provide appropriate certainty for regulated entities and renewable fuel producers, and to limit any potential misuse of cellulosic biofuel credits to reduce the use of other renewable fuels, and for such other purposes as the Administrator determines will help achieve the goals of this subsection. The regulations shall limit the number of cellulosic biofuel credits for any calendar year to the minimum applicable volume (as reduced under this subparagraph) of cellulosic biofuel for that year.

**(E) Biomass-based diesel**

**(i) Market evaluation**

The Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, shall periodically evaluate the impact of the biomass-based diesel requirements established under this paragraph on the price of diesel fuel.

**(ii) Waiver**

If the Administrator determines that there is a significant renewable feedstock disruption or other market circumstances that would make the price of biomass-based diesel fuel increase significantly, the Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, shall issue an order to reduce, for up to a 60-day period, the quantity of biomass-based diesel required under subparagraph (A) by an appropriate quantity that does not exceed 15 percent of the applicable annual requirement for biomass-based diesel. For any calendar year in which the Administrator makes a reduction under this subparagraph, the Administrator may also reduce the applicable volume of renewable fuel and advanced biofuels requirement established under paragraph (2)(B) by the same or a lesser volume.

**(iii) Extensions**

If the Administrator determines that the feedstock disruption or circumstances described in clause (ii) is continuing beyond the 60-day period described in clause (ii) or this clause, the Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, may issue an order to reduce, for up to an additional 60-day period, the quantity of biomass-based diesel required under subparagraph (A) by an appropriate quantity that does not exceed an additional 15 percent of the applicable annual requirement for biomass-based diesel.

**(F) Modification of applicable volumes**

For any of the tables in paragraph (2)(B), if the Administrator waives—

(i) at least 20 percent of the applicable volume requirement set forth in any such table for 2 consecutive years; or

(ii) at least 50 percent of such volume requirement for a single year,

the Administrator shall promulgate a rule (within 1 year after issuing such waiver) that modifies the applicable volumes set forth in the table concerned for all years following the final year to which the waiver applies, except that no such modification in applicable volumes shall be made for any year before 2016. In promulgating such a rule, the Administrator shall comply with the processes, criteria, and standards set forth in paragraph (2)(B)(ii).

**(8) Study and waiver for initial year of program**

**(A) In general**

Not later than 180 days after August 8, 2005, the Secretary of Energy shall conduct for the Administrator a study assessing whether the renewable fuel requirement under paragraph (2) will likely result in significant adverse impacts on consumers in 2006, on a national, regional, or State basis.

**(B) Required evaluations**

The study shall evaluate renewable fuel—

(i) supplies and prices;

(ii) blendstock supplies; and

(iii) supply and distribution system capabilities.

**(C) Recommendations by the Secretary**

Based on the results of the study, the Secretary of Energy shall make specific recommendations to the Administrator concerning waiver of the requirements of paragraph (2), in whole or in part, to prevent any adverse impacts described in subparagraph (A).

**(D) Waiver**

**(i) In general**

Not later than 270 days after August 8, 2005, the Administrator shall, if and to the extent recommended by the Secretary of Energy under subparagraph (C), waive, in whole or in part, the renewable fuel requirement under paragraph (2) by reducing the national quantity of renewable fuel required under paragraph (2) in calendar year 2006.

**(ii) No effect on waiver authority**

Clause (i) does not limit the authority of the Administrator to waive the requirements of paragraph (2) in whole, or in part, under paragraph (7).

**(9) Small refineries**

**(A) Temporary exemption**

**(i) In general**

The requirements of paragraph (2) shall not apply to small refineries until calendar year 2011.

**(ii) Extension of exemption**

**(I) Study by Secretary of Energy**

Not later than December 31, 2008, the Secretary of Energy shall conduct for the Administrator a study to determine whether compliance with the requirements of paragraph (2) would impose a disproportionate economic hardship on small refineries.

**(II) Extension of exemption**

In the case of a small refinery that the Secretary of Energy determines under subclause (I) would be subject to a disproportionate economic hardship if required to comply with paragraph (2), the Administrator shall extend the exemption under clause (i) for the small refinery for a period of not less than 2 additional years.

**(B) Petitions based on disproportionate economic hardship**

**(i) Extension of exemption**

A small refinery may at any time petition the Administrator for an extension of the exemption under subparagraph (A) for the reason of disproportionate economic hardship.

**(ii) Evaluation of petitions**

In evaluating a petition under clause (i), the Administrator, in consultation with the Secretary of Energy, shall consider the findings of the study under subparagraph (A)(ii) and other economic factors.

**(iii) Deadline for action on petitions**

The Administrator shall act on any petition submitted by a small refinery for a hardship exemption not later than 90 days after the date of receipt of the petition.

**(C) Credit program**

If a small refinery notifies the Administrator that the small refinery waives the exemption under subparagraph (A), the regulations promulgated under paragraph (2)(A) shall provide for the generation of credits by the small refinery under paragraph (5) beginning in the calendar year following the date of notification.

**(D) Opt-in for small refineries**

A small refinery shall be subject to the requirements of paragraph (2) if the small refinery notifies the Administrator that the small refinery waives the exemption under subparagraph (A).

**(10) Ethanol market concentration analysis**

**(A) Analysis**

**(i) In general**

Not later than 180 days after August 8, 2005, and annually thereafter, the Federal Trade Commission shall perform a market concentration analysis of the ethanol production industry using the Herfindahl-Hirschman Index to determine whether there is sufficient competition among industry participants to avoid price-setting and other anticompetitive behavior.

**(ii) Scoring**

For the purpose of scoring under clause (i) using the Herfindahl-Hirschman Index, all marketing arrangements among industry participants shall be considered.

**(B) Report**

Not later than December 1, 2005, and annually thereafter, the Federal Trade Commission shall submit to Congress and the Administrator a report on the results of the market concentration analysis performed under subparagraph (A)(i).

**(11) Periodic reviews**

To allow for the appropriate adjustment of the requirements described in subparagraph (B) of paragraph (2), the Administrator shall conduct periodic reviews of—

(A) existing technologies;

(B) the feasibility of achieving compliance with the requirements; and

(C) the impacts of the requirements described in subsection (a)(2)[11] on each individual and entity described in paragraph (2).

**(12) Effect on other provisions**

Nothing in this subsection, or regulations issued pursuant to this subsection, shall affect or be construed to affect the regulatory status of carbon dioxide or any other greenhouse gas,

---

[11] So in original. Subsection (a) does not contain a par. (2).

or to expand or limit regulatory authority regarding carbon dioxide or any other greenhouse gas, for purposes of other provisions (including section 7475) of this chapter. The previous sentence shall not affect implementation and enforcement of this subsection.

**(q) [12] Analyses of motor vehicle fuel changes and emissions model**

**(1) Anti-backsliding analysis**

**(A) Draft analysis**

Not later than 4 years after August 8, 2005, the Administrator shall publish for public comment a draft analysis of the changes in emissions of air pollutants and air quality due to the use of motor vehicle fuel and fuel additives resulting from implementation of the amendments made by the Energy Policy Act of 2005.

**(B) Final analysis**

After providing a reasonable opportunity for comment but not later than 5 years after August 8, 2005, the Administrator shall publish the analysis in final form.

**(2) Emissions model**

For the purposes of this section, not later than 4 years after August 8, 2005, the Administrator shall develop and finalize an emissions model that reflects, to the maximum extent practicable, the effects of gasoline characteristics or components on emissions from vehicles in the motor vehicle fleet during calendar year 2007.

**(3) Permeation effects study**

**(A) In general**

Not later than 1 year after August 8, 2005, the Administrator shall conduct a study, and report to Congress the results of the study, on the effects of ethanol content in gasoline on permeation, the process by which fuel molecules migrate through the elastomeric materials (rubber and plastic parts) that make up the fuel and fuel vapor systems of a motor vehicle.

**(B) Evaporative emissions**

The study shall include estimates of the increase in total evaporative emissions likely to result from the use of gasoline with ethanol content in a motor vehicle, and the fleet of motor vehicles, due to permeation.

**(r) Fuel and fuel additive importers and importation**

For the purposes of this section, the term "manufacturer" includes an importer and the term "manufacture" includes importation.

**(s) Conversion assistance for cellulosic biomass, waste-derived ethanol, approved renewable fuels**

**(1) In general**

The Secretary of Energy may provide grants to merchant producers of cellulosic biomass ethanol, waste-derived ethanol, and approved renewable fuels in the United States to assist the producers in building eligible production facilities described in paragraph (2) for the production of ethanol or approved renewable fuels.

**(2) Eligible production facilities**

A production facility shall be eligible to receive a grant under this subsection if the production facility—

(A) is located in the United States; and

(B) uses cellulosic or renewable biomass or waste-derived feedstocks derived from agricultural residues, wood residues, municipal solid waste, or agricultural byproducts.

**(3) Authorization of appropriations**

There are authorized to be appropriated the following amounts to carry out this subsection:

(A) $100,000,000 for fiscal year 2006.

(B) $250,000,000 for fiscal year 2007.

(C) $400,000,000 for fiscal year 2008.

**(4) Definitions**

For the purposes of this subsection:

(A) The term "approved renewable fuels" are fuels and components of fuels that have been approved by the Department of Energy, as defined in section 13211 of this title, which have been made from renewable biomass.

(B) The term "renewable biomass" is, as defined in Presidential Executive Order 13134, published in the Federal Register on August 16, 1999, any organic matter that is available on a renewable or recurring basis (excluding old-growth timber), including dedicated energy crops and trees, agricultural food and feed crop residues, aquatic plants, animal wastes, wood and wood residues, paper and paper residues, and other vegetative waste materials. Old-growth timber means timber of a forest from the late successional stage of forest development.

**(t) Blending of compliant reformulated gasolines**

**(1) In general**

Notwithstanding subsections (h) and (k) and subject to the limitations in paragraph (2) of this subsection, it shall not be a violation of this part [13] for a gasoline retailer, during any month of the year, to blend at a retail location batches of ethanol-blended and non-ethanol-blended reformulated gasoline, provided that—

(A) each batch of gasoline to be blended has been individually certified as in compliance with subsections (h) and (k) prior to being blended;

(B) the retailer notifies the Administrator prior to such blending, and identifies the exact location of the retail station and the specific tank in which such blending will take place;

(C) the retailer retains and, as requested by the Administrator or the Administrator's designee, makes available for inspection such certifications accounting for all gasoline at the retail outlet; and

(D) the retailer does not, between June 1 and September 15 of each year, blend a batch of VOC-controlled, or "summer", gasoline

---

[12] So in original. No subsec. (p) has been enacted.

[13] See References in Text note below.

*    *    *    *    *

[FR Doc. 2021–06616 Filed 3–31–21; 8:45 am]
BILLING CODE 6560–50–P

---

# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Part 80

[EPA–HQ–OAR–2020–0725; FRL–10021–95–OAR]

RIN 2060–AV07

## Extension of 2019 and 2020 Renewable Fuel Standard Compliance and Attest Engagement Reporting Deadlines

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is finalizing modifications of certain compliance dates under the Renewable Fuel Standard (RFS) program. First, EPA is extending the RFS compliance deadline for the 2019 compliance year and the associated deadline for submission of attest engagement reports for the 2019 compliance year for small refineries. The new deadlines are November 30, 2021, and June 1, 2022, respectively. Second, EPA is extending the RFS compliance deadline for the 2020 compliance year and the associated deadline for submission of attest engagement reports for the 2020 compliance year for obligated parties. The new deadlines are January 31, 2022, and June 1, 2022, respectively. Finally, EPA is extending the deadline for submission of attest engagement reports for the 2021 compliance year for obligated parties to September 1, 2022.

**DATES:** This final rule is effective on March 30, 2021.

*Operational dates:* For operational purposes under the Clean Air Act, this final rule is effective as of March 23, 2021.

**ADDRESSES:** EPA has established a docket for this action under Docket ID No. EPA–HQ–OAR–2020–0725. All documents in the docket are listed on the *https://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *e.g.,* CBI or other information

whose disclosure is restricted by statute. Certain other material is not available on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available electronically through *http://www.regulations.gov*.

**FOR FURTHER INFORMATION CONTACT:** For questions regarding this action, contact Lauren Michaels, Office of Transportation and Air Quality, Assessment and Standards Division, Environmental Protection Agency, 2000 Traverwood Drive, Ann Arbor, MI 48105; telephone number: (734) 214–4640; email address: *michaels.lauren@epa.gov*.

**SUPPLEMENTARY INFORMATION:** *Dates.* Section 553(d) of the Administrative Procedure Act (APA), 5 U.S.C. chapter 5, generally provides that rules may not take effect until 30 days after they are published in the **Federal Register**. EPA is issuing this final rule under CAA sec. 307(d), which states, "The provisions of section 553 through 557 . . . of Title 5 shall not, except as expressly provided in this section, apply to actions to which this subsection applies." Thus, section 553(d) of the APA does not apply to this rule. EPA is nevertheless acting consistently with the policies underlying APA section 553(d) in making this final rule effective upon signature. The purpose of this APA provision is to "give affected parties a reasonable time to adjust their behavior before the final rule takes effect." *Omnipoint Corp.* v. *Fed. Commc'n Comm'n,* 78 F.3d 620, 630 (D.C. Cir. 1996); see also *United States* v. *Gavrilovic,* 551 F.2d 1099, 1104 (8th Cir. 1977) (quoting legislative history). However, when an agency grants or recognizes an exemption or relieves a restriction, affected parties do not need a reasonable time to adjust because the effect is not adverse. Thus, APA section 553(d) allows an effective date less than 30 days after publication for any rule that "grants or recognizes an exemption or relieves a restriction" (see 5 U.S.C. 553(d)(1)). An accelerated effective date may also be appropriate for good cause pursuant to APA section 553(d)(3) where an agency can "balance the necessity for immediate implementation against principles of fundamental

fairness which require that all affected persons be afforded a reasonable amount of time to prepare for the effective date of its ruling.'' *Gavrilovic,* 551 F.2d at 1105.

EPA has determined that the regulatory amendments to 40 CFR part 80, subpart M, are operational upon signature because they relieve a restriction by extending the 2019 and 2020 compliance deadlines (and associated attest engagement report deadlines) ahead of the otherwise imminent 2020 RFS compliance deadline of March 31, 2021, thereby providing obligated parties with additional time to demonstrate compliance. There is additionally good cause for immediate implementation of these provisions because pending litigation in the Supreme Court makes it necessary for this rule to go into effect prior to March 31, 2021, to ensure regulated entities do not begin complying with removed regulatory obligations. Among other actions, EPA is today extending the regulatory deadline for small refineries to comply with their 2019 RFS obligations from March 31, 2020, to November 30, 2021, because litigation pending before the United States Supreme Court is expected to resolve legal questions regarding some small refineries' eligibility to receive annual exemptions from their 2019 regulatory obligations. EPA is also extending the regulatory deadline for all obligated parties to comply with their 2020 RFS obligations, from March 31, 2021, to January 31, 2022, which is required because of agency delay in promulgating future RFS compliance obligations and the corresponding impact on compliance decisions. These actions mean any delay in the effectiveness of this final rule past March 31, 2021, would result in confusion among regulated entities regarding their compliance obligations.

*Does this action apply to me?*

Entities potentially affected by this rule are those involved with the production, distribution, and sale of transportation fuels, including gasoline, diesel, and renewable fuels such as ethanol, biodiesel, renewable diesel, and biogas. Potentially affected categories include:

| Category | NAICS[1] code | Examples of potentially affected entities |
|---|---|---|
| Industry ........................................................................................ | 324110 | Petroleum refineries. |
| Industry ........................................................................................ | 325193 | Ethyl alcohol manufacturing. |
| Industry ........................................................................................ | 325199 | Other basic organic chemical manufacturing. |
| Industry ........................................................................................ | 424690 | Chemical and allied products merchant wholesalers. |
| Industry ........................................................................................ | 424710 | Petroleum bulk stations and terminals. |
| Industry ........................................................................................ | 424720 | Petroleum and petroleum products merchant wholesalers. |
| Industry ........................................................................................ | 221210 | Manufactured gas production and distribution. |

| Category | NAICS [1] code | Examples of potentially affected entities |
|---|---|---|
| Industry ........................................................................... | 454319 | Other fuel dealers. |

[1] North American Industry Classification System (NAICS).

This table is not intended to be exhaustive, but rather provides a guide for readers regarding entities likely to be affected by this action. This table lists the types of entities that EPA is now aware could potentially be affected by this action. Other types of entities not listed in the table could also be affected. To determine whether your entity would be affected by this action, you should carefully examine the applicability criteria in 40 CFR part 80. If you have any questions regarding the applicability of this action to a particular entity, consult the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

**Outline of this Preamble**

I. Background and Extension of Deadlines
　A. Extension of the 2019 RFS Compliance Deadline for Small Refineries
　B. Extension of the 2020 RFS Compliance Deadline for All Obligated Parties
　C. Corresponding Attest Engagement Report Deadlines
II. Statutory and Executive Order Reviews
　A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
　B. Paperwork Reduction Act (PRA)
　C. Regulatory Flexibility Act (RFA)
　D. Unfunded Mandates Reform Act (UMRA)

E. Executive Order 13132: Federalism
F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
I. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51
J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
K. Congressional Review Act (CRA)
III. Statutory Authority

**I. Background and Extension of Deadlines**

In January 2021, EPA proposed amendments to the RFS regulations to extend the deadline for obligated parties to demonstrate compliance with their 2019 and 2020 RFS obligations.[1] We are finalizing the amendments as proposed to extend the deadlines for small refineries to submit reports demonstrating compliance with their 2019 RFS obligations and their corresponding attest engagement reports. We are also finalizing

amendments to extend the deadlines for all obligated parties to submit reports demonstrating compliance with their 2020 RFS obligations and their corresponding attest engagement reports. Finally, in response to stakeholder feedback, we are also extending the 2021 attest engagement report deadline for all obligated parties.

For small refineries, we are extending the 2019 compliance deadline in light of the continued uncertainty surrounding small refinery exemptions (SREs) under the RFS program.[2] We are finalizing a 2019 compliance deadline for small refineries of November 30, 2021, and an attest engagement report deadline of June 1, 2022. For the 2020 compliance year, we are extending the compliance deadline for all obligated parties because we have not yet promulgated an annual rulemaking establishing the 2021 RFS standards. We are finalizing a 2020 compliance deadline for all obligated parties of January 31, 2022, and an attest engagement report deadline of June 1, 2022. Finally, for the 2021 compliance year, we are extending the attest engagement report deadline for obligated parties to September 1, 2022. These new deadlines are summarized in Table I.A–1 below.

TABLE I.A–1—ORIGINAL AND REVISED ANNUAL COMPLIANCE AND ATTEST ENGAGEMENT REPORTING DEADLINES FOR OBLIGATED PARTIES FOR THE 2019 (AS APPLICABLE), 2020, AND 2021 COMPLIANCE YEARS

| Regulated party category | Original annual compliance deadline | Revised annual compliance deadline | Original attest engagement reporting deadline | Revised attest engagement reporting deadline |
|---|---|---|---|---|
| **2019 Compliance Year** | | | | |
| Small refineries ................................................. | March 31, 2020 ......... | November 30, 2021 .. | June 1, 2020 .............. | June 1, 2022. |
| **2020 Compliance Year** | | | | |
| Obligated parties ............................................... | March 31, 2021 ......... | January 31, 2022 ....... | June 1, 2021 .............. | June 1, 2022. |
| **2021 Compliance Year** | | | | |
| Obligated parties ............................................... | March 31, 2022 (unchanged) | | June 1, 2022 .............. | September 1, 2022. |

Obligated party commenters were generally supportive of our proposal to extend the compliance deadlines, although some suggested that additional

compliance deadline extensions would be helpful. In contrast, biofuels industry groups suggested extensions were either not justified or excessive in length. We

also received comments from stakeholders involved in the attest engagement process who provided feedback on the scope and sequencing

[1] See 86 FR 3928 (January 15, 2021).

[2] The Renewable Fuel Standard (RFS) program, established under Clean Air Act (CAA) section 211(o), requires a certain volume of renewable fuel

to replace or reduce the quantity of petroleum-based transportation fuel, heating oil, or jet fuel used in the United States. Small refineries may petition EPA annually for exemption from their RFS obligations under CAA section 211(o)(9)(B). For

more information about small refinery exemptions (SREs), see *https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rfs-small-refinery-exemptions.*

of attest report deadline extensions. We have considered these comments, and in some cases, adjusted our regulations in response to the comments.[3]

### A. Extension of the 2019 RFS Compliance Deadline for Small Refineries

The RFS regulations establish deadlines for obligated parties with renewable volume obligations (RVOs) to submit annual compliance demonstration reports to EPA, and later deadlines for the same parties to submit associated attest engagement reports. Under existing RFS regulations, obligated parties must submit compliance demonstration reports for each calendar year by March 31 of the following year, and associated attest engagements by June 1 of the following year.[4] In this action, we are revising certain reporting deadlines applicable to the 2019, 2020, and 2021 compliance years.

On January 24, 2020, the U.S. Court of Appeals for the Tenth Circuit issued a decision in *Renewable Fuels Association (RFA)* v. *EPA* invalidating several SREs granted by EPA.[5] The small refineries whose SREs were invalidated by the court in the *RFA* case sought rehearing from the Tenth Circuit, which was denied on April 7, 2020.[6] Thus, the Tenth Circuit's decision was not final until after the 2019 compliance reporting deadline had already passed on March 31, 2020. On September 4, 2020, the small refinery intervenors in that suit filed a petition for a writ of certiorari from the U.S. Supreme Court, which was granted on January 8, 2021, in *HollyFrontier* v. *RFA*.[7] Briefing in that case is ongoing, and oral argument is scheduled for April 27, 2021. The Supreme Court's decision in *HollyFrontier* has the potential to affect the availability of SREs. Due to the resulting uncertainty, we do not believe it would be appropriate to require small refineries to demonstrate compliance with their 2019 obligations until the Supreme Court renders a decision in *HollyFrontier*.[8]

Therefore, we are finalizing our proposed extension of the 2019 compliance deadline for small refineries. We believe that it is appropriate to do so only for small refineries because it is only the compliance requirements of these parties that would be affected by the outcome of the *HollyFrontier* case.[9] All other obligated parties' compliance obligations for 2019 remain the same regardless of the *HollyFrontier* decision.

As stated in the proposed rule, EPA will allow small refineries to revisit their compliance reports in the time period between finalization of this rule and up to the new compliance date for 2019 established by this rulemaking. This means that if a small refinery carried forward a deficit to demonstrate 2019 compliance by March 31, 2020, but later receives an SRE for 2019 or retires RINs[10] in accordance with its obligation, that initial decision to carry forward a deficit will not constitute a carry-forward deficit (*i.e.*, failing to meet the requirement to retire sufficient RINs as described in 40 CFR 80.1427(a)(1)) that would make the small refinery ineligible to do the same for 2020 under 40 CFR 80.1427(b). Small refineries that did not submit a compliance report by March 31, 2020, will need to submit a compliance report to comply with the new November 30, 2021, compliance deadline, unless they receive an exemption for 100% relief of their RFS compliance obligations.

This deadline extension applies only to those parties who meet the definition of small refinery in CAA section 211(o)(1)(k) and 40 CFR 80.1441(e)(2)(iii) for the 2019 compliance year. Limiting the extension in this way is appropriate because only small refineries' compliance obligations are affected by the *HollyFrontier* case and it is consistent with our eligibility requirements regarding SREs. We recognize that in recent years we have determined that some parties who have petitioned for SREs have been deemed ineligible by EPA, often due to the refinery's throughput (*i.e.*, more than

75,000 barrels of crude oil per day) or the nature of their business (*i.e.*, not a petroleum refinery). The parties that EPA has found ineligible because they do not meet the definition of small refinery in recent years will similarly not be eligible for the compliance date extension for small refineries.

We note that all of the existing regulatory flexibilities for small refineries—including the ability to satisfy up to 20 percent of their 2019 RVOs using 2018 carryover RINs under 40 CFR 80.1427(a)(5) and the ability to carry forward a deficit from 2019 to 2020 if they did not carry forward a deficit from 2018 under 40 CFR 80.1427(b)—will continue to be available to them to demonstrate compliance for 2019 on the new November 30, 2021, compliance deadline. This means that small refineries that carried forward a deficit for 2019 in their initial 2019 compliance reports (filed in 2020) can reverse that decision in new compliance reports and retain their ability to carry forward a deficit for 2020. It also means that small refineries that did not submit a 2019 compliance report by March 31, 2020, can also carry forward a deficit for 2020. Finally, small refineries can either carry forward a deficit for 2019 (if they did not do so for 2018) or for 2020 (if they do not do so for 2019). Due to the ongoing litigation, we take no position on the availability of SREs for the 2019 compliance year, but refer stakeholders to EPA's announcement on February 24, 2021, regarding the *HollyFrontier* case.[11]

### B. Extension of the 2020 RFS Compliance Deadline for All Obligated Parties

We are also finalizing the proposed modification of the 2020 compliance deadline for all obligated parties to January 31, 2022. We are doing so because EPA has not yet proposed the 2021 RFS standards, including applicable volumes, and we recognize the importance to obligated parties of planning their compliance for a given calendar year by understanding their obligations for the years before and after.[12] This is particularly true given the two-year "lifespan" for RINs, such that 2020 RINs can be used for compliance with either 2020 or 2021 obligations. Compliance obligations for

---

[3] Further discussion of the comments received, and our responses to them, can be found in the Response to Comments document, available in the docket for this action.

[4] See 40 CFR 80.1451(a) and 80.1464(d).

[5] *Renewable Fuels Ass'n* v. *EPA*, 948 F.3d 1206 (10th Cir. 2020) (*RFA*).

[6] Order, *RFA*, No. 18–9533 (10th Cir. Apr. 7, 2020).

[7] *HollyFrontier Cheyenne Refining, LLC* v. *Renewable Fuels Ass'n*, No. 20–472 (U.S.).

[8] EPA received a letter from the Small Refineries Coalition dated July 30, 2020, requesting that EPA modify the 2019, 2020, and 2021 compliance deadlines and corresponding attest engagement reporting deadlines. The letter suggests that

uncertainty due to the lack of 2019 and 2020 SRE decisions and the unknown 2021 RFS standards "make it practically impossible for small refineries to plan for compliance." This letter is available in the docket for this action.

[9] Most small refineries currently have pending 2019 SRE petitions before the agency. We are extending this flexibility to all small refineries because others may elect to submit petitions in the future.

[10] RINs, or renewable identification numbers, are credits generated by renewable fuel producers and used for compliance with RFS obligations. For more information about RINs, see *https://www.epa.gov/renewable-fuel-standard-program/renewable-identification-numbers-rins-under-renewable-fuel-standard.*

[11] Available at: *https://www.epa.gov/renewable-fuel-standard-program/epa-signals-new-position-small-refinery-exemptions.*

[12] For discussion of obligated parties' interest in such extensions in past actions, see 80 FR 33099, 33149 (June 10, 2015) and 78 FR 49794, 49823 (August 15, 2013).

2021 will remain unknown until EPA finalizes the 2021 standards.

We are also modifying the 2020 compliance deadline to allow small refineries who have not yet demonstrated compliance with their 2019 obligations sufficient time between each year's compliance obligation demonstration. Modifying the 2020 compliance deadline to a date after the 2019 compliance deadline for small refineries will allow for complete 2019 compliance by all obligated parties, including these small refineries, prior to having to demonstrate 2020 compliance. Requiring full compliance with the 2019 standards prior to the 2020 compliance deadline will provide all obligated parties and market participants with an accurate picture of the RIN market, including the availability of 2019 carryover RINs to comply with 2020 standards.

We are finalizing the proposed 2020 compliance date of January 31, 2022, for all obligated parties. This deadline allows several things to occur prior to that compliance date. First, it allows small refineries to complete compliance with their 2019 obligations. Second, it provides 60 days between the 2019 and 2020 compliance deadlines to allow for obligated parties to make additional RIN acquisitions, transfers, transactions, and retirements prior to the 2020 compliance deadline. Finally, this deadline provides 60 days between 2020 and 2021 compliance deadlines, allowing the 2021 compliance deadline to remain on March 31, 2022, as currently prescribed in our regulations.[13]

### C. Corresponding Attest Engagement Report Deadlines

We are finalizing the proposed changes to the deadlines for attest engagement reports required under 40 CFR 80.1464(g) for small refineries for 2019 compliance demonstrations and for all obligated parties for 2020 compliance demonstrations. In addition, we are also adopting a change to the 2021 attest engagement reporting deadline for all obligated parties to ensure enough time for attest auditors to reasonably conduct the 2019, 2020, and 2021 attest engagement reports; this change is supported by stakeholder feedback on the proposed rule and consideration of the administrative complications that will accompany the attest engagement compliance and reporting deadline extensions being finalized in this rule. However, after consideration of public comments received, we are not finalizing the

proposed changes to the 2020 attest engagement reporting deadline for RIN-generating renewable fuel producers, RIN-generating importers of renewable fuel, and other parties owning RINs, for the reasons explained below.

For small refineries, given the short period of time between when small refineries will have to demonstrate compliance with their 2019 and 2020 obligations, we do not believe it is feasible for them to conduct an attest engagement for 2019 between the new 2019 and 2020 compliance deadlines. Therefore, we are finalizing the requirement that small refineries conduct their 2019 attest engagement by June 1, 2022.

For all obligated parties, we are also finalizing that the 2020 attest engagement reporting deadline be June 1, 2022. We believe this will provide all obligated parties with the time necessary to conduct their attest engagements in a timely manner and on a similar schedule. Because attest engagements are based on the information in the previously submitted compliance reports, sequencing the attest engagement to occur after the compliance deadline is a reasonable approach. We believe that this sequencing of reports, and the time allowed between them, will allow obligated parties to proceed to demonstrate compliance with both their 2019 and 2020 RVOs in a logical and orderly fashion with all relevant information available and with sufficient intervening time so as not to pose an increased burden.

For the 2021 compliance year, we are extending the attest engagement reporting deadline for all obligated parties to September 1, 2022. We agree with feedback received from stakeholders who prepare attest engagement reports for obligated parties that it would be useful to stagger attest engagement deadlines to accommodate the staggered nature of the annual compliance deadlines and so as not to overwhelm auditors and processes for preparing and submitting reports.[14] This stakeholder highlighted concerns regarding the proposed requirement that the 2019 (for small refineries), 2020, and 2021 attest report deadlines would fall on the same date, which would almost certainly mean that the limited number of attest auditors that perform these services for obligated parties would not have enough time to perform the audits and prepare the reports, thereby creating

an administrative bottleneck.[15] Another commenter recommended that we maintain at least 90 days between respective annual compliance deadlines and annual attest engagement reporting deadlines.[16] We agree with these comments and believe providing an additional three months for 2021 attest engagements will provide auditors a reasonable amount of time to perform the audits. This change also will not impact obligated parties' plans and actions to comply with their RFS obligations, since the attest engagements are after-the-fact reports summarizing those compliance measures.

In contrast, we do not believe that requiring small refineries to submit both their 2019 and 2020 attest engagement reports by June 1, 2022, will create much additional effort for attest auditors due to the relatively low number of small refineries and the fact that all other obligated parties have already submitted their 2019 attest engagement reports, which were due on June 1, 2020.

In response to public comment, we are not finalizing the proposed changes to the deadline for 2020 attest engagement reports for RIN-generating renewable fuel producers, RIN-generating importers of renewable fuel, and other parties owning RINs. A commenter stated that such a deadline extension was unnecessary because all the records and reports needed to perform the attest audits and prepare the attest engagement reports for these parties are already available and not dependent on the compliance deadlines for obligated parties. The commenter highlighted concern that attest auditors may already be stretched to provide sufficient time and resources to complete all audits in such a short window for obligated parties, and there was no need to compound this situation by extending the attest audit deadlines for these parties and we agree with these comments. Additionally, based on our experience overseeing compliance with reporting deadlines, we believe we should maintain existing reporting deadlines when possible, as this provides regulated parties with regulatory certainty. Therefore, we are maintaining the 2020 attest engagement reporting deadline of June 1, 2021, for RIN-generating renewable fuel producers, RIN-generating importers of renewable fuel, and other parties owning RINs.[17] We also encourage

---

[13] See 40 CFR 80.1451.

[14] See ''External Party Meeting Log for RFS Compliance Date Extension Rule,'' available in the docket for this action.

[15] See also comments from Weaver suggesting staggered attest report dates for 2019–2021 (Docket Item No. EPA–HQ–OAR–2020–0725—0011.

[16] See comments from AFPM (Docket Item No. EPA–HQ–OAR–2020–0725–0023).

[17] See 40 CFR 80.1464(d).

parties required to submit annual attest engagement reports to submit those reports early, if possible, as this may help attest auditors better sequence their work and ensure that reports are submitted on time.

Finally, we note that we intend to provide additional reporting instructions on our fuels reporting website for the attest engagement reports prior to the revised deadlines.[18]

We commonly post helpful and detailed information that will assist parties in submitting compliance reports, including attest engagement reports, to our website and we encourage them to use our website as a resource.

## II. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *http://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

This action is not a significant regulatory action and was therefore not submitted to the Office of Management and Budget (OMB) for review.

### B. Paperwork Reduction Act (PRA)

This action does not impose any new information collection burden under the PRA. OMB has previously approved the information collection activities contained in the existing regulations and has assigned OMB control number 2060–0725 and 2060–0723. This action only makes a one-time change in the compliance dates for certain regulated parties and adjusts the due date of their compliance reports and attest engagements to reflect this change. It does not change the information to be collected or increase the frequency of collection.

### C. Regulatory Flexibility Act (RFA)

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. In making this determination, the impact of concern is any significant adverse economic impact on small entities. An agency may certify that a rule will not have a significant economic impact on a substantial number of small entities if the rule relieves regulatory burden, has no net burden or otherwise has a positive economic effect on the small entities subject to the rule. This action extends the RFS compliance deadlines. We do not anticipate that there will be any costs associated with these changes. We have therefore concluded that this action will have no regulatory burden for all directly regulated small entities.

### D. Unfunded Mandates Reform Act (UMRA)

This action does not contain an unfunded mandate of $100 million or more as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. This action imposes no enforceable duty on any state, local or tribal governments. Requirements for the private sector do not exceed $100 million in any one year.

### E. Executive Order 13132: Federalism

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

### F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

This action does not have tribal implications as specified in Executive Order 13175. This rule only affects RFS obligated parties. Thus, Executive Order 13175 does not apply to this action.

### G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that EPA has reason to believe may disproportionately affect children, per the definition of ''covered regulatory action'' in section 2–202 of the Executive Order. This action is not subject to Executive Order 13045 because it does not concern an environmental health risk or safety risk.

### H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

### I. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51

This action does not involve technical standards.

### J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

The EPA believes that this action is not subject to Executive Order 12898 (59 FR 7629, February 16, 1994) because it does not create disproportionately high and adverse human health or environmental effects on minority and low-income populations.

### K. Congressional Review Act (CRA)

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

## III. Statutory Authority

Statutory authority for this action comes from section 211(o) of the Clean Air Act, 42 U.S.C. 7545(o).

## List of Subjects in 40 CFR Part 80

Environmental protection, Administrative practice and procedure, Air pollution control, Diesel fuel, Fuel additives, Gasoline, Imports, Oil imports, Penalties, Petroleum, Renewable fuel, Reporting and recordkeeping requirements.

**Michael Regan,**
*Administrator.*

For the reasons set forth in the preamble, EPA amends 40 CFR part 80 as follows:

## PART 80—REGISTRATION OF FUELS AND FUEL ADDITIVES

■ 1. The authority citation for part 80 continues to read as follows:

**Authority:** 42 U.S.C. 7414, 7521, 7542, 7545, and 7601(a).

## Subpart M—Renewable Fuel Standard

■ 2. Amend § 80.1451 by adding paragraphs (a)(1)(xiv)(E) and (F) to read as follows:

### § 80.1451  What are the reporting requirements under the RFS program?

(a) * * *
(1) * * *
(xiv) * * *
(E) For obligated parties that meet the requirements for a small refinery under § 80.1441(e)(2)(iii), for the 2019 compliance year, annual compliance

---

[18] See *https://www.epa.gov/fuels-registration-reporting-and-compliance-help/program-specific-instructions-attest-engagements.*

reports must be submitted no later than November 30, 2021.

(F) For obligated parties, for the 2020 compliance year, annual compliance reports must be submitted no later than January 31, 2022.

* * * * *

■ 3. Amend § 80.1464 by adding paragraphs (g)(7), (8) and (9) to read as follows:

### § 80.1464  What are the attest engagement requirements under the RFS program?

(g) * * *

(7) For obligated parties that meet the requirements for a small refinery under § 80.1441(e)(2)(iii), for the 2019 compliance year, reports required under this section must be submitted to the EPA no later than June 1, 2022.

(8) For obligated parties, for the 2020 compliance year, reports required under this section must be submitted to the EPA no later than June 1, 2022.

(9) For obligated parties, for the 2021 compliance year, reports required under this section must be submitted to the EPA no later than September 1, 2022.

* * * * *

[FR Doc. 2021–06336 Filed 3–30–21; 8:45 am]

**BILLING CODE 6560–50–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Federal Emergency Management Agency

### 44 CFR Part 64

**[Docket ID FEMA–2021–0003; Internal Agency Docket No. FEMA–8673]**

### Suspension of Community Eligibility

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Final rule.

**SUMMARY:** This rule identifies communities where the sale of flood insurance has been authorized under the National Flood Insurance Program (NFIP) that are scheduled for suspension on the effective dates listed within this rule because of noncompliance with the floodplain management requirements of the program. If the Federal Emergency Management Agency (FEMA) receives documentation that the community has adopted the required floodplain management measures prior to the effective suspension date given in this rule, the suspension will not occur. Information identifying the current participation status of a community can be obtained from FEMA's CSB available

at *www.fema.gov/flood-insurance/work-with-nfip/community-status-book.* Please note that per Revisions to Publication Requirements for Community Eligibility Status Information Under the National Flood Insurance Program, notices such as this one for scheduled suspension will no longer be published in the **Federal Register** as of June 2021 but will be available at National Flood Insurance Community Status and Public Notification | *FEMA.gov.* Individuals without internet access will be able to contact their local floodplain management official and/or State NFIP Coordinating Office directly for assistance.

**DATES:** The effective date of each community's scheduled suspension is the third date ("Susp.") listed in the third column of the following tables.

**FOR FURTHER INFORMATION CONTACT:** If you want to determine whether a particular community was suspended on the suspension date or for further information, contact Adrienne L. Sheldon, PE, CFM, Federal Insurance and Mitigation Administration, Federal Emergency Management Agency, 400 C Street SW, Washington, DC 20472, (202) 674–1087. Details regarding updated publication requirements of community eligibility status information under the NFIP can be found on the CSB section at *www.fema.gov.*

**SUPPLEMENTARY INFORMATION:** The NFIP enables property owners to purchase Federal flood insurance that is not otherwise generally available from private insurers. In return, communities agree to adopt and administer local floodplain management measures aimed at protecting lives, new and substantially improved construction, and development in general from future flooding. Section 1315 of the National Flood Insurance Act of 1968, as amended, 42 U.S.C. 4022, prohibits the sale of NFIP flood insurance unless an appropriate public body adopts adequate floodplain management measures with effective enforcement measures. The communities listed in this document no longer meet that statutory requirement for compliance with NFIP regulations, 44 CFR part 59. Accordingly, the communities will be suspended on the effective date listed in the third column. As of that date, flood insurance will no longer be available in the community. FEMA recognizes communities may adopt and submit the required documentation after this rule is published but prior to the actual suspension date. These communities will not be suspended and will continue to be eligible for the sale of NFIP flood

insurance. Their current NFIP participation status can be verified at anytime on the CSB section at *fema.gov.*

In addition, FEMA publishes a Flood Insurance Rate Map (FIRM) that identifies the Special Flood Hazard Areas (SFHAs) in these communities. The date of the published FIRM is indicated in the fourth column of the table. No direct federal financial assistance (except assistance pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act not in connection with a flood) may be provided for construction or acquisition of buildings in identified SFHAs for communities not participating in the NFIP and identified for more than a year on FEMA's initial FIRM for the community as having flood-prone areas (section 202(a) of the Flood Disaster Protection Act of 1973, 42 U.S.C. 4106(a), as amended). This prohibition against certain types of federal assistance becomes effective for the communities listed on the date shown in the last column. The Administrator finds that notice and public comment procedures under 5 U.S.C. 553(b), are impracticable and unnecessary because communities listed in this final rule have been adequately notified.

Each community receives 6-month, 90-day, and 30-day notification letters addressed to the Chief Executive Officer stating that the community will be suspended unless the required floodplain management measures are met prior to the effective suspension date. Since these notifications were made, this final rule may take effect within less than 30 days.

*National Environmental Policy Act.* FEMA has determined that the community suspension(s) included in this rule is a non-discretionary action and therefore the National Environmental Policy Act of 1969 (42 U.S.C. 4321 *et seq.*) does not apply.

*Regulatory Flexibility Act.* The Administrator has determined that this rule is exempt from the requirements of the Regulatory Flexibility Act because the National Flood Insurance Act of 1968, as amended, Section 1315, 42 U.S.C. 4022, prohibits flood insurance coverage unless an appropriate public body adopts adequate floodplain management measures with effective enforcement measures. The communities listed no longer comply with the statutory requirements, and after the effective date, flood insurance will no longer be available in the communities unless remedial action takes place.

*Regulatory Classification.* This final rule is not a significant regulatory action under the criteria of section 3(f) of

Infants and children, Inventions and patents, Parking, Penalties, Postal Service, Privacy, Reporting and recordkeeping requirements, Seals and insignia, Security measures, Wages.

**Signing Authority**

Denis McDonough, Secretary of Veterans Affairs, approved this document on December 2, 2021, and authorized the undersigned to sign and submit the document to the Office of the Federal Register for publication electronically as an official document of the Department of Veterans Affairs.

**Jeffrey M. Martin,**

*Assistant Director, Office of Regulation Policy & Management, Office of General Counsel, Department of Veterans Affairs.*

For the reasons stated in the preamble, the Department of Veterans Affairs amends 38 CFR part 1 as set forth below:

## PART 1—GENERAL PROVISIONS

■ 1. The authority citation for part 1 is revised to read as follows:

**Authority:** 31 U.S.C. 3711(e); 38 U.S.C. 501, 5701(g) and (i); 38 U.S.C. 5320.

■ 2. Amend § 1.916 by revising paragraph (c) to read as follows:

**§ 1.916   Disclosure of debt information to consumer reporting agencies (CRA).**

\* \* \* \* \*

(c) Subject to the conditions set forth in this paragraph (c) and paragraph (d) of this section, information concerning individuals may be disclosed to consumer reporting agencies for inclusion in consumer reports pertaining to the individual, or for the purpose of locating the individual. Disclosure of the fact of indebtedness will be made if the individual fails to respond in accordance with written demands for repayment, or refuses to repay a debt to the United States. In making any disclosure under this section, VA will provide consumer reporting agencies with sufficient information to identify the individual, including the individual's name, address, if known, date of birth, VA file number, and Social Security number.

(1) The Secretary has established a minimum threshold for a debt, arising from a benefit administered by the Under Secretary for Benefits or Under Secretary for Health, that the Secretary will report to a consumer reporting agency under 31 U.S.C. 3711.

(2) VA will only report those debts that meet the following standards:

(i) The debt is classified as currently not collectible. For purposes of this paragraph (c)(2)(i), the debt is currently

not collectible if VA has exhausted available collection efforts, including, as appropriate, referrals for administrative offset and enforced collection;

(ii) The debt is not owed by an individual who is determined by VA to be catastrophically disabled or has reported to VA a gross household income below the applicable geographically adjusted income limits that would entitle a VA beneficiary to cost-free health care, medications and/ or beneficiary travel; and

(iii) The outstanding debt amount is over $25, or such higher amount VA may from time to time prescribe, in accordance with § 1.921.

(3) The minimum threshold set forth in this paragraph (c) will not apply if there is an indication of fraud, misrepresentation, or bad faith on the part of the individual in connection with the debt.

\* \* \* \* \*

[FR Doc. 2022–01496 Filed 2–1–22; 8:45 am]

**BILLING CODE 8320–01–P**

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 80**

**[EPA–HQ–OAR–2021–0793; FRL–8521.1– 01–OAR]**

**RIN 2060–AV57**

**Renewable Fuel Standard (RFS) Program: Extension of Compliance and Attest Engagement Reporting Deadlines**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is finalizing modifications of certain compliance dates under the Renewable Fuel Standard (RFS) program. First, EPA is extending the RFS compliance reporting deadline and the associated attest engagement reporting deadline for the 2019 compliance year for small refineries only. Second, EPA is extending the RFS compliance reporting deadline and the associated attest engagement reporting deadline for the 2020, 2021, and 2022 compliance years for all obligated parties. Finally, EPA is changing the way in which future RFS compliance and attest engagement reporting deadlines are determined.

**DATES:**

*Effective date:* The amendatory instructions in this final rule are effective on January 31, 2022.

*Operational dates:* For operational purposes under the Clean Air Act (CAA), this final rule is effective as of January 27, 2022.

**ADDRESSES:** EPA has established a docket for this action under Docket ID No. EPA–HQ–OAR–2021–0793. All documents in the docket are listed on the *https://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *e.g.,* confidential business information (CBI) or other information whose disclosure is restricted by statute. Certain other material is not available on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available electronically through *https:// www.regulations.gov*.

**FOR FURTHER INFORMATION CONTACT:** For questions regarding this action, contact Karen Nelson, Office of Transportation and Air Quality, Compliance Division, Environmental Protection Agency, 2000 Traverwood Drive, Ann Arbor, MI 48105; telephone number: (734) 214– 4657; email address: *nelson.karen@ epa.gov*.

**SUPPLEMENTARY INFORMATION:**

**Dates**

Section 553(d) of the Administrative Procedure Act (APA), 5 U.S.C. chapter 5, generally provides that rules may not take effect until 30 days after they are published in the **Federal Register**. EPA is issuing this final rule under CAA section 307(d), which states, ''The provisions of section 553 through 557 . . . of Title 5 shall not, except as expressly provided in this section, apply to actions to which this subsection applies.'' Thus, section 553(d) of the APA does not apply to this rule. EPA is nevertheless acting consistently with the policies underlying APA section 553(d) in making this final rule effective upon signature. The purpose of this APA provision is to ''give affected parties a reasonable time to adjust their behavior before the final rule takes effect.'' *Omnipoint Corp.* v. *Fed. Commc'n Comm'n,* 78 F.3d 620, 630 (D.C. Cir. 1996); see also *United States* v. *Gavrilovic,* 551 F.2d 1099, 1104 (8th Cir. 1977) (quoting legislative history). However, when an agency grants or recognizes an exemption or relieves a restriction, affected parties do not need a reasonable time to adjust because the effect is not adverse. Thus, APA section 553(d) allows an effective date less than 30 days after publication for any rule that ''grants or recognizes an exemption or relieves a restriction'' (see 5 U.S.C. 553(d)(1)). An accelerated effective date

may also be appropriate for good cause pursuant to APA section 553(d)(3) where an agency can ''balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable amount of time to prepare for the effective date of its ruling.'' *Gavrilovic,* 551 F.2d at 1105.

EPA has determined that the regulatory amendments to 40 CFR part 80, subpart M, are effective upon signature because they relieve a restriction by extending the 2019–2022 compliance reporting deadlines (and associated attest engagement report deadlines) ahead of the otherwise imminent 2020 and 2021 compliance reporting deadlines (January 31, 2022, and March 31, 2023, respectively), thereby providing obligated parties with additional time to demonstrate compliance.[1] There is additionally good cause for immediate implementation of these provisions such that they are effective in advance of the finalization of two different but related RFS actions, as this will ensure regulated parties have clarity on their present and future RFS obligations before they are required to demonstrate compliance for the years at issue. First, EPA has proposed to deny all pending small refinery exemption (SRE) petitions, including 29 petitions for 2019.[2] There is therefore good cause for this action to be effective upon signature to extend the regulatory deadline for small refineries to comply with their 2019 obligations (previously November 30, 2021) because EPA believes that the most equitable approach for the small refineries that have pending SRE petitions is to take final action on those petitions before small refineries are required to comply with their 2019 obligations. Second, EPA has proposed to revise the 2020 standards as well as to establish the 2021 and 2022 standards.[3] There is good cause for this action to be effective upon signature to relieve regulated entities of the requirement to comply with their 2020 obligations that may be modified by the final 2020–2022 rule; any delay in the effectiveness of this action past January 31, 2022, would result in confusion among regulated entities regarding the timing of their compliance obligations.

**Does this action apply to me?**

Entities potentially affected by this final rule are those involved with the production, distribution, and sale of transportation fuels, including gasoline, diesel, and renewable fuels such as ethanol, biodiesel, renewable diesel, and biogas. Potentially affected categories include:

| Category | NAICS[1] code | Examples of potentially affected entities |
|---|---|---|
| Industry .... | 324110 | Petroleum refineries. |
| Industry .... | 325193 | Ethyl alcohol manufacturing. |
| Industry .... | 325199 | Other basic organic chemical manufacturing. |
| Industry .... | 424690 | Chemical and allied products merchant wholesalers. |
| Industry .... | 424710 | Petroleum bulk stations and terminals. |
| Industry .... | 424720 | Petroleum and petroleum products merchant wholesalers. |
| Industry .... | 221210 | Manufactured gas production and distribution. |
| Industry .... | 454319 | Other fuel dealers. |

[1] North American Industry Classification System (NAICS).

This table is not intended to be exhaustive, but rather provides a guide for readers regarding entities likely to be affected by this action. This table lists the types of entities that EPA is now aware could potentially be affected by this action. Other types of entities not listed in the table could also be affected. To determine whether your entity would be affected by this action, you should carefully examine the applicability criteria in 40 CFR part 80. If you have any questions regarding the applicability of this action to a particular entity, consult the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

**Table of Contents**

I. Background and Extension of Deadlines
  A. Extension of the 2019 RFS Compliance Reporting Deadline for Small Refineries
  B. Extension of the 2020, 2021, and 2022 RFS Compliance Reporting Deadline for All Obligated Parties
  C. Corresponding Attest Engagement Reporting Deadlines
  D. Annual Compliance and Attest Engagement Reporting Deadlines Based on Effective Date
  E. Severability
II. Statutory and Executive Order Reviews
  A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
  B. Paperwork Reduction Act (PRA)
  C. Regulatory Flexibility Act (RFA)
  D. Unfunded Mandates Reform Act (UMRA)
  E. Executive Order 13132: Federalism
  F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
  G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
  H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
  I. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51
  J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
  K. Congressional Review Act (CRA)
III. Statutory Authority

**I. Background and Extension of Deadlines**

The RFS regulations establish deadlines for obligated parties with renewable volume obligations (RVOs) to submit annual compliance reports to EPA, and later deadlines for the same parties to submit associated attest engagement reports. Under the previous RFS regulations, obligated parties needed to submit compliance reports for each calendar year by March 31 of the following year and the associated attest engagements by June 1 of the following year.[4] On April 1, 2021, EPA extended the deadlines for small refineries to demonstrate compliance with their 2019 RFS obligations and for all obligated parties to demonstrate compliance with their 2020 RFS obligations.[5] In that same action, we also extended the deadlines for the corresponding attest engagements reports.[6]

On November 26, 2021, we again proposed to extend certain reporting deadlines applicable to the 2019 and 2020 compliance years, and additionally to extend certain reporting deadlines for the 2021 compliance year, due to continued delay in the promulgation of the 2021 and 2022 standards and uncertainty around EPA's SRE policy.[7] Following this proposal, on December 14, 2021, we issued the Proposed SRE Denial, proposing to deny all pending SRE petitions. And on December 21, 2021, we proposed the 2020–2022 rule to establish the 2021 and 2022 standards and to modify the 2020 standards.

Table I–1 summarizes the new annual compliance and attest engagement reporting deadlines for the 2019–2022 compliance years that EPA is finalizing.

---

[1] This action postdates the previous 2019 compliance reporting deadline of November 30, 2021 (86 FR 17073, 17074; April 1, 2021).

[2] 86 FR 70999 (December 14, 2021) (hereinafter ''the Proposed SRE Denial'').

[3] 86 FR 72436 (December 21, 2021) (hereinafter ''the 2020–2022 rule'').

[4] See 40 CFR 80.1451(a) and 80.1464(d).

[5] 86 FR 17073 (April 1, 2021).

[6] *Id.*

[7] 86 FR 67419 (November 26, 2021).

Obligated party commenters generally supported our proposal to extend the compliance deadlines, although some suggested that longer compliance deadline extensions would be helpful.

In contrast, biofuels industry groups opposed our proposal and suggested that extensions were not necessary or disruptive to the program. We have considered these comments, and in

some cases (*i.e.,* 2022 deadlines), slightly adjusted our regulations in response to the comments.[8]

TABLE I–1—SUMMARY OF RFS ANNUAL COMPLIANCE AND ATTEST ENGAGEMENT REPORTING DEADLINES FOR OBLIGATED PARTIES FOR 2019–2022

| Compliance year | Obligated party | Annual compliance reporting deadline | Attest engagement reporting deadline |
|---|---|---|---|
| 2019 ............... | All obligated parties (except small refineries). | March 31, 2020 .................................................. | June 1, 2020. |
| 2019 ............... | Small refineries ............. | Next quarterly reporting deadline [a] after the effective date of the 2021 standards. | Next June 1 annual attest engagement reporting deadline after the 2019 compliance reporting deadline for small refineries. |
| 2020 ............... | All obligated parties ...... | Next quarterly reporting deadline after the 2019 compliance reporting deadline for small refineries. | Next June 1 annual attest engagement reporting deadline after the 2020 compliance reporting deadline. |
| 2021 ............... | All obligated parties ...... | Next quarterly reporting deadline after the 2020 compliance reporting deadline. | Next June 1 annual attest engagement reporting deadline after the 2021 compliance reporting deadline. |
| 2022 ............... | All obligated parties ...... | Next quarterly reporting deadline after either the effective date of the 2023 standards or the 2021 compliance reporting deadline, whichever is later. | Next June 1 annual attest engagement reporting deadline after the 2022 compliance reporting deadline. |

[a] The RFS quarterly reporting deadlines are March 31, June 1, September 1, and December 1, as specified in 40 CFR 80.1451(f)(2).

We are also finalizing a new approach to setting reporting deadlines for obligated parties that will automatically establish the annual compliance and attest engagement reporting deadlines for a given compliance year based on the effective date of the subsequent compliance year's standards, if such a date is after the March 31 regulatory deadline. We discuss this new approach in more detail in section I.D. Comments from both obligated parties and biofuels industry groups generally opposed the automatic extensions of the reporting deadlines. One obligated party commenter stated that an approach for automatic extensions should instead be considered as part of EPA's upcoming "Set Rule" for years 2023 and beyond. Biofuels industry groups stated that creating a system for automatic extensions of the reporting deadlines would disincentivize EPA from promulgating future-year standards on time. We have considered these comments, but we have concluded that having regulations in place that remove one source of uncertainty in the RFS program, were EPA to ever again be late in promulgating standards, is in the best interest of our implementation of the program, as it will render future rulemakings like this one to extend

compliance deadlines unnecessary and prevent placing an unnecessary burden on obligated parties to prepare, submit, and then possibly retract and revise compliance reports for deadlines that were later extended. Therefore, we are finalizing our approach as proposed.[9]

*A. Extension of the 2019 RFS Compliance Reporting Deadline for Small Refineries*

For small refineries, we are extending the 2019 compliance reporting deadline to the next quarterly reporting deadline after the effective date of the 2021 standards, as proposed.[10] In December 2021, EPA proposed two RFS actions that, if finalized, are likely to affect 2019 compliance for small refineries. First, in the 2020–2022 rule, we proposed to lower the existing 2020 standards. As explained in that proposal, this revision is justified by decreased transportation fuel demand due to the COVID–19 pandemic and due to a potential change in approach to how EPA evaluates SRE petitions compared to the policy that was in place at the time the 2020 standards were finalized. Second, in the Proposed SRE Denial, we proposed to deny all pending SRE petitions currently before EPA.[11] The comment periods for these actions close after both

the previous 2019 compliance deadline for small refineries and the previous 2020 compliance deadline for all obligated parties. Because we have not yet made a final decision on the SRE petitions nor finalized changes to the 2020 standards, and given the continued uncertainty surrounding SREs under the RFS program, we are finalizing our proposed extension of the 2019 compliance deadline until the next quarterly reporting deadline after the 2021 standards become effective.[12] We note also that, if we adjust the 2020 standards downward as proposed in the 2020–2022 rule, additional Renewable Identification Numbers (RINs) will likely become available in the marketplace for small refineries to demonstrate compliance with their 2019 obligations.

As an example of the potential timing of this deadline, if the final rule establishing the 2021 standards is published in the **Federal Register** on May 15, 2022, then the effective date of the 2021 standards would be 60 days later on July 14, 2022, and the 2019 compliance reporting deadline for small refineries would be September 1, 2022, because that would be the next quarterly reporting deadline after the effective date of the 2021 standards.[13] We are

[8] Further discussion of the comments received, and our responses to them, can be found in the Response to Comments document, available in the docket for this action.

[9] Further discussion of the comments received on the automatic reporting deadline extensions, and our responses to them, can be found in section 3

of the Response to Comments document, available in the docket for this action.

[10] The effective date of 2021 standards is generally expected to be 60 days after publication of the action establishing the standards in the **Federal Register**.

[11] EPA currently has before it over 60 SRE petitions for 2019–2021.

[12] A small refinery may petition EPA for an exemption from its RFS obligations under 40 CFR 80.1441(e)(2).

[13] Table I.C–1 illustrates this example deadline for 2019 based on an effective date of July 14, 2022.

tying the 2019 compliance reporting deadline to the effective date of the 2021 standards to allow for the proper sequencing of deadlines such that 2019 compliance will be complete prior to 2020 compliance, and 2020 compliance will be complete prior to 2021 compliance, given the continued delay in promulgating the 2021 standards. As noted earlier, we proposed to revise the 2020 standards in the 2020–2022 rule; thus, the 2020 standards may be revised along with the promulgation of the 2021 standards. The compliance schedule finalized in this action sequences the 2019 and 2020 compliance reporting deadlines to eliminate the need for small refineries to demonstrate compliance with their 2020 obligations before EPA takes a final action on revising the 2020 standards.

On January 24, 2020, the U.S. Court of Appeals for the Tenth Circuit issued a decision in *Renewable Fuels Association* v. *EPA* (*RFA*) invalidating on multiple grounds three SREs granted by EPA.[14] The small refineries whose SREs were invalidated by the court in the *RFA* case sought rehearing from the Tenth Circuit, which was denied on April 7, 2020.[15] Thus, the Tenth Circuit's decision was not final until after the 2019 compliance reporting deadline of March 31, 2020, had already passed. On September 4, 2020, the small refinery intervenors in that suit filed a petition for a writ of certiorari from the U.S. Supreme Court, which was granted on January 8, 2021, in *HollyFrontier* v. *RFA*.[16] On June 25, 2021, the Supreme Court issued its opinion in *HollyFrontier*.[17] In line with this case law, EPA has proposed to deny all of the pending SRE petitions in the Proposed SRE Denial, but as the comment period for that action is still ongoing, EPA has not yet made a final decision and there remains uncertainty about the resolution of the 2019 and other pending SRE petitions at this time.

Therefore, we believe it appropriate to extend the 2019 compliance reporting deadline for small refineries as proposed. Additionally, because we proposed to modify the 2020 standards in the 2020–2022 rule, RIN availability in the market is likely to change due to the two-year ''lifespan'' of RINs. Obligated parties may satisfy up to 20 percent of their individual 2020 obligations through the use of 2019 RINs. If finalized, our proposed

reductions to the 2020 volumes would likely result in additional 2019 RINs being available in the market as parties make adjustments to their RIN holdings. These 2019 RINs could thus become available to small refineries for compliance with their 2019 RFS obligations. We believe that it is appropriate to extend the 2019 compliance reporting deadline only for small refineries because it is only their compliance requirements that have been affected by the recent *HollyFrontier* and *RFA* decisions. We are extending this flexibility to all small refineries regardless of whether they have an SRE petition for 2019 pending before EPA. All other obligated parties' compliance obligation deadlines for 2019 have already passed and remain unchanged.[18]

We recognize that some small refineries have already submitted their 2019 compliance reports. However, we will allow all small refineries to revisit their 2019 compliance reports before their new 2019 compliance reporting deadline. This means that if a small refinery carried forward a deficit to demonstrate compliance for 2019 by November 30, 2021, but later receives an SRE for 2019 or retires RINs in accordance with its RVOs, that initial decision to carry forward a deficit will not constitute a carry-forward deficit (*i.e.,* failing to meet the requirement to retire sufficient RINs as described in 40 CFR 80.1427(a)(1)) that would make the small refinery ineligible to do the same for 2020 under 40 CFR 80.1427(b). Small refineries that did not submit a compliance report by November 30, 2021, will need to submit a compliance report to comply with the new 2019 compliance reporting deadline, unless they receive an exemption for 2019.

This deadline extension will apply only to those parties who meet the definition of small refinery in Clean Air Act (CAA) section 211(o)(1)(k) and 40 CFR 80.1441(e)(2)(iii) for the 2019 compliance year. Limiting the extension in this way is appropriate because only small refineries' compliance obligations are affected by the *HollyFrontier* and *RFA* opinions and it is consistent with our eligibility requirements regarding SREs. We recognize that, in recent years, we have determined that some parties who have petitioned for SREs have been deemed ineligible by EPA, often due to the refinery's throughput (*i.e.,* more than 75,000 barrels of crude oil per day) or the nature of their business (*i.e.,* not a petroleum refinery). The parties that

EPA has found ineligible because they do not meet the definition of small refinery in recent years will similarly not be eligible for the 2019 compliance date extension for small refineries.

We note that all of the existing regulatory flexibilities for small refineries—including the ability to satisfy up to 20 percent of their 2019 RVOs using 2018 carryover RINs under 40 CFR 80.1427(a)(5) and the ability to carry forward a deficit from 2019 to 2020 if they did not carry forward a deficit from 2018 under 40 CFR 80.1427(b)—continue to be available to them to demonstrate compliance for 2019 by the new 2019 compliance reporting deadline. This means that small refineries that carried forward a deficit for 2019 in their initial 2019 compliance reports (filed in 2020 or 2021) can reverse that decision in new compliance reports and retain their ability to carry forward a deficit for 2020. It also means that small refineries that did not submit a 2019 compliance report by November 30, 2021, can also carry forward a deficit for 2020. Finally, small refineries can either carry forward a deficit for 2019 (if they did not do so for 2018) or for 2020 (if they do not do so for 2019).

## B. Extension of the 2020, 2021, and 2022 RFS Compliance Reporting Deadline for All Obligated Parties

As proposed, we are finalizing the extension of the 2020 compliance reporting deadline for all obligated parties from January 31, 2022, to the next quarterly reporting deadline after the 2019 compliance reporting deadline for small refineries, and the extension of the 2021 compliance reporting deadline for all obligated parties from March 31, 2022, to the next quarterly reporting deadline after the 2020 compliance reporting deadline. Also, in response to comments and in order to ensure proper sequencing of the compliance reporting deadlines, we are extending the 2022 compliance reporting deadline for all obligated parties from March 31, 2023, to the next quarterly reporting deadline after either the effective date of the 2023 standards or the 2021 compliance reporting deadline, whichever is later. We are doing so because EPA has not yet established the 2021 or 2022 standards, including applicable volumes, and we recognize the importance to obligated parties of planning their compliance for a given calendar year by understanding their obligations for the years before and

[14] *Renewable Fuels Ass'n* v. *EPA,* 948 F.3d 1206 (10th Cir. 2020) (*RFA*).

[15] Order, *RFA,* No. 18–9533 (10th Cir. Apr. 7, 2020).

[16] *HollyFrontier Cheyenne Refining, LLC* v. *Renewable Fuels Ass'n,* 114 S.Ct. 2172 (2021).

[17] *Id.* at 2181.

[18] The 2019 compliance and attest engagement reporting deadlines were March 31, 2020, and June 1, 2020, respectively.

after.[19] This is particularly true given the two-year "lifespan" for RINs, such that 2020 RINs can be used for compliance with either 2020 or 2021 obligations. Compliance obligations for 2021 and 2022 will remain unknown until EPA finalizes the 2021 and 2022 standards. Additionally, EPA has proposed to modify the 2020 standards in the 2020–2022 rule. Delaying the 2020 compliance deadline until after EPA completes its revision of the 2020 standards would avoid unnecessary RIN retirements and corresponding unretirements due to potential modification of the standards. Finally, several commenters noted that it is likely that the 2022 compliance reporting deadline will be affected by the new sequencing of the 2019, 2020, and 2021 compliance reporting deadlines, and recommended that EPA take the same approach to extending the 2022 deadline as for 2020 and 2021. We agree with the commenters and are extending the 2022 compliance reporting deadline as well. However, unlike 2019, 2020, and 2021, for 2022 we have not yet proposed the subsequent year's standards (i.e., the 2023 standards). Therefore, we are establishing the 2022 compliance reporting deadline as the next quarterly reporting deadline after either the effective date of the 2023 standards or the 2021 compliance reporting deadline, whichever is later. This will ensure that obligated parties know their 2023 obligations before complying with their 2022 obligations, consistent with our approach for 2019–2021.

These deadline extensions will allow proper sequencing of the compliance dates. It will allow small refineries to complete compliance with their 2019 obligations before having to comply with their 2020 RFS obligations. It will also allow for obligated parties to make additional RIN acquisitions, transfers, transactions, and retirements prior to the compliance reporting deadlines by providing at least 60 days between each of the 2019–2022 compliance reporting deadlines.

Using the prior example, if the final rule establishing the 2021 standards has an effective date of July 14, 2022, the 2019 compliance reporting deadline for small refineries would be September 1, 2022. Furthermore, by operation of law, under this scenario, the 2020 compliance reporting deadline for all obligated parties would be December 1, 2022, the 2021 compliance reporting deadline would be March 31, 2023, and the 2022 compliance reporting deadline would be June 1, 2023.[20]

### C. Corresponding Attest Engagement Reporting Deadlines

We are finalizing the deadline extension for attest engagement reports required under 40 CFR 80.1464(g) for small refineries for 2019 compliance demonstrations and for all obligated parties for 2020 and 2021 compliance demonstrations to the next June 1 annual attest engagement reporting deadline after the applicable 2019–2021 compliance reporting deadline. Also, in response to comments and in order to ensure proper sequencing of the attest engagement reporting deadlines, we are extending the 2022 attest engagement reporting deadline for all obligated parties from June 1, 2023, to the next

June 1 annual attest engagement reporting deadline after the 2022 compliance reporting deadline. Using the prior example where the final rule establishing the 2021 standards has an effective date of July 14, 2022, under this approach, the 2019 attest engagement reporting deadline for small refineries and the 2020 and 2021 attest engagement reporting deadline for all obligated parties would be due on June 1, 2023, and the 2022 attest engagement reporting deadline for all obligated parties would be due on June 1, 2024.

We are extending these attest engagement reporting deadlines to ensure enough time for attest auditors to reasonably conduct the 2019, 2020, 2021, and 2022 attest engagement reports. Because the annual attest engagement reporting deadline occurs only once each year (June 1), it is likely that with the new compliance deadline extensions, several of the affected 2019, 2020, 2021, and 2022 attest engagement reports will be due on the same June 1 deadline (either in 2023 or 2024). This change will therefore minimize confusion and maximize efficiency for the attest auditors to conduct and prepare reports.

Table I.C–1 illustrates the example deadlines for the 2019–2022 annual compliance and attest engagement reporting deadlines. Note that these dates do not represent the actual reporting deadlines, which will be based on the effective date of the 2021 standards. We will post the actual reporting deadlines on our reporting deadlines website.[21]

TABLE I.C–1—EXAMPLE RFS ANNUAL COMPLIANCE AND ATTEST ENGAGEMENT REPORTING DEADLINES FOR OBLIGATED PARTIES [a]

| Compliance year | Obligated party | Annual compliance reporting deadline | Attest engagement reporting deadline |
|---|---|---|---|
| 2019 | All obligated parties (except small refineries) | March 31, 2020 | June 1, 2020. |
| 2019 | Small refineries | September 1, 2022 | June 1, 2023. |
| 2020 | All obligated parties | December 1, 2022 | June 1, 2023. |
| 2021 | All obligated parties | March 31, 2023 | June 1, 2023. |
| 2022 | All obligated parties | June 1, 2023 | June 1, 2024. |

[a] Example based on an effective date of July 14, 2022, for the final rule establishing the 2021 standards.

### D. Annual Compliance and Attest Engagement Reporting Deadlines Based on Effective Date

For annual compliance and annual attest engagement reporting deadlines for 2023 and beyond, we are finalizing the same approach as that outlined above for 2019–2022. Under this approach, for 2023 and beyond, the annual compliance reporting deadline will be the latest date of the following:

• March 31st of the subsequent calendar year;

---

[19] For discussion of obligated parties' interest in such extensions in past actions, see 80 FR 33100, 33149–50 (June 10, 2015) and 78 FR 49794, 49823 (August 15, 2013).

[20] Table I.C–1 illustrates these example deadlines for 2020, 2021, and 2022 based on an effective date of July 14, 2022.

[21] The reporting deadlines website is available at: https://www.epa.gov/fuels-registration-reporting-

and-compliance-help/reporting-deadlines-fuel-programs.

• The next quarterly reporting deadline after the effective date of the subsequent compliance year's standards (typically 60 days after publication of the final rule in the **Federal Register**); or

• The next quarterly reporting deadline under 40 CFR 80.1451(f)(2) after the annual compliance reporting deadline for the prior compliance year.

Under this approach, which is consistent with the proposal, the annual compliance reporting deadline will be at least 60 days after publication of the subsequent year's standards in the **Federal Register** and 60 days after the prior year's compliance reporting deadline. This approach will also avoid EPA having to repeatedly extend compliance reporting deadlines for obligated parties should promulgation of the subsequent year's standards be delayed, and will provide regulatory certainty for obligated parties. We will continue to strive to promulgate the standards for a given compliance year prior to the beginning of that year, and the provisions finalized in this action will apply only in the unusual circumstance where promulgation of the following year's standards are significantly delayed.

Similarly, for 2023 and beyond, we are tying the annual attest engagement reporting deadline to the effective date of the standards in the same manner as finalized for the 2019–2022 annual attest engagement reporting deadlines, which will make it the latest date of the following:

• June 1 of the subsequent calendar year; or

• The next June 1 annual attest engagement reporting deadline after the annual compliance reporting deadline.

Under this approach, annual attest engagement reports will be due at least 60 days after the annual compliance reporting deadline like under the current regulations.

To help communicate the annual compliance and annual attest engagement reporting deadlines, we will also post the annual compliance and annual attest engagement reporting deadlines on our website.[22]

*E. Severability*

We intend for our action in this final rule modifying the compliance reporting deadlines for 2019 for small refineries

and 2020, 2021 and 2022 for all obligated parties, as well as the associated annual attest engagement reporting deadlines, to be severable from our modifications of the regulations relating to future compliance deadlines (*i.e.,* for compliance years 2023 and beyond).

**II. Statutory and Executive Order Reviews**

Additional information about these statutes and Executive orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

*A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review*

This action is not a significant regulatory action and was therefore not submitted to the Office of Management and Budget (OMB) for review.

*B. Paperwork Reduction Act (PRA)*

This action does not impose any new information collection burden under the PRA. OMB has previously approved the information collection activities contained in the existing regulations and has assigned OMB control number 2060–0725 and 2060–0723. This action only makes a one-time change in the compliance dates for certain regulated parties and adjusts the due date of their compliance reports and attest engagements to reflect this change. It does not change the information to be collected or increase the frequency of collection.

*C. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. In making this determination, EPA concludes that the impact of concern for this rule is any significant adverse economic impact on small entities and that the agency is certifying that this rulemaking will not have a significant economic impact on a substantial number of small entities if the rule has no net burden on the small entities subject to the rule. This action extends the RFS compliance and attest engagement reporting deadlines. We do not anticipate that there will be any costs associated with these changes. We have therefore concluded that this action will have no net regulatory burden for all directly regulated small entities.

*D. Unfunded Mandates Reform Act (UMRA)*

This action does not contain an unfunded mandate of $100 million or

more as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. This action imposes no enforceable duty on any state, local or tribal governments. Requirements for the private sector do not exceed $100 million in any one year.

*E. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the National Government and the states, or on the distribution of power and responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action does not have tribal implications as specified in Executive Order 13175. This rule only affects RFS obligated parties. Thus, Executive Order 13175 does not apply to this action.

*G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that EPA has reason to believe may disproportionately affect children, per the definition of ''covered regulatory action'' in section 2–202 of the Executive order. This action is not subject to Executive Order 13045 because it does not concern an environmental health risk or safety risk.

*H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

*I. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51*

This action does not involve technical standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

The EPA believes that this action is not subject to Executive Order 12898 (59 FR 7629, February 16, 1994) because it does establish an environmental health or safety standard. This action addresses the RFS compliance and attest

[22] Information related to annual compliance and attest engagement reporting is available at: *https://www.epa.gov/fuels-registration-reporting-and-compliance-help/reporting-fuel-programs.* The annual compliance and attest engagement reporting deadlines will be posted at: *https://www.epa.gov/fuels-registration-reporting-and-compliance-help/reporting-deadlines-fuel-programs.*

engagement reporting deadlines and does not impact the standards themselves.

*K. Congressional Review Act (CRA)*

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

**III. Statutory Authority**

Statutory authority for this action comes from section 211(o) of the Clean Air Act, 42 U.S.C. 7545(o).

**List of Subjects in 40 CFR Part 80**

Environmental protection, Administrative practice and procedure, Air pollution control, Diesel fuel, Fuel additives, Gasoline, Imports, Oil imports, Penalties, Petroleum, Renewable fuel, Reporting and recordkeeping requirements.

Dated: January 27, 2022.

**Michael S. Regan,**
*Administrator.*

For the reasons set forth in the preamble, EPA amends 40 CFR part 80 as follows:

**PART 80—REGULATION OF FUELS AND FUEL ADDITIVES**

■ 1. The authority citation for part 80 continues to read as follows:

**Authority:** 42 U.S.C. 7414, 7521, 7542, 7545, and 7601(a).

**Subpart M—Renewable Fuel Standard**

■ 2. Amend § 80.1451 by:
■ a. Revising paragraph (a)(1) introductory text;
■ b. Removing and reserving paragraph (a)(1)(xiv);
■ c. Revising paragraph (f) introductory text; and
■ d. Adding paragraph (f)(1) and headings for paragraphs (f)(2) and (3).

The revisions and additions read as follows:

**§ 80.1451   What are the reporting requirements under the RFS program?**

(a) * * *

(1) Annual compliance reports must include all the following information:

* * * * *

(f) *Report submission deadlines.* The submission deadlines for annual and quarterly reports are as follows:

(1) *Annual compliance reports*—(i) *Obligated parties.* (A) Except as specified in paragraph (f)(1)(i)(B) of this section, for obligated parties, annual compliance reports must be submitted by whichever of the following dates is latest:

(*1*) March 31 of the subsequent calendar year.

(*2*) The next quarterly reporting deadline under paragraph (f)(2) of this section after the date the subsequent compliance year's renewable fuel standards become effective in § 80.1405(a).

(*3*) The next quarterly reporting deadline under paragraph (f)(2) of this section after the annual compliance reporting deadline for the prior compliance year.

(B)(*1*) For obligated parties that meet the requirements for a small refinery under § 80.1441(e)(2)(iii), for the 2019 compliance year, annual compliance reports must be submitted no later than the next quarterly reporting deadline under paragraph (f)(2) of this section after the date the 2021 renewable fuel standards become effective in § 80.1405(a).

(*2*) For the 2020 compliance year, annual compliance reports must be submitted no later than the next quarterly reporting deadline in paragraph (f)(2) of this section after the deadline in paragraph (f)(1)(i)(B)(*1*) of this section.

(*3*) For the 2021 compliance year, annual compliance reports must be submitted no later than the next quarterly reporting deadline in paragraph (f)(2) of this section after the deadline in paragraph (f)(1)(i)(B)(*2*) of this section.

(*4*) For the 2022 compliance year, annual compliance reports must be submitted by whichever of the following dates is latest:

(*i*) The next quarterly reporting deadline under paragraph (f)(2) of this section after the date the 2023 renewable fuel standards become effective in § 80.1405(a).

(*ii*) The next quarterly reporting deadline under paragraph (f)(2) of this section after the deadline in paragraph (f)(1)(i)(B)(*3*) of this section.

(ii) *All other parties.* For all parties other than obligated parties, annual compliance reports must be submitted by March 31 of the subsequent year.

(iii) *Deadline publication.* The annual compliance reporting deadline will be calculated in accordance with paragraph (f)(1)(i) of this section and published on EPA's website.

(2) *Quarterly compliance reports.*
* * * * *

(3) *Report certification.* * * *

* * * * *

■ 3. Amend § 80.1464 by:
■ a. Revising paragraph (d); and
■ b. Removing and reserving paragraph (g); and
■ c. Removing paragraph (i)(3).

The revision reads as follows:

**§ 80.1464   What are the attest engagement requirements under the RFS program?**

* * * * *

(d) *Report submission deadlines.*—(1) *Obligated parties.* (i) Except as specified in paragraph (d)(1)(ii) of this section, for obligated parties, annual attest engagement reports must be submitted to EPA by whichever of the following dates is latest:

(A) June 1 of the subsequent calendar year.

(B) The next June 1 annual attest engagement reporting deadline after the annual compliance reporting deadline under § 80.1451(f)(1)(i)(A).

(ii)(A) For obligated parties that meet the requirements for a small refinery under § 80.1441(e)(2)(iii), for the 2019 compliance year, annual attest engagement reports must be submitted to EPA no later than the next June 1 annual attest engagement reporting deadline after the annual compliance reporting deadline under § 80.1451(f)(1)(i)(B)(*1*).

(B) For obligated parties, for the 2020 compliance year, annual attest engagement reports must be submitted to EPA no later than the next June 1 annual attest engagement reporting deadline after the annual compliance reporting deadline under § 80.1451(f)(1)(i)(B)(*2*).

(C) For obligated parties, for the 2021 compliance year, annual attest engagement reports must be submitted to EPA no later than the next June 1 annual attest engagement reporting deadline after the annual compliance reporting deadline under § 80.1451(f)(1)(i)(B)(*3*).

(D) For obligated parties, for the 2022 compliance year, annual attest engagement reports must be submitted to EPA no later than the next June 1 annual attest engagement reporting deadline after the annual compliance reporting deadline under § 80.1451(f)(1)(i)(B)(*4*).

(2) *All other parties.* All parties other than obligated parties must submit annual attest engagement reports to EPA by June 1 of the subsequent calendar year.

(3) *Deadline publication.* The annual attest engagement reporting deadline will be calculated in accordance with paragraph (d)(1) of this section and published on EPA's website.

* * * * *

[FR Doc. 2022–02149 Filed 1–31–22; 8:45 am]

**BILLING CODE 6560–50–P**

USCA11 Case: 22-11617 Document: 77 Date Filed: 04/20/2023 Page: 104 of 112

*F. Environment*

We have analyzed this rule under Department of Homeland Security Directive 023–01, Rev. 1, associated implementing instructions, and Environmental Planning COMDTINST 5090.1 (series), which guide the Coast Guard in complying with the National Environmental Policy Act of 1969 (42 U.S.C. 4321–4370f), and have determined that this action is one of a category of actions that do not individually or cumulatively have a significant effect on the human environment. This rule involves a safety zone lasting only 9 hours that will prohibit entry into the area being used by swimmers and safety craft for the Alligator Lighthouse swim. It is categorically excluded from further review under paragraph L60(a) of Appendix A, Table 1 of DHS Instruction Manual 023–01–001–01, Rev. 1. A Record of Environmental Consideration supporting this determination is available in the docket. For instructions on locating the docket, see the **ADDRESSES** section of this preamble.

*G. Protest Activities*

The Coast Guard respects the First Amendment rights of protesters. Protesters are asked to call or email the person listed in the **FOR FURTHER INFORMATION CONTACT** section to coordinate protest activities so that your message can be received without jeopardizing the safety or security of people, places or vessels.

**List of Subjects in 33 CFR Part 165**

Harbors, Marine safety, Navigation (water), Reporting and recordkeeping requirements, Security measures, Waterways.

For the reasons discussed in the preamble, the Coast Guard amends 33 CFR part 165 as follows:

## PART 165—REGULATED NAVIGATION AREAS AND LIMITED ACCESS AREAS

■ 1. The authority citation for part 165 continues to read as follows:

**Authority:** 46 U.S.C. 70034, 70051; 33 CFR 1.05–1, 6.04–1, 6.04–6, and 160.5; Department of Homeland Security Delegation No. 00170.1, Revision No. 01.2.

■ 2. Add § 165.T07–0650 to read as follows:

**§ 165.T07–0650 Safety Zone; Swim for Alligator Lighthouse, Islamorada, FL.**

*(a) Location.* The following regulated area is a safety zone: All waters of the Atlantic Ocean beginning at a point Latitude 24°54.82′ N, longitude 080°38.03′ W, thence to latitude 24°54.36′ N, longitude 080°37.72′ W,

thence to latitude 24°51.07′ N, longitude 080°37.14′ W, thence to latitude 24°54.36′ N, longitude 080°37.72′ W, thence to point of origin at latitude 24°54.82′ N, longitude 080°38.03′ W. The event course begins and ends at Amara Cay Resort in Islamorada, Florida, extending through Hawks Channel with a turnaround point at Alligator Lighthouse. All coordinates are North American Datum 1983.

*(b) Definition.* As used in this section, the term ''designated representative'' means a Coast Guard Patrol Commander, including a Coast Guard coxswain, petty officer, or other officer operating a Coast Guard vessel and a Federal, State, and local officer designated by or assisting the Captain of the Port Key West (COTP) in the enforcement of the safety zone.

(c) *Regulations.* (1) All persons and vessels are prohibited from entering, transiting through, anchoring in, or remaining within the regulated area unless authorized by the COTP Key West or a designated representative.

(2) Persons and vessels desiring to enter, transit through, anchor in, or remain within the regulated area may contact the COTP Key West by telephone at (305) 292–8772, or a designated representative via VHF–FM radio on channel 16 to request authorization. If authorization is granted, all persons and vessels receiving such authorization must comply with the instructions of the COTP Key West or a designated representative.

(3) The Coast Guard will provide notice of the regulated area by Local Notice to Mariners, Broadcast Notice to Mariners via VHF–FM channel 16, or the COTP's designated representative.

*(d) Enforcement period.* This rule will be enforced from 7:30 a.m. until 4:00 p.m., on September 10, 2022.

Dated: August 29, 2022.

**J. Ingram,**

*Captain, U.S. Coast Guard, Captain of the Port Key West.*

[FR Doc. 2022–19074 Filed 9–1–22; 8:45 am]

**BILLING CODE 9110–04–P**

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 80**

**[EPA–HQ–OAR–2022–0434; FRL–9821–02–OAR]**

**RIN 2060–AV72**

**Renewable Fuel Standard (RFS) Program: Alternative RIN Retirement Schedule for Small Refineries**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** EPA is finalizing an optional alternative renewable identification number (RIN) retirement schedule for small refineries under the Renewable Fuel Standard (RFS) program for the 2020 compliance year. Small refineries that elect to use the alternative RIN retirement schedule will have to fully comply with their 2020 RFS obligations—including any RIN deficits from 2019 carried forward into the 2020 compliance year—by February 1, 2024. EPA is taking this action because small refineries may need more time to plan for compliance with their RFS obligations given EPA's delay in deciding small refinery exemption (SRE) petitions and setting the associated compliance deadlines.

**DATES:** This rule is effective on September 2, 2022.

**ADDRESSES:** EPA has established a docket for this action under Docket ID No. EPA–HQ–OAR–2022–0434. All documents in the docket are listed on the *https://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *e.g.,* CBI or other information whose disclosure is restricted by statute. Certain other material is not available on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available electronically through *https://www.regulations.gov*.

**FOR FURTHER INFORMATION CONTACT:** For questions regarding this action, contact Robert Anderson, Office of Transportation and Air Quality, Compliance Division, Environmental Protection Agency, 2000 Traverwood Drive, Ann Arbor, MI 48105; telephone number: (734) 214–4280; email address: *anderson.robert@epa.gov*.

**SUPPLEMENTARY INFORMATION:**

## Dates

Section 553(d) of the Administrative Procedure Act (APA), 5 U.S.C. chapter 5, generally provides that rules may not take effect until 30 days after they are

published in the **Federal Register**. EPA is issuing this final rule under section 307(d) of the Clean Air Act (CAA or "the Act"), which states, "The provisions of section 553 through 557 . . . of Title 5 shall not, except as expressly provided in this section, apply to actions to which this subsection applies." Thus, section 553(d) of the APA does not apply to this rule. EPA is nevertheless acting consistently with the policies underlying APA section 553(d) in making this final rule effective upon publication. The purpose of this APA provision is to "give affected parties a reasonable time to adjust their behavior before the final rule takes effect." [1] However, when an agency grants or recognizes an exemption or relieves a restriction, affected parties do not need a reasonable time to adjust because the effect is not adverse. Thus, APA section 553(d) allows an effective date less than 30 days after publication for any rule that "grants or recognizes an exemption or relieves a restriction." [2] An accelerated effective date may also be appropriate for good cause pursuant to APA section 553(d)(3) where an agency can "balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable amount of time to prepare for the effective date of its ruling." [3]

EPA has determined that the regulatory amendments to 40 CFR part 80, subpart M, are effective upon publication in the **Federal Register** because they relieve a restriction by providing small refineries with an alternative schedule for retiring RINs toward their 2020 renewable volume obligations (RVOs), thereby providing small refineries with additional time to demonstrate compliance. There is additionally good cause for implementation of these provisions upon publication because it will ensure that the provisions are effective prior to the 2020 RFS compliance deadline (December 1, 2022), which is the point at which small refineries intending to utilize the alternative RIN retirement schedule provided in this action will need to notify EPA. Any delay in effectiveness could cause uncertainty regarding its availability.

## Does this action apply to me?

Entities potentially affected by this final rule are those involved with the production, distribution, and sale of transportation fuels, including gasoline, diesel, and renewable fuels such as ethanol, biodiesel, renewable diesel, and biogas. Potentially affected categories include:

| Category | NAICS [1] code | Examples of potentially affected entities |
|---|---|---|
| Industry ................................................... | 324110 | Petroleum refineries. |
| Industry ................................................... | 325193 | Ethyl alcohol manufacturing. |
| Industry ................................................... | 325199 | Other basic organic chemical manufacturing. |
| Industry ................................................... | 424690 | Chemical and allied products merchant wholesalers. |
| Industry ................................................... | 424710 | Petroleum bulk stations and terminals. |
| Industry ................................................... | 424720 | Petroleum and petroleum products merchant wholesalers. |
| Industry ................................................... | 221210 | Manufactured gas production and distribution. |
| Industry ................................................... | 454319 | Other fuel dealers. |

[1] North American Industry Classification System (NAICS).

This table is not intended to be exhaustive, but rather provides a guide for readers regarding entities likely to be affected by this action. This table lists the types of entities that EPA is now aware could potentially be affected by this action. Other types of entities not listed in the table could also be affected. To determine whether your entity would be affected by this action, you should carefully examine the applicability criteria in 40 CFR part 80. If you have any questions regarding the applicability of this action to a particular entity, consult the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

## Outline of This Preamble

I. Background
II. Small Refineries and RFS Compliance
  A. Unique Small Refinery Compliance Challenges
  B. Overview of Compliance Approach
III. Alternative RIN Retirement Schedule for Small Refineries for the 2020 Compliance Year
IV. Statutory and Executive Order Reviews

A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
B. Paperwork Reduction Act (PRA)
C. Regulatory Flexibility Act (RFA)
D. Unfunded Mandates Reform Act (UMRA)
E. Executive Order 13132: Federalism
F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
I. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51
J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
K. Congressional Review Act (CRA)
V. Statutory Authority

## I. Background

The RFS program sets annual, nationally applicable volume targets for renewable fuel. EPA translates those volume targets into compliance obligations that parties must meet each year. EPA has designated refiners and importers of gasoline and diesel fuel used as transportation fuel to be those obligated parties.[4] Small refineries, a subset of refiners, are defined by the Act as "refiner[ies] for which the average aggregate daily crude oil throughput for a calendar year . . . does not exceed 75,000 barrels." [5] At the start of the RFS program, Congress initially granted all eligible small refineries a temporary exemption from the obligations of the RFS program until 2011.[6] Under EPA's regulations, small refineries that were producing either "gasoline" under RFS1 [7] or "transportation fuel" under RFS2 [8] were required to notify EPA that they qualified for the temporary exemption by submitting verification letters stating

[1] *Omnipoint Corp.* v. *Fed. Commc'n Comm'n,* 78 F.3d 620, 630 (D.C. Cir. 1996); see also *United States* v. *Gavrilovic,* 551 F.2d 1099, 1104 (8th Cir. 1977) (quoting legislative history).

[2] See 5 U.S.C. 553(d)(1).

[3] *Gavrilovic,* 551 F.2d at 1105.

[4] 40 CFR 80.1406(a).

[5] CAA section 211(o)(1)(K).

[6] CAA section 211(o)(9)(A)(i).

[7] 72 FR 23900, 23926 (May 1, 2007).

[8] 40 CFR 80.1441(a)(1).

their average crude oil throughput rate during the applicable qualification period.[9] The CAA provides that a small refinery may at any time petition EPA for an extension of the exemption from the obligations of the RFS program for the reason of disproportionate economic hardship (DEH).[10] In evaluating such petitions, the EPA Administrator, in consultation with the Secretary of Energy, will consider the findings of a Department of Energy (DOE) study and other economic factors.[11]

On December 7, 2021, EPA proposed to deny 65 pending SRE petitions for the 2016–2021 compliance years [12] and took public comment via a **Federal Register** notification.[13] That proposal included proposed changes to EPA's interpretation of the SRE provisions in the CAA that were informed by the holdings of the U.S. Court of Appeals for the Tenth Circuit in *Renewable Fuels Association et al.* v. *EPA (RFA)* [14] and EPA's long-held findings regarding RFS compliance costs being passed through ultimately to wholesale purchasers (generally referred to as RIN cost passthrough). Consistent with that proposal, on April 7, 2022, EPA announced the April 2022 SRE Denial,[15] which denied 36 previously-decided SRE petitions for the 2018 compliance year that had been remanded to EPA for reconsideration by the U.S. Court of

Appeals for the D.C. Circuit.[16] Then, on June 3, 2022, EPA announced the June 2022 SRE Denial,[17] which denied 69 SRE petitions for the 2016–2021 compliance years that were still pending.[18] On that same day, EPA also announced and sought comment on this alternative RIN retirement schedule.

## II. Small Refineries and RFS Compliance

### A. Unique Small Refinery Compliance Challenges

We understand that some small refineries that recently had their 2019 and 2020 SRE petitions denied may not be prepared to comply with their renewable volume obligations (RVOs or ''RFS obligations'') for the 2020 compliance year by the applicable compliance deadlines, likely because they received SREs in recent years and assumed they would continue. Additionally, the 2019, 2020, and 2021 compliance deadlines have been compressed [19] and some small refineries have stated that they have been unable to acquire the RINs they need to comply with their RFS obligations.[20] For these reasons, EPA believes it is appropriate to allow all small refineries—including those that carried forward a 2019 RIN deficit into the 2020 compliance year pursuant to 40 CFR 80.1427(b)—to elect to use the alternative RIN retirement schedule described in Section III to meet their 2020 RFS obligations. This will give small refineries additional time and open a broader range of RIN vintages to acquire and retire the RINs needed to demonstrate compliance for the 2020 compliance year.

Several commenters supported EPA's proposed alternative RIN retirement schedule. However, other commenters stated that the alternative RIN retirement schedule for small refineries is unnecessary, that a small refinery's

decision to postpone its RIN purchases is not an adequate reason for providing this additional flexibility, and that EPA should explicitly limit the alternative RIN retirement schedule to only the 2020 compliance year. These commenters asserted that small refineries were put on notice regarding the uncertainty of their 2019 and 2020 SRE petitions by the *RFA* opinion, then notified again in December 2021 when EPA proposed to deny 65 pending SRE petitions. Thus, the commenters argued, small refineries had ample awareness of EPA's SRE petition evaluation criteria such that they should have had no reasonable expectation of receiving exemptions, given the high burden of demonstrating that EPA's RIN cost passthrough findings do not apply to them. Furthermore, they argued, small refineries had ample opportunity to begin planning and preparing for RFS compliance and should not again postpone their compliance planning and preparation. These commenters also asserted that EPA already provided significant support to small refineries by retroactively lowering the 2020 volumes, extending the 2019, 2020, 2021, and 2022 compliance deadlines, and issuing the April 2022 and June 2022 Compliance Actions (hereinafter the ''Compliance Actions''),[21] thereby negating the need for the alternative RIN retirement schedule.

We generally agree that compliance should not be indefinitely postponed for any obligated party—including small refineries—and that small refineries should plan for compliance and not delay their RIN purchases. However, this is not EPA's sole justification for this action. Instead, we aim to avoid having small refineries fall into noncompliance due to their expectation that EPA would continue to grant SREs, largely because such noncompliance would exacerbate existing uncertainty in the RIN market. The goal of the alternative RIN retirement schedule is not to provide small refineries with a means of avoiding compliance with their RFS obligations, but rather to support small refineries in their transition into positions where they will be able to comply with their RVOs on an ongoing basis. This will also ensure the use of renewable fuels in the U.S. as required by the RFS program and help provide certainty in the RFS program

[9] 72 FR 23900, 23925–26 (May 1, 2007); 40 CFR 80.1441(b). EPA's regulations allowed small refineries that had submitted verification letters to qualify for the original statutory exemption under EPAct/RFS1 to not have to submit an additional verification letter to qualify under the SRE provisions in EISA/RFS2.

[10] CAA section 211(o)(9)(B)(i).

[11] CAA section 211(o)(9)(B)(ii).

[12] ''Proposed RFS Small Refinery Exemption Decision,'' EPA–420–D–21–001, December 2021.

[13] 86 FR 70999 (December 14, 2021).

[14] *Renewable Fuels Ass'n et al.* v. *EPA,* 948 F.3d 1206 (10th Cir. 2020). The court held that (1) the disproportionate economic hardship required in order to receive an SRE under the CAA must be caused by RFS compliance, (2) EPA acted arbitrarily and capriciously when it granted the SREs at issue without reconciling those decisions with the Agency's previous findings on RIN cost passthrough, and (3) ''extension'' as used in the CAA SRE provisions required continuity, such that small refineries were only eligible for SREs if they had been continuously exempted from the outset of the RFS program. On September 4, 2020, the small refineries filed a petition for a writ of certiorari from the Supreme Court requesting review only of the holding regarding the meaning of ''extension,'' which was granted on January 8, 2021, and following oral argument, was decided on June 25, 2021, in *HollyFrontier Cheyenne Refining, LLC et al.* v. *Renewable Fuels Ass'n et al.,* 114 S.Ct. 2172 (2021) (*HollyFrontier*). The Supreme Court held in *HollyFrontier* that ''extension'' as used in the SRE provisions of the CAA does not require continuous exemption. The other holdings in *RFA* were not appealed.

[15] ''April 2022 Denial of Petitions for RFS Small Refinery Exemptions,'' EPA–420–R–22–005, April 2022.

[16] *Sinclair Wyoming Refining Co.* v. *EPA,* No. 19–1196 (D.C. Cir.), Dec. 8, 2021 Order, Doc. No. 1925942.

[17] ''June 2022 Denial of Petitions for RFS Small Refinery Exemptions,'' EPA–420–R–22–011, June 2022.

[18] More information about SREs is available at *https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rfs-small-refinery-exemptions.*

[19] The RFS regulations establish deadlines for obligated parties—including small refineries—to comply with their annual RVOs; the deadlines provide the dates by which obligated parties must retire sufficient RINs to comply with those RVOs and submit associated compliance reports. The 2019 compliance deadline for small refineries is September 1, 2022; the 2020 compliance deadline for all obligated parties is December 1, 2022; and the 2021 compliance deadline for all obligated parties is March 31, 2023.

[20] See, e.g., Comments on 2020–2022 RFS Rule from the Small Refinery Coalition, Docket Item No. EPA–HQ–OAR–2021–0324–0570.

[21] ''April 2022 Alternative Compliance Demonstration Approach for Certain Small Refineries Under the Renewable Fuel Standard Program,'' EPA–420–R–22–006, April 2022; and ''June 2022 Alternative Compliance Demonstration Approach for Certain Small Refineries Under the Renewable Fuel Standard Program,'' EPA–420–R–22–012, June 2022.

and fuels markets given the unique circumstances as a result of our June 2022 actions. While we agree that small refineries were given some notice regarding the importance of RIN cost passthrough in our evaluation of SRE petitions by the *RFA* opinion and the likelihood that it would affect their ability to continue receiving annual SREs, that awareness does not resolve the consequences of the challenges facing small refineries, including the current limitations on RIN availability and the resulting impact on the RFS program and the fuels markets in general. Additionally, we did not propose, nor are we finalizing, an extension of the alternative RIN retirement schedule beyond the 2020 compliance year.

*B. Overview of Compliance Approach*

For the reasons provided herein, we are providing an alternative RIN retirement schedule to small refineries for the 2020 compliance year to facilitate their transition into full compliance with the RFS program. This alternative RIN retirement schedule will decrease the number of RINs that small refineries must acquire in the near term, extend the time period over which small refineries can plan and implement their RIN transactions, and allow the use of RINs generated in future compliance years, thereby reducing the immediate financial impacts on small refineries, and in so doing the impacts on the RIN market and the RFS program as a whole within the broader fuels market.

Some commenters asserted that the alternative RIN retirement schedule would harm the RFS program and lead to increased uncertainty in the RIN market. The commenters stated that the market would not know how small refineries would choose to comply—whether by the 2020 compliance deadline or using the alternative RIN retirement schedule—and that this would undermine reliability and predictability in the RIN market. We disagree with these assertions. The alternative RIN retirement schedule aims to bring small refineries into a routine of complying with their RVOs, thereby restoring predictability and reliability in the RIN market while moderating the immediate impacts on the RFS program and fuels markets. While the alternative RIN retirement schedule may result in some limited uncertainty in the RIN market, we believe it is outweighed by the benefit of increasing the likelihood that small refineries will be able to comply with their 2020 obligations and that any such uncertainty can be reduced by providing greater transparency on the utilization

of the alternative RIN retirement schedule. Therefore, we intend to post information and aggregated data related to the alternative RIN retirement schedule on the RFS SRE website.[22] Such information may include the number of small refineries that opt-in to the alternative RIN retirement schedule, the refinery names and facility locations,[23] and the total portion of the 2020 RVO that small refineries are complying with using the alternative RIN retirement schedule. We believe that posting this information will provide necessary transparency as to the size and scope of the impact of the alternative RIN retirement schedule.

We are allowing any refinery that meets the definition of "small refinery"[24] for the 2020 compliance year to use this alternative RIN retirement schedule, regardless of whether it submitted an SRE petition for 2020 or recently received an SRE denial. Almost all small refineries submitted an SRE petition for 2020 that was denied in the June 2022 SRE Denial. We further believe that the alternative RIN retirement schedule should be provided to all small refineries because the previous uncertainty surrounding the availability of SREs potentially affected all small refineries, which "may at any time petition" for an SRE.[25]

Several commenters highlighted that the proposed regulations were inconsistent with EPA's stated intent in the preamble of the proposed rule to allow all small refineries to use the proposed alternative RIN retirement schedule. The proposed regulations, they noted, stated that a small refinery must meet the requirements of 40 CFR 80.1441(e)(2)(iii) in order to avail itself of the alternative RIN retirement schedule. The commenters stated that there is a distinction between meeting the requirements of the definition of "small refinery" in 40 CFR 80.1401 and qualifying for an SRE under 40 CFR 80.1441(e)(2)(iii).[26] We agree and have clarified the final regulations to reflect that a small refinery must meet the

definition of "small refinery" in 40 CFR 80.1401 in the applicable compliance year (*i.e.,* 2020) in order to elect to use the alternative RIN retirement schedule.

We did not receive any comments objecting to limiting the alternative RIN retirement schedule for 2020 to only small refineries and, therefore, are finalizing it as proposed. However, one commenter stated that EPA's prior action to retroactively reduce the 2020 standards to preserve the carryover RIN bank and ensure that sufficient RINs were available for 2020 compliance made the proposed alternative RIN retirement schedule unnecessary. We disagree with this assertion and believe that it is appropriate to provide this alternative RIN retirement schedule for small refineries for their 2020 RFS obligations because it responds to their unique circumstances at this time. Some small refineries have stated that they have not been acquiring RINs ratably while producing transportation fuels that incur an RFS obligation in anticipation of EPA granting their SRE petitions as it had in past years, a result that did not manifest.[27] Currently, the available RINs[28] small refineries need for compliance with their 2020 RVOs are being held in large part by other obligated parties that likely intend to use these RINs for compliance with their own RFS obligations, and those parties may not be willing to sell them.[29] While the revisions to the 2020

---

[22] See *https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rfs-small-refinery-exemptions.*

[23] 40 CFR 80.1402(c).

[24] CAA section 211(o)(1)(K), 40 CFR 80.1401.

[25] CAA section 211(o)(9)(B)(i).

[26] The definition of "small refinery" in 40 CFR 80.1401 requires that a refinery's average aggregate daily crude oil throughput does not exceed 75,000 bpd for a given year. The requirements of 40 CFR 80.1441(e)(2)(iii) require that a refinery meet the definition of "small refinery" for both the year in question and the year prior. For purposes of the proposed alternative RIN retirement schedule, the proposed regulations would have meant that a refinery needed to qualify as a "small refinery" for both 2019 and 2020 in order to use the alternative RIN retirement schedule.

[27] We note, however, that the RIN cost passthrough analysis presented in the April 2022 and June 2022 SRE Denials puts small refineries on notice regarding the high burden they bear when petitioning for an SRE to demonstrate that their alleged DEH is caused by compliance with the RFS program. Thus, absent a compelling demonstration that a small refinery experiences DEH caused by compliance with the RFS program, a small refinery should have no reasonable expectation that its SRE petition will be granted in the future and has no reason to again delay the acquisition of RINs to demonstrate compliance with its RFS obligations. This is a long-held position by EPA; for example, in its December 6, 2016, SRE guidance document, EPA stated that "[p]etitioning small refineries should always presume that they are subject to the requirements of the RFS program and include RFS compliance in their overall planning." Accordingly, as has been true in the past, every small refinery should plan and prepare to demonstrate compliance with their RFS obligations unless and until they receive an exemption.

[28] "Available RINs" refers to those RINs that can be used to demonstrate compliance because they have not been retired as required under 40 CFR 80.1434.

[29] RIN-holding data indicates that just four obligated parties—which represented approximately 40 percent of the 2019 total RVO—currently hold over half of all available 2019 RINs, and nine obligated parties—which represent approximately 55 percent of the 2019 total RVO—hold over three-quarters of all available 2019 RINs. Similarly, just five obligated parties currently hold over half of all available 2020 and 2021 RINs, and 12 obligated parties hold over three-quarters of all

Continued

standards made it possible for them to be met by the market as a whole, those revisions did not take targeted action to assist individual compliance by small refineries. For these reasons, many small refineries may not be prepared to comply with their 2020 RVOs by the 2020 compliance deadline. Therefore, we are providing small refineries with more time to acquire RINs and allow the use of a broader range of RIN vintages through the alternative RIN retirement schedule, which we believe will help

resolve some of the obstacles small refineries may currently be facing.

### III. Alternative RIN Retirement Schedule for Small Refineries for the 2020 Compliance Year

The alternative RIN retirement schedule is an extended period over which small refineries must acquire and retire RINs to demonstrate compliance with their 2020 RFS obligations. The alternative RIN retirement schedule includes five quarterly RIN retirement deadlines that extend into the 2024 calendar year, thereby allowing small

refineries to potentially use 2021, 2022, 2023, and 2024 RINs to satisfy a portion of their 2020 RVOs. We are providing this schedule to allow over 18 months between the June 2022 SRE Denial and the final 2020 RVO quarterly RIN retirement deadline of February 1, 2024, for small refineries to satisfy, in full, their 2020 RVOs. Table III.1 provides the alternative RIN retirement schedule and expected RIN vintages that can be used for each quarterly RIN retirement deadline, along with annual compliance reporting deadlines:

TABLE III.1—2020 RVO ALTERNATIVE RIN RETIREMENT SCHEDULE WITH ANNUAL COMPLIANCE REPORTING DEADLINES

| Milestone | Deadline | RIN vintage | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| 2019 Compliance Deadline ................................ | September 1, 2022 ..................... | C | X | ......... | ......... | ......... | ......... | ......... |
| 2020 Compliance Deadline ................................ | December 1, 2022 ..................... | | C | X | ......... | ......... | ......... | ......... |
| 2020 RVO RIN Retirement 1 (20%) .................... | February 1, 2023 ...................... | | ......... | X | X | X | X | ......... |
| 2021 Compliance Deadline ................................ | March 31, 2023 ......................... | | ......... | C | X | | | ......... |
| 2020 RVO RIN Retirement 2 (40%) .................... | May 1, 2023 ............................. | | ......... | X | X | X | X | ......... |
| 2020 RVO RIN Retirement 3 (60%) .................... | August 1, 2023 ......................... | | ......... | X | X | X | X | ......... |
| 2022 Compliance Deadline ª ............................. | September 1, 2023 ..................... | | ......... | C | X | ......... | ......... | ......... |
| 2020 RVO RIN Retirement 4 (80%) .................... | November 1, 2023 ..................... | | ......... | X | X | X | X | ......... |
| 2020 RVO RIN Retirement 5 (100%) .................. | February 1, 2024 ...................... | | ......... | X | X | X | X | X |
| 2023 Compliance Deadline ª ............................. | March 31, 2024 ......................... | | ......... | ......... | ......... | C | X | ......... |

ª The 2022 and 2023 compliance deadlines are provided for illustrative purposes but have not yet been established. See 40 CFR 80.1451(f)(1)(A).
X = RINs of this vintage may be used in any amount.
C = RINs of this vintage may be used to satisfy up to 20 percent of the RVO, per 40 CFR 80.1427(a)(5).

We are establishing these specific RIN retirement deadlines so that they will not overlap with other RFS compliance reporting deadlines. This approach will allow EPA staff to implement and oversee the RIN retirements more effectively and mitigate the potential for confusion on the part of participating small refineries that will have overlapping compliance reporting requirements. We are setting specific dates for these deadlines—as opposed to tying them to the effective date of this or another RFS-related action—to provide greater certainty regarding the RIN retirement deadlines under the alternative RIN retirement schedule.

We are establishing the five quarterly RIN retirement deadlines because this will allow small refineries additional time to acquire RINs, as well as provide small refineries with access to additional newer RIN vintages, as any valid RIN at the time of retirement can be used to demonstrate compliance. In this way, the alternative RIN retirement schedule strikes a balance between easing the compliance burden for small

refineries while not indefinitely postponing their compliance demonstrations, thereby also supporting the integrity of the RFS program and ensuring the use of renewable fuels in the U.S. The extended RIN retirement schedule and expanded RIN vintage eligibility will help individual small refineries fully comply, and in so doing will strengthen the entire RFS program following the recent delays in issuing SRE petition decisions for 2019 and 2020 and in establishing the RFS standards for 2021 and 2022 (and revised standards for 2020).

Several commenters stated that acquiring and retiring RINs for the 2020 compliance year over five quarterly installments would still impose too high of a compliance burden that small refineries could not bear. These commenters advocated for EPA to allow all small refineries to use the same approach to demonstrating compliance with their 2019 and 2020 RFS obligations that EPA provided to the 31 small refineries for their 2016–2018 RFS obligations in the Compliance Actions.

These commenters asserted that the RIN market fundamentally disadvantages small refineries that comply by purchasing RINs, and that the extended time to purchase RINs would not remedy this situation.

We disagree that using the approach suggested by commenters is appropriate for the 2019 and 2020 compliance years. First, the unique confluence of circumstances that justified the Compliance Actions for the 31 small refineries' 2016–2018 RFS obligations does not exist for the small refineries that have unmet 2019 and 2020 RFS obligations.[30] In particular, EPA had not previously granted SREs for 2019 and 2020, which it then subsequently revoked, nor do we find that compliance is not feasible for small refineries for 2019 and 2020. Second, we fundamentally disagree that a small refinery is disadvantaged by needing to purchase RINs instead of being able to blend renewable fuels into their petroleum-based transportation fuels to separate RINs, as explained in the June 2022 SRE Denial. Indeed, extending the

available 2020 and 2021 RINs. See "EMTS RIN Holding Data as of August 1, 2022," available in the docket for this action. RIN holdings are presented in relation to the 2019 total RVO because this is the

most recent year for which EPA has compliance data.

[30] See "April 2022 Alternative Compliance Demonstration Approach for Certain Small

Refineries Under the Renewable Fuel Standard Program," EPA–420–R–22–006, April 2022, at Section III.

unusual remedy provided in the Compliance Actions to the 2019 and 2020 RVOs would be wholly inappropriate, as it would be contrary to the purpose of transitioning small refineries into a compliance posture and ignore the unique circumstances that warranted such an extreme compliance demonstration for the 2016–2018 RVOs, thereby exacerbating uncertainty in the RIN market. Nevertheless, we believe the alternative RIN retirement schedule for 2020 is necessary and appropriate for facilitating RFS compliance by small refineries.

Under the alternative RIN retirement schedule, a small refinery must retire at least 20 percent of its 2020 RVOs by the first quarterly RIN retirement deadline, at least 40 percent by the second quarterly RIN retirement deadline, and so on, as laid out in Table III.1, such that a small refinery's full 2020 RVOs must be met on the final RIN retirement deadline of February 1, 2024. For example, under the alternative RIN retirement schedule, if a small refinery retired RINs sufficient to meet 30 percent of its 2020 RVOs by the 2020 compliance deadline of December 1, 2022, then it would not be obligated to retire additional RINs towards its 2020 RVOs until the second quarterly RIN retirement deadline (*i.e.*, May 1, 2023), at which time it would be obligated to retire RINs equal to at least 40 percent of its 2020 RVOs.

We are also allowing small refineries to use any valid RINs at the time of retirement for compliance, including RIN vintages after 2020 (*i.e.*, 2021, 2022, 2023, and 2024 RINs) until such RIN vintages expire (*e.g.*, 2021 RINs expire after the 2022 compliance deadline). This will allow small refineries access to additional RINs while maintaining compliance with the RFS regulations regarding the validity and expiration of RINs.[31] Doing so will increase the likelihood of a small refinery satisfying its outstanding 2020 obligations and that the volume targets are fulfilled. Given the relatively small proportion of the overall demand for RINs that is represented by all small refineries (*i.e.*, less than 10 percent of the total RVO for any given year) and that there is likely only a limited number of small refineries that will utilize the alternative RIN retirement schedule, we do not

anticipate that this action will have any significant impact on the overall RIN market in future years through increased demand for future year vintages given the small volume of RINs likely to be used through the alternative RIN retirement schedule as compared to the larger renewable fuels market.

One commenter asserted that it is inappropriate to allow the use of RINs generated in 2023 and 2024 as part of the alternative RIN retirement schedule because EPA has not yet established the RVOs for those years. However, the commenter did not explain why the fact the EPA has not yet set the standards for 2023 and 2024 makes the use of those vintage RINs inappropriate for the alternative RIN retirement schedule. Indeed, this is an integral aspect of the alternative RIN retirement schedule as it eases current RIN supply constraints and provides small refineries with sufficient time to plan and execute their RIN purchases.

Other commenters asserted that the proposal to allow small refineries to use 2023 and 2024 RINs for compliance with their 2020 obligations under the alternative RIN retirement schedule did not go far enough to support small refineries. These commenters asserted that EPA should allow small refineries to use any 2019 or 2020 RINs they currently hold for compliance in any compliance year through 2023. One commenter further suggested that EPA could create a separate compliance category for small refineries and set their RFS obligations at the same average percentage of their RVOs based on the number of RINs the group currently holds.

We disagree that these additional flexibilities are appropriate or necessary to bring small refineries into compliance with their RFS obligations. Small refineries currently holding 2019 or 2020 RINs are encouraged to use those RINs for 2019 or 2020 compliance, such that there will be fewer RINs that they need to acquire going forward. Additionally, EPA did not propose a new methodology to create small refinery-specific RVOs and such comments overlook the fact that the RFS obligations are already proportional to an obligated party's production of gasoline and diesel fuel. Moreover, CAA section 211(o)(3)(B)(ii)(III) requires EPA to establish a single annual standard applicable to all obligated parties. The commenter did not provide any explanation as to how EPA could establish a separate annual obligation for only small refineries under the terms of CAA section 211(o)(3)(B)(ii)(III).

We are requiring small refineries to notify EPA of their intent to use the

alternative RIN retirement schedule on or before the 2020 compliance deadline. This notice will inform EPA as to which small refineries are using the alternative RIN retirement schedule and will allow EPA to monitor and track the progress of the small refineries towards full compliance with their 2020 RVOs. We are requiring a small refinery to send us a letter signed by the responsible corporate officer expressing their intent to comply using the alternative RIN retirement schedule. We will acknowledge receipt of the small refinery's notification of their intent to comply using the alternative RIN retirement schedule. We did not receive any comments on this aspect of the proposal. Accordingly, we are finalizing as proposed.

Under the alternative RIN retirement schedule, we will still require that participating small refineries submit a 2020 annual compliance report by the 2020 compliance deadline. The 2020 annual compliance report is necessary to establish a small refinery's 2020 RVOs, which will be used by the small refinery to determine minimum RIN retirements for each installment under the alternative RIN retirement schedule, and for EPA to verify that the small refinery is meeting its quarterly RIN retirement obligations. We did not receive any comments on this aspect of the proposal and are finalizing it as proposed.

As a condition to use the alternative RIN retirement schedule, the obligated party that owns/operates the small refinery must, on its annual RFS compliance report, provide the individual-small refinery RVO for the 2020 compliance year (*i.e.*, comply on a refinery-basis for that small refinery). Under the RFS program, obligated parties must either comply with their RVOs on an individual-refinery basis or an aggregated basis (*i.e.*, they combine the RVOs from all of their refineries). If an obligated party owns other refineries with RVOs in addition to the small refinery and complies on an aggregated basis, it would be unclear what portion of the aggregated RVOs apply to only the small refinery and whether the obligated party has met the RIN retirement quotas under the alternative RIN retirement schedule. Therefore, as a condition for a small refinery to use the alternative RIN retirement schedule, the small refinery must demonstrate compliance on an individual basis so that RINs can be retired for the specific small refinery's RVOs. Similarly, if an obligated party carries forward a RIN deficit from 2019 into 2020, that obligated party would need to comply on an individual-refinery basis for the

---

[31] 40 CFR 80.1428(a) specifies that any RIN that is not used for compliance purposes for the calendar year in which it was generated, or for the following calendar year, will be considered an expired RIN. Pursuant to 40 CFR 80.1431(a), an expired RIN will be considered an invalid RIN. We are not reopening these regulations, nor the regulations associated with which RIN vintages are available for compliance under 40 CFR 1427(a).

2019 compliance year as well. This condition allows EPA to track the small refinery's progress towards compliance with its 2020 obligations more effectively, and will not unduly hinder obligated parties in making their compliance demonstrations. We did not receive any comments on this aspect of the proposal. Accordingly, we are finalizing as proposed.

We are not changing the regulatory provisions governing the use of cellulosic waiver credits (CWCs). The regulations currently state that CWCs "may only be used for an obligated party's current-year cellulosic biofuel RVO and not towards any prior year deficit cellulosic biofuel volume obligations." [32] We believe this approach is appropriate because, in recent years, the use of CWCs has decreased as obligated parties have largely been complying with their cellulosic RVO through RIN retirements.[33] Accordingly, small refineries wishing to use CWCs for their 2020 cellulosic biofuel RVO must purchase and use CWCs by the 2020 compliance deadline.[34] Additionally, allowing small refineries to use CWCs to meet their cellulosic biofuel RVO through the alternative RIN retirement schedule (*i.e.,* after the 2020 compliance deadline) would introduce logistical challenges for EPA and small refineries that would complicate the implementation of the alternative RIN retirement schedule. Moreover, it is unlikely that modifications to the CWC regulations would provide small refineries with a meaningful benefit in complying with their RFS obligations, when viewed in light of what we have already provided in this alternative RIN retirement schedule. We did not receive any comments on this aspect of the proposal and are finalizing it as proposed.

Under the alternative RIN retirement schedule, a participating small refinery will not be permitted to carry forward a RIN deficit from 2021 or a subsequent year into the following compliance year unless it had fully complied with its 2020 RFS obligations. We are imposing this condition as a prerequisite to carrying forward a future RIN deficit because we want to prevent the scenario in which a small refinery continuously accrues annual RIN deficits, placing it in the position where it is no longer

capable of complying with its accrued RFS obligations. The alternative RIN retirement schedule is intended to support small refineries in achieving and maintaining full compliance with their RFS obligations and get them on track for future compliance, not to permit them to indefinitely delay their compliance demonstrations.

Some commenters supported the RIN deficit carry-forward restriction, while several other commenters opposed this limitation as being contrary to EPA's goal of providing meaningful support to small refineries to achieve compliance. The commenters opposing this restriction also asserted that it is contrary to CAA section 211(o)(5)(D) in that it denies small refineries that would be in compliance with the alternative RIN retirement schedule a statutory flexibility that would otherwise be available to them. We disagree that this restriction is contrary to CAA section 211(o)(5)(D). In this instance, EPA is allowing small refineries to carry forward RIN deficits from 2019 into 2020 and satisfy their combined obligations using the alternative RIN retirement schedule. Thus, EPA is not depriving small refineries of that statutory flexibility. However, as the statute requires that such a deficit be satisfied in the next compliance year, and the compliance demonstration for 2020 is prolonged by the alternative RIN retirement schedule, it would be a violation of the statute and regulations to allow additional deficits to be carried forward. Moreover, even if a small refinery chose not to carry forward a 2019 RIN deficit and only used the alternative RIN retirement schedule for its 2020 RVOs, permitting a 2021 deficit to be carried forward before the 2020 obligations have been fully satisfied would only encourage small refineries to again delay their compliance preparation and demonstration, contrary to the goals of the alternative RIN retirement schedule and the RFS program. Additionally, a small refinery would again be eligible to carry forward a deficit upon full demonstration of its 2020 obligation; thus, it is the decisions of the small refinery itself that determine whether or not they can utilize the statutory and regulatory flexibilities provided by the deficit carry forward provision.

We note that all of the already existing regulatory flexibilities for small refineries—including the ability to satisfy up to 20 percent of their 2019 RVOs using 2018 carryover RINs under 40 CFR 80.1427(a)(5) and the ability to carry forward a RIN deficit from 2019 to 2020 if they did not carry forward a RIN deficit from 2018 under 40 CFR

80.1427(b)—will continue to be available under the alternative RIN retirement schedule. It should also be noted that other current RFS regulations will also remain in effect, including that small refineries that use 2018 RINs to meet up to 20 percent of their 2019 RVOs must do so by the 2019 compliance deadline because 2018 RINs expire after the 2019 compliance deadline and become invalid.[35] Similarly, any 2019 RINs that a small refinery uses to satisfy up to 20 percent of its 2020 RVOs must be retired for compliance by the 2020 compliance deadline because 2019 RINs expire after the 2020 annual compliance deadline and become invalid.[36]

As described above, participating small refineries will still be able to use any valid RINs at the time of retirement under the alternative RIN retirement schedule. We believe that this approach will encourage participating small refineries to retire a maximum number of 2019 RINs for their 2020 RVOs while providing flexibility for small refineries to obtain and retire valid RINs for 2021, 2022, 2023, and 2024 to satisfy their 2020 RVOs.

To help implement the alternative RIN retirement schedule for participating small refineries, we intend to assist parties with procedures for submitting forms that they would use. For example, we plan to leverage existing forms and procedures for the submission of reports and transactions under our e-reporting systems. Due to the limited number of small refineries, we plan to work individually with participating small refineries. To further help communicate this alternative RIN retirement schedule for small refineries, we also intend to post the deadlines for the alternative RIN retirement schedule on our website.[37]

Lastly, we received comments from one commenter that were beyond the scope of this rulemaking. This commenter raised issues facing the RFS program as a whole, such as renewable fuel blending challenges relating to the E10 "blendwall," the imposition of RIN price controls, and the potential environmental impacts of renewable fuel production. While the proposed RIN retirement schedule touched on many challenges small refineries currently face—including the final RFS standards, RIN price controls, and the environmental impacts of renewable fuel production—these matters are

---

[32] 40 CFR 80.1456(b)(4).

[33] See Table 4: RFS2 RIN Retirements in EMTS Nested by RVO and Table 6: Cellulosic Waiver Credits Purchased Annually at *https://www.epa.gov/fuels-registration-reporting-and-compliance-help/annual-compliance-data-obligated-parties-and.*

[34] 40 CFR 80.1456(c)(2).

[35] 40 CFR 80.1427(a)(6), 80.1428(c).

[36] 40 CFR 80.1427(a)(6).

[37] Information related to annual compliance and attest engagement reporting is available at *https://www.epa.gov/fuels-registration-reporting-and-compliance-help/reporting-fuel-programs.*

beyond the scope of this rulemaking. Many of these issues, moreover, have been addressed in separate proceedings. Therefore, these topics are not further addressed in this action.

## IV. Statutory and Executive Order Reviews

Additional information about these statutes and Executive orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

This action is not a significant regulatory action and was therefore not submitted to the Office of Management and Budget (OMB) for review.

### B. Paperwork Reduction Act (PRA)

The information collection activities in this final rule have been submitted for approval to the Office of Management and Budget (OMB) under the PRA. The Information Collection Request (ICR) document that the EPA prepared has been assigned EPA ICR number 2718.02. You can find a copy of the ICR in the docket for this rule, and it is briefly summarized here. The information collection requirements are not enforceable until OMB approves them.

The information to be collected is necessary to implement the alternative RIN retirement schedule for small refineries. As part of this rule, a participating small refinery will submit a notification to EPA indicating that the small refinery will use the alternative RIN retirement schedule and maintain records related to the determination and retirement of RINs under the alternative RIN retirement schedule. We estimate that 13 small refineries will use the alternative RIN retirement schedule.

*Respondents/affected entities:* Small refineries.

*Respondent's obligation to respond:* Mandatory in order to receive compliance flexibility under § 80.1444.

*Estimated number of respondents:* 39.[38]

*Frequency of response:* Notification letters would typically be a one-time response. Recordkeeping is performed on occasion, and as needed.

*Total estimated burden:* 19 hours (per year). Burden is defined at 5 CFR 1320.3(b).

*Total estimated cost:* $1,710, all of which is labor costs, and which includes $0 annualized capital or operation & maintenance costs.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for the EPA's regulations in 40 CFR are listed in 40 CFR part 9. When OMB approves this ICR, EPA will announce that approval in the **Federal Register** and publish a technical amendment to 40 CFR part 9 to display the OMB control number for the approved information collection activities contained in this final rule.

### C. Regulatory Flexibility Act (RFA)

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. In making this determination, EPA concludes that the impact of concern for this rule is any significant adverse economic impact on small entities and that the agency is certifying that this rule will not have a significant economic impact on a substantial number of small entities because the rule has no net burden on the small entities subject to the rule. This action reduces burden to small refineries by creating an alternative RIN retirement schedule for their 2020 RVOs. As small refineries have no obligation to use the alternative RIN retirement schedule, there is no additional cost to small refineries if they simply comply with the existing regulatory schedule. We do not anticipate that there will be any costs associated with these changes and that the alternative RIN retirement schedule may reduce costs. We have therefore concluded that this action will have no net regulatory burden for all directly regulated small entities.

### D. Unfunded Mandates Reform Act (UMRA)

This action does not contain an unfunded mandate of $100 million or more as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. This action imposes no enforceable duty on any state, local, or tribal governments. Requirements for the private sector do not exceed $100 million in any one year.

### E. Executive Order 13132: Federalism

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the National Government and the states, or on the distribution of power and responsibilities among the various levels of government.

### F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

This action does not have tribal implications as specified in Executive Order 13175. This action only affects RFS obligated parties. Thus, Executive Order 13175 does not apply to this action.

### G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of the Executive order. This action is not subject to Executive Order 13045 because it does not concern an environmental health or safety risk.

### H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

### I. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51

This action does not involve technical standards.

### J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

EPA believes that this action is not subject to Executive Order 12898 (59 FR 7629, February 16, 1994) because it does establish an environmental health or safety standard. This action addresses the 2020 compliance deadline for small refineries only and does not impact the RFS standards themselves.

### K. Congressional Review Act (CRA)

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United

---

[38] We note that under this alternative RIN retirement schedule, each participating small refinery will have to submit a notification letter, keep records of the submitted notification letter, and keep records of the methods and variables used to determine RIN retirements under the alternative RIN retirement schedule. For purposes of estimating burden associated with reporting and recordkeeping as a result of this rule, we count each small refinery three times. Because we estimate that 13 small refineries will elect to take advantage of the alternative RIN retirement schedule, we estimate that the total number of respondents under this collection will be 39.

States. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

## V. Statutory Authority

Statutory authority for this action comes from section 211(o) of the Clean Air Act, 42 U.S.C. 7545(o).

## List of Subjects in 40 CFR Part 80

Environmental protection, Administrative practice and procedure, Air pollution control, Diesel fuel, Fuel additives, Gasoline, Imports, Oil imports, Penalties, Petroleum, Renewable fuel, Reporting and recordkeeping requirements.

**Michael S. Regan,**
*Administrator.*

For the reasons set forth in the preamble, EPA amends 40 CFR part 80 as follows:

## PART 80—REGISTRATION OF FUELS AND FUEL ADDITIVES

■ 1. The authority citation for part 80 continues to read as follows:

**Authority:** 42 U.S.C. 7414, 7521, 7542, 7545, and 7601(a).

## Subpart M—Renewable Fuel Standard

■ 2. Add § 80.1444 to read as follows:

### § 80.1444 Alternative RIN retirement schedule for small refineries.

(a) *Applicability.* The provisions of this section apply to the following compliance years:

(1) 2020.

(2) [Reserved]

(b) *Eligibility.* Any obligated party that has a refinery that meets the definition of small refinery in § 80.1401 for the applicable compliance year in paragraph (a) of this section (hereinafter the "applicable compliance year") is eligible to use the provisions of this section for each small refinery it operates (hereinafter the "small refinery").

(c) *Treatment of RVOs.* (1) In lieu of retiring sufficient RINs under § 80.1427(a) to demonstrate compliance with the small refinery's RVOs for the applicable compliance year by the applicable compliance deadline, the obligated party must meet all the requirements of this section and all other applicable requirements of this subpart.

(2) If the obligated party does not meet all of the requirements in this section, the obligated party is subject to the requirements of § 80.1427(a).

(d) *Individual facility compliance.* (1) If the obligated party carries a deficit into the applicable compliance year from the previous compliance year, the

obligated party must comply with its RVOs for each refinery it operates on an individual basis (as specified in § 80.1406(c)) for both the previous compliance year and the applicable compliance year.

(2) If the obligated party does not carry a deficit into the applicable compliance year from the previous compliance year, the obligated party must comply with its RVOs for each refinery it operates on an individual basis (as specified in § 80.1406(c)) for the applicable compliance year.

(e) *Compliance report submission and notification.* The obligated party must do all the following by the annual compliance reporting deadline specified in § 80.1451(f)(1)(i) for the applicable compliance year (hereinafter the "applicable compliance deadline"):

(1) Submit an annual compliance report for the small refinery for the applicable compliance year.

(2) Notify EPA in a letter signed by the responsible corporate officer (RCO) or RCO delegate, as specified at 40 CFR 1090.800(d), of its intent to use the provisions of this section for the small refinery.

(f) *Alternative RIN retirement schedule.* The obligated party must retire sufficient RINs to satisfy the minimum percentages of each and every RVO for the applicable compliance year (as determined under § 80.1407(a)) according to the following RIN retirement schedule:

(1) For the 2020 compliance year:

TABLE 1 TO PARAGRAPH (f)(1)—2020 COMPLIANCE YEAR RIN RETIREMENT SCHEDULE

| Minimum 2020 RVOs percentage RIN retirement | Deadline |
| --- | --- |
| 20 | February 1, 2023. |
| 40 | May 1, 2023. |
| 60 | August 1, 2023. |
| 80 | November 1, 2023. |
| 100 | February 1, 2024. |

(2) [Reserved]

(g) *RIN vintages and retirements.* (1) The obligated party may retire for compliance any valid RINs at the time of retirement towards the small refinery's RVOs for the applicable compliance year and is exempt from the requirements in § 80.1427(a)(6)(i).

(2) The obligated party must not retire for compliance any prior-year RINs for the small refinery's RVOs after the applicable compliance deadline.

(h) *Deficit carry-forward for subsequent compliance years.* The obligated party may not carry forward any deficit under § 80.1427(b) for the

small refinery for compliance years after the applicable compliance year until it has retired sufficient RINs to satisfy each and every RVO for the applicable compliance year in its entirety.

(i) *Forms and procedures.* The obligated party must submit annual compliance reports and retire RINs under this section using forms and procedures specified by EPA under §§ 80.1451(j) and 80.1452(d).

■ 3. Amend § 80.1454 by adding paragraph (a)(7) to read as follows:

### § 80.1454 What are the recordkeeping requirements under the RFS program?

(a) * * *

(7) Any obligated party that uses the provisions of § 80.1444 for a small refinery must keep the following records:

(i) Copies of any notifications submitted to EPA under § 80.1444(e)(2).

(ii) Copies of the methods and variables used to calculate the number of RINs retired for the alternative RIN retirement schedule under § 80.1444(f).

* * * * *

[FR Doc. 2022–18870 Filed 9–1–22; 8:45 am]

**BILLING CODE 6560–50–P**

---

## GENERAL SERVICES ADMINISTRATION

### 41 CFR Part 102–74

[FMR Case 2022–02; Docket No. GSA–FMR–2022–0011, Sequence No. 1]

**RIN 3090–AK54**

### Federal Management Regulation; Soliciting Union Memberships Among Contractors in GSA-Controlled Buildings

**AGENCY:** Office of Government-wide Policy (OGP), General Services Administration (GSA).

**ACTION:** Final rule.

**SUMMARY:** GSA is issuing a final rule amending the Federal Management Regulation (FMR) to revise the soliciting, vending, and debt collection policy. The rule will update policies consistent with the White House Task Force on Worker Organizing and Empowerment recommendations to revise the FMR. This rule will clarify that activities related to worker organizing and collective bargaining among contractors' employees working in Federal Government facilities are not covered or restricted by the general prohibition on soliciting, posting and distributing materials in or on Federal property under the jurisdiction, custody or control of GSA (GSA-controlled property).